IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff<br><br>vs.<br><br>MERRILL SCOTT & ASSOCIATES, LTD., et al.,<br><br>                      Defendants. | ORDER AND MEMORANDUM DECISION<br><br>2:02 CV 39 |

      Michael G. Licopantis is one of three individuals named as defendants in this action by the Securities and Exchange Commission. Like David Ross II, another individually named defendant, Mr. Licopantis has agreed to the entry of a Consent and Proposed Judgment in which he neither admits nor denies the allegations against him but consents to the imposition of the injunctive relief requested by the SEC in its Complaint. (See Consent of Michael G. Licopantis (dkt. #742).)

      In the Consent and Proposed Judgment, Mr. Licopantis acknowledges that the SEC may request that the court impose a civil monetary penalty on Mr. Licopantis. (See id. at 3.) The SEC has now filed such a request, arguing that Mr. Licopantis should be fined $110,000. According to the SEC, such a fine is necessary to penalize Mr. Licopantis for the part he played in the financial fraud that preceded the collapse of Merrill Scott & Associates, Ltd., ("Merrill

Scott")[1] and also to deter future violations of the securities laws. Mr. Licopantis opposes the SEC's motion, arguing that a civil fine is not appropriate under the circumstances of this case. After reviewing the materials submitted by the parties and considering the argument offered by counsel at the hearing on this matter, the court agrees with the SEC that the imposition of a fine is appropriate in this case. For the reasons set out more fully below, the court orders Mr. Licopantis to disgorge $1 and to pay a civil fine of $110,000.[2]

## Background

Mr. Licopantis's relationship with Merrill Scott began in late 1998, when he answered an advertisement placed by Merrill Scott in *The Wall Street Journal*. According to the advertisement, Merrill Scott was seeking someone to serve as a financial advisor. At the time Mr. Licopantis contacted Merrill Scott, he had already amassed an impressive employment record. For example, Mr. Licopantis had worked in management positions with the Hartford Insurance Group, Aim Capital Management, and E.F. Hutton Insurance Group. Considering his level of expertise and his past work experience, Merrill Scott was, not surprisingly, interested in hiring Mr. Licopantis.

After the initial contact with Merrill Scott, Mr. Licopantis traveled to Salt Lake City, Utah, Merrill Scott's base of operations, to meet Patrick Brody, a Merrill Scott principal. According to Mr. Licopantis, Merrill Scott exhibited all the outward trappings of a successful

---

[1] Merrill Scott is just one of numerous related entities directly involved in the scheme outlined in the SEC's Complaint. For convenience, the court refers to Merrill Scott and the Merrill Scott-related entities collectively as "Merrill Scott."

[2] During oral argument, the SEC requested that the court order Mr. Licopantis to disgorge a nominal amount of money in order to trigger the Fair Fund provision of the Sarbanes-Oxley Act of 2002, which would allow Merrill Scott victims to recover the civil penalty imposed against Mr. Licopantis. See 15 U.S.C. § 7246.

and legitimate business enterprise. After the Salt Lake City meeting, Merrill Scott formally offered Mr. Licopantis a position, which he accepted.

After hiring Mr. Licopantis, Merrill Scott did not hesitate to tout Mr. Licopantis's qualifications to existing and potential clients, stating in promotional materials that Mr. Licopantis had "in excess of thirty years of diverse investment experience managing institutional and high net worth portfolios." (Merrill Scott Promotional Material 12, attached as Ex. 8 to Ex. 1 to Mem. in Supp. of Mot. for Imposition of Civil Monetary Penalty Against Def. Michael G. Licopantis (dkt. #698).)

Mr. Licopantis moved to Salt Lake City in January of 1999. Once there, he began to work as an investment manager and advisor for two Merrill Scott entities: Phoenix Overseas Advisors, Ltd. ("POA"), and Gibraltar Permanente Assurance, Ltd. ("GPA"). POA and GPA served different Merrill Scott purposes. POA was organized to serve as an investment arm of Merrill Scott. POA administered a variety of investment funds and maintained brokerage accounts at TD Evergreen, a brokerage firm, into which investor and corporate funds were deposited. GPA, on the other hand, offered Merrill Scott clients insurance products, including loss of income policies and foreign annuities.

A short time after Mr. Licopantis's arrival in Salt Lake City, Mr. Brody learned that it was necessary for POA to register with the SEC as an investment advisor. Instead of registering with the SEC, Mr. Brody decided to move the operations of POA offshore to The Bahamas. Mr. Brody then asked Mr. Licopantis to move to the Bahamas to facilitate the management of POA. Mr. Licopantis agreed and, in the fall of 1999, began to serve as the general manager for both POA and GPA from his new location on the island of Nassau in The Bahamas.

Both POA and GPA served critical roles in furthering the business operations of Merrill Scott.  Merrill Scott would routinely prepare a Master Financial Plan ("MFP") for the benefit of a particular client.  The MFPs prepared by Merrill Scott would typically encourage clients to make use of the investment opportunities offered by POA and would also encourage the purchase of insurance products offered by GPA.  The offerings of POA and GPA were presented to Merrill Scott clients as a vehicle for securing offshore tax-free investment growth.  Merrill Scott's sales pitch proved effective and soon Merrill Scott had attracted numerous clients who made use of both POA and GPA, funneling a substantial amount of money into the entities.

As general manager, Mr. Licopantis had ostensible authority over the assets maintained or managed by POA and GPA.  Consistent with that authority, Mr. Licopantis opened securities trading accounts in POA's name with TD Evergreen and TD Securities (USA), Inc.  Mr. Licopantis had trading authority in those accounts and bought and sold investments on behalf of Merrill Scott clients.

But the authority to access and control POA assets was not vested in Mr. Licopantis alone.  According to the SEC, Merrill Scott was structured in a manner that allowed Mr. Brody to access client assets as he wished.  Mr. Brody's reach extended into the POA and GPA organizations.  The SEC alleges that Mr. Brody misappropriated approximately $14 million in investor funds to (1) pay for his own personal expenses, (2) pay operating expenses associated with Merrill Scott, (3) make unauthorized high-risk investments in start-up companies, and (4) fund a massive Ponzi scheme.

One of the methods Mr. Brody used to acquire client assets was to "margin" the TD Evergreen accounts.  Mr. Brody used this method even though Merrill Scott investors did not

authorize Mr. Brody, or anyone affiliated with Merrill Scott, to margin the investment accounts. During 1999, Mr. Licopantis became aware of Mr. Brody's margining of the TD Evergreen accounts. In fact, Mr. Licopantis had discussions with representatives of TD Evergreen concerning Mr. Brody's actions.

Mr. Licopantis made attempts to control the damage caused by Mr. Brody and also tried to put in place internal controls that would prevent future misuse of investor funds. Mr. Licopantis refused to actively participate in margin borrowing by Mr. Brody or by Alex Jones, Ltd., a Bahamian company controlled by Mr. Brody. Additionally, Mr. Licopantis convinced Mr. Brody to sign an agreement that required Merrill Scott to maintain unencumbered collateral valued at an amount acceptable to POA that equaled at least the total indebtedness of Alex Jones. Under the terms of the agreement, Mr. Brody agreed to a reduction in salary to the extent necessary to correct any shortfall in the value of collateral. Mr. Licopantis also formally recommended that Merrill Scott take measures to reduce expenses, hoping that the reduction in expenses would decrease the temptation to Mr. Brody to borrow client funds.

Mr. Licopantis was aware that Mr. Brody had pooled all the TD Evergreen funds into one large account so that the investor money could be aggregated for borrowing purposes. Recognizing the risks associated with the pooling of investor funds, Mr. Licopantis created individual separate accounts for investors from the pooled fund. Mr. Brody promptly ordered the consolidation of the newly separate accounts. Despite the pooling of the TD Evergreen accounts, Mr. Licopantis tried to keep an accounting of each individual investor's interest in the combined account and also tracked the margin borrowing against individual investors' interests. Mr. Licopantis forwarded that information to Merrill Scott, and maintains that he believed Merrill

Scott was providing the information to individual investors. The account statements prepared by Mr. Licopantis and forwarded to Merrill Scott included a disclosure statement of his own drafting, which indicated that investor funds may be pooled and margined.

Mr. Brody's misappropriation was not confined to POA alone. He also borrowed money from GPA. GPA generally received funds from Merrill Scott clients in the form of insurance premiums. GPA represented that a significant portion of the premium would be invested on behalf of the Merrill Scott client with a guaranteed 5% rate of return. In fact, Mr. Brody was borrowing against the GPA funds, some of which were held by TD Evergreen, in the same manner in which he was borrowing against POA funds. Mr. Brody, through Alex Jones, was also borrowing GPA funds that were held in GPA's own bank and investment accounts. Mr. Licopantis recommended that GPA change the manner in which it handled its insurance products in an attempt to prevent Mr. Brody's actions. But Mr. Brody, who served on GPA's Product Development Committee, insisted that policy management remain unchanged.

The contentious relationship between Mr. Licopantis and Mr. Brody continued throughout Mr. Licopantis's association with Merrill Scott. In December of 2000, Mr. Licopantis resigned as an officer and director of POA and GPA. But he remained with Merrill Scott as an employee through June of 2001. Mr. Licopantis contends that he stayed on as a Merrill Scott employee after his December resignation because he was awaiting the results of a financial audit of POA and GPA. According to Mr. Licopantis, he was hopeful that he could take the results of the audit to the POA and GPA boards and convince them to take aggressive action to correct the management problems. Mr. Licopantis ultimately left Merrill Scott, and The Bahamas, before the audit was complete.

Several months after Mr. Licopantis ended his association with Merrill Scott, the SEC filed the present lawsuit. In its Complaint, the SEC alleges that while working with Merrill Scott Mr. Licopantis violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and also alleges that Mr. Licopantis aided and abetted violations of Section 206(1) and (2) of the Investment Advisors Act. Although the SEC alleges multiple claims against Mr. Licopantis, in its current motion it has requested the imposition of only a single penalty. By all accounts, Mr. Licopantis has cooperated fully with the SEC and other governmental authorities following the filing of the SEC's Complaint, producing many relevant documents, meeting with authorities on multiple occasions, and answering numerous questions.

## Analysis

Mr. Licopantis, without confirming or denying the allegations levied against him in the SEC's Complaint, has consented to the entry of a final judgment against him that grants the SEC the injunctive relief it requested in its Complaint. The SEC now requests a civil monetary penalty against Mr. Licopantis in the amount of $110,000. Both the Securities Act and the Exchange Act provide for civil penalties to remedy violations of federal securities laws. See 15 U.S.C. §§ 77t(d) and 78u(d)(3). "A monetary penalty is designed to serve as a deterrent against securities law violations." SEC v. Lybrand, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003) (citing SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998); SEC v. Tanner, 02 Civ. 306, 2003 WL 21523978, *2 (S.D.N.Y. July 3, 2003); SEC v. Moran, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

The United States Code outlines three "tiers" of penalty amounts running from $5000 to $100,000. See 15 U.S.C. §§ 77t(d) and 78u(d)(3). The SEC requests the imposition of a third-

tier penalty against Mr. Licopantis in the amount of $110,000.[3]  A third-tier penalty is appropriate when a violation of the federal securities laws "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Id.  The burden is on the SEC to make "a proper showing" that the imposition of a penalty is appropriate. See id.  But "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances." Id.

Consideration of numerous factors is warranted when determining whether to impose a civil penalty and, if a penalty is imposed, when setting the amount of that penalty.  See Lybrand, 281 F. Supp. 2d at 730.  The factors that courts generally consider include

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

Id. (citing Robinson, 2002 WL 1552049 at *10; SEC v. McCaskey, 98 Civ. 6153, 2002 WL 850001, *14 (S.D.N.Y. March 26, 2002); SEC v. Coates, 137 F. Supp. 2d 413, 428-29 (S.D.N.Y. 2001); SEC v. Todt, 98 Civ. 3980, 2000 WL 223836, *13 (S.D.N.Y. Feb. 25, 2000).  A weighing of the above factors supports the imposition of a third-tier penalty against Mr. Licopantis.

Mr. Licopantis worked as the managing director and chief investment officer for two of

---

[3] The Debt Collection Improvement Act of 1996 adjusts the rate of civil monetary penalty amounts to reflect inflation.  The $110,000 penalty requested by the SEC is consistent with the maximum third-tier penalty amount in effect during the time Mr. Licopantis associated with Merrill Scott. See 17 CFR § 201.1001 (Nov. 8 1996) and 17 CFR § 201.1002 (Feb. 2, 2001).

the most active Merrill Scott entities, POA and GPA, both of which played crucial roles in Merrill Scott's overall business scheme. By virtue of his position in those entities, Mr. Licopantis had knowledge of Mr. Brody's actions and was also aware that the events unfolding at Merrill Scott amounted to egregious violations of federal law as well as serious violations of trust between Merrill Scott and its clients. Mr. Licopantis, as a primary mover in POA and GPA, was also intimately familiar with the substantial nature of the financial risk to which Merrill Scott was exposing its clients. In fact, on December 16, 1999, Mr. Licopantis sent a memorandum to Mr. Brody stating that "[Merrill Scott] has been a drift [sic] for some time. Currently, it is out of control." (Memorandum from Michael G. Licopantis to Pat Brody, Dec. 16, 1999, attached as Ex. B to Ex. 1 of Exhibits to Memo. in Opp'n to Mot. for Imposition of Civil Monetary Penalty Against Michael G. Licopantis (dkt. #744).) While the record indicates that Mr. Licopantis did not directly endorse the actions taken by Mr. Brody, Mr. Licopantis essentially abandoned his responsibilities to Merrill Scott clients and law enforcement authorities by abdicating any authority or ability he may have possessed to bring a quicker end to Merrill Scott's actions.

     In his December 16, 1999 memorandum to Mr. Brody, Mr. Licopantis acknowledged his understanding that Mr. Brody had the ability to manage and use Merrill Scott funds, including those held by POA and GPA as he saw fit, stating that "[p]olicy is unilaterally formulated without my participation. I am advised of changes in areas reportedly that I am held accountable. . . . I am simply an employee carrying out the directives of Salt Lake City. This is not a threat of resignation but a recognition of the current state of affairs." (Id.) Mr. Licopantis's assessment of his role at Merrill Scott is borne out by the record. He may not have approved of the actions taken by those around him, but he allowed those actions to occur, in essence "carrying out the

directives" of his superiors in the Merrill Scott organization.  (See id.)

       To Mr. Licopantis's credit, he did sound the alarm within the company and made efforts to bring some stability and control to Merrill Scott's business practices.  But at the same time, Mr. Licopantis projected an aura of confidence to Merrill Scott investors, frequently reassuring them that their money was safely invested when he knew full well that millions of dollars were at substantial risk.  (See Ex. 19, Depo. of Jeffrey B. Bowen, May 15, 2003, at 61-62 (stating that Mr. Licopantis never indicated that investment accounts were being used in a manner inconsistent with investor's wishes or that there was any need for concern); Ex. 20, Depo. of Jay R. Sharp, Sr., Oct. 18, 2005, at 59-63, 98 ("I got on an airplane and went to the Bahamas and visited with Mike Licopantis who assured me that every dime that I had invested was where it was supposed to be."); Ex. 3, Depo. of Thomas Shelton Powers, M.D., Sept. 26, 2003, at Vol. II: 284, 399-400 (stating that he was promised that investment accounts would remain separate and that the stock held in those accounts would not be margined); all attached as exhibits to Exhibits 1-23 to Plf. SEC's Memo. in Supp. of Mot. for Imposition of Civil Monetary Penalty Against Def. Michael G. Licopantis (dkt. #701).)  All told, the SEC estimates that Merrill Scott investors lost approximately $14 million as a result of Mr. Brody's deception.

       Despite his acquiescence to Mr. Brody's actions, Mr. Licopantis argues that it would be inappropriate to impose a monetary penalty against him because he has not repeatedly violated securities laws and the need for court action to deter him from committing future violations is small.  It does appear that Mr. Licopantis enjoyed a distinguished career, free from any accusation of illegal or unethical practices, before he joined Merrill Scott.  Nevertheless, Mr. Licopantis's argument overlooks the fact that civil penalties are not designed to deter future

violations by the individual being fined alone, but also to deter violations of securities laws generally.  Further, while Mr. Licopantis does not meet the profile of a serial offender of federal securities laws, the record establishes that he remained at Merrill Scott even though he was growing increasingly aware Merrill Scott's questionable practices.  As already mentioned, Mr. Licopantis declared in late 1999 that Merrill Scott was "out of control," yet he did not break from the company until June of 2001.  Mr. Licopantis continued to work for Merrill Scott after he gained knowledge that Merrill Scott was engaging in deceptive practices and, during that time, Merrill Scott was able to use Mr. Licopantis's experience and reputation as a means of attracting additional clients, which in turn led to additional loss.

It is also worth noting that Mr. Licopantis's willingness to cooperate with the authorities in this matter is admirable and weighs against the imposition of a civil penalty.  But when the totality of the factors identified above are considered and weighed, Mr. Licopantis's positive actions are not sufficient to outweigh the role he played in Merrill Scott's fraudulent and improper practices.[4]

## Conclusion

A review of the facts and circumstances of the present case supports the imposition of a third-tier civil monetary penalty against Mr. Licopantis.  The court acknowledges that Mr. Licopantis took steps within the Merrill Scott organization that were designed to reign in deceptive practices and that Mr. Licopantis also tried to minimize the financial exposure of

---

[4] Many courts consider the present financial situation of a defendant before deciding whether to impose a penalty or when setting the amount of a penalty.  Mr. Licopantis has not provided any evidence relating to his current financial status and has made no claim that he lacks the ability to pay a fine.  Accordingly, the current state of Mr. Licopantis's finances play no role in the court's decision to impose a $110,000 fine.

Merrill Scott investors. Mr. Licopantis has also cooperated with authorities investigating Merrill Scott. While the positive acts taken by Mr. Licopantis are commendable, they do not counteract the fact that Mr. Licopantis actively participated and acquiesced in a significant amount of activity that he knew was improper. Instead of warning Merrill Scott investors or contacting the authorities, Mr. Licopantis choose to remain with Merrill Scott, lending the institution his experience and prestige, all while making ultimately futile attempts to correct Merrill Scott's course. Mr. Licopantis simply knew too much to do so little. For the foregoing reasons, the court orders Mr. Licopantis to disgorge $1 and to pay a civil monetary penalty in the amount of $110,000.

SO ORDERED this 28th day of November, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge