IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff<br><br>vs.<br><br>MERRILL SCOTT & ASSOCIATES, LTD., et al.,<br><br>                    Defendants. | ORDER AND MEMORANDUM DECISION<br><br>2:02 CV 39 |

      This matter is before the court for the resolution of cross motions for summary disposition. At issue is certain property that the court-appointed Receiver for Merrill Scott and Associates, Ltd. claims are part of the receivership estate. Cross-movant Richard Gerber, M.D., claims that he, as opposed to the Receiver, is the rightful owner of the property. Dr. Gerber bases his claim on the premise that the Receiver is not entitled to gather and distribute assets over which Merrill Scott exerted only managerial control. Dr. Gerber contends that he is the "beneficial owner" of the assets the Receiver seeks to recover, and that the assets should therefore not be included in the receivership estate.

      The Receiver was specifically charged with the task of gathering all assets within Merrill Scott's control. (See Stipulated Order Appointing Receiver 2-3 (dkt. #15) ("The Receiver shall take control of Merrill Scott's funds, assets and property . . . belonging to or in the possession of or control of Merrill Scott . . . .").) The Receiver's authority to marshal assets extends to

"Merrill Scott & Associates, Ltd., Merrill Scott & Associates, Inc., and Phoenix Overseas Advisers, Ltd, and all subsidiaries and affiliated entities." (Id. at 2.)[1] Nearly all assets held by Merrill Scott were transferred to Merrill Scott by clients who believed that they retained "beneficial ownership" over transferred assets. If defrauded clients could recover the entirety of their investment with Merrill Scott by claiming "beneficial ownership" of the assets they transferred to Merrill Scott, the entire purpose of this federal equity receivership would be defeated. Therefore, as outlined below, the court grants the Receiver's motion for summary disposition and denies Dr. Gerber's cross-motion for summary disposition.

## Background

Dr. Gerber, like many Merrill Scott clients, invested with the company in an effort to benefit from the asset protection and wealth management services Merrill Scott offered. During the course of his association with Merrill Scott, Dr. Gerber entered into several transactions that are relevant to the resolution of the pending cross-motions for summary disposition. Generally speaking, the record reveals a course of dealing through which Dr. Gerber transferred funds and assets into the Merrill Scott structure and, in return, received some cash payments and also obtained the ostensible ability to direct Merrill Scott to make asset purchases and investments on his behalf.

The specific assets that the Receiver claims should be included in the receivership estate are stocks held in the name Dark Amethyst, LLC, a Porsche automobile, and a home in San Diego County, California. Each of those assets were purchased by Merrill Scott-related entities

---

[1] For convenience, the court refers to Merrill Scott and all Merrill Scott-related entities collectively as "Merrill Scott."

2

at some point following the transfer by Dr. Gerber of extremely valuable stock into the Merrill Scott system.

A.     *The Digital Nation Stock*

One of Dr. Gerber's initial transfers into Merrill Scott's financial structure was shares of a company called Digital Nation.  Dr. Gerber had originally obtained the stock by exercising stock options that Digital Nation had granted him in connection with five separate loans that he made to Digital Nation over the course of several years.  Dr. Gerber had loaned Digital Nation a total of $250,000, which Digital Nation repaid.  Dr. Gerber eventually transferred his Digital Nation stock to Black Pearl, LLC, in exchange for a $500,000 annuity.

Black Pearl was a Nevada corporation created by Merrill Scott.  David Ross, a Merrill Scott principal, served as the manager of Black Pearl.  Seely Enterprises, a Bahamian corporation, was the parent company of Black Pearl.  Merrill Scott had created Seely Enterprises on behalf of another client before Dr. Gerber's association with Merrill Scott began.

Although it is not entirely clear whether Dr. Gerber was aware of the value of the Digital Nation stock at the time of the transfer to Black Pearl, the record does show that Black Pearl, after holding the stock for approximately three and a half months, sold the stock to a third-party for $4,125,956.67. After the sale, Mr. Ross transferred the proceeds to Seely Enterprises's account at Phoenix Overseas Advisors, Ltd. ("POA"), a Merrill Scott entity that held and invested client funds.  During his deposition, Dr. Gerber acknowledged that he has never held a legal interest in, or had the ability to control, Seely Enterprises or Black Pearl.  Dr. Gerber does not dispute that the $4,125,956.67 transferred into Seely Enterprises's POA account originated from the sale of the Digital Nation stock.

B.     *Franklin Street Partners Investments*

Around the time that Dr. Gerber sold his Digital Nation stock, he also transferred a partnership interest in Franklin Street Partners ("FSP"),[2] a real estate investment trust corporation investing primarily in suburban office buildings, to Merrill Scott. Dr. Gerber personally received $215,000 for the FSP partnership interest. The funds used to purchase the FSP interest originated from a commingled Merrill Scott account held by Fidelity Funding, Ltd., a Merrill Scott entity.

Dr. Gerber had a long-standing investing relationship with FSP. And after his initial transfer of his own FSP interest to Merrill Scott, Dr. Gerber instructed Merrill Scott to purchase, ostensibly on his behalf, additional interests in FSP. Merrill Scott ultimately purchased five additional FSP interests, all of which were held by a Merrill Scott-created company called Dark Amethyst, LLC. Like numerous other Merrill Scott-created entities, Dark Amethyst was a Nevada corporation, for which Mr. Ross served as both manager and member. During his deposition, Dr. Gerber testified unequivocally that he has no legal interest in Dark Amethyst.

The five additional FSP interests (designated as FSP--Southfield, FSP--Blue Ravine, FSP--Willow Bend, FSP--Centennial, and FSP--Fair Lakes) were all purchased with commingled Merrill Scott funds. Following a merger of the FSP partnership entity into FSP corporation, all partnership interest were converted into shares. As of September of 2003, FSP held 81,003.90 shares in the name of Dark Amethyst. FSP--Willow Bend held one share in the name of Dark Amethyst.

---

[2] The record indicates that Franklin Street Partners commenced business operations in 1997 as Franklin Street Partners Limited Partnership. In 2002, the Franklin Street Partners Limited Partnership merged into Franklin Street Partners Corporation, with all partnership units converted into common stock.

C.     *The Porsche*

Dr. Gerber is currently in possession of a Porsche automobile. The record shows that an entity called MSA Leasing, LLC, a Merrill Scott-related entity, is listed on the title as the owner of the vehicle. In his deposition, Dr. Gerber testified that the Porsche was purchased by either Seely Enterprises or Emerald Cabochon, both Merrill Scott entities, and that the title of the car was "given" to MSA Leasing to allow MSA Leasing to serve as the "leasing agent." (Depo. of Richard Borisow Gerber, M.D., Feb. 9, 2004, 146:2-23, attached as Ex. B to Memo. in Supp. of Receiver's Mot. for Summ. Disposition (dkt. #781)[hereinafter "Gerber Depo."].)

The financial records provided by the Receiver indicate that the Porsche was purchased by Emerald Cabochon and that Emerald Cabochon and MSA Leasing executed a promissory note covering the purchase price of the vehicle, presumably at the time MSA Leasing became the title owner of the Porsche. During his deposition, Dr. Gerber admitted that he has made no payments to MSA Leasing in relation to the vehicle. Additionally, there is no evidence that Dr. Gerber has any legal interest in either Emerald Cabochon or MSA Leasing.

C.     *The San Diego County House*

The final Merrill Scott transaction connected to the cross-motions for summary disposition is the purchase of a house in San Diego County, California. The house was apparently purchased by an entity called Grey Diamond Marketing, Inc., a Nevada company incorporated by Janet Ackerson, a Merrill Scott employee. The articles of incorporation list Ms. Ackerson and Mr. Ross as directors of the company.

The record contains evidence indicating that the total purchase price of the San Diego County home was $1.6 million. Documentary evidence submitted by the Receiver shows that

Grey Diamond Marketing paid a $48,000 deposit and a $655,000 down payment toward the purchase, with Pacific Trust Bank financing the remainder of the cost. The $655,000 down payment was transferred between several Merrill Scott entities before Grey Diamond Marketing ultimately submitted the money to South Coast Title Escrow. It appears that the originating source of the funds was Seely Enterprises. Dr. Gerber testified during his deposition that Ronna Lindner was 50% owner of Grey Diamond Marketing and that the other 50% of Grey Diamond Marketing was owned by a company called Au Panache. But there is no evidence in the record that suggests that either Ms. Lindner or Au Panache ever held an ownership interest in Grey Diamond Marketing. Nevertheless, Ms. Lindner's name does appear on loan documents apparently created in connection with the financing of the San Diego County home. In those documents, Ms. Lindner is designated as the vice president of Grey Diamond Marketing.

## Analysis

The Receiver contends that all FSP shares held in the name of Dark Amethyst, the Porsche automobile, and the San Diego County home are part of the receivership estate and should be included in any distribution to Merrill Scott clients. Dr. Gerber counters that the Receiver cannot claim property simply because Merrill Scott exerted managerial control over that property, especially when the property is beneficially owned by a party that has not engaged in any wrongdoing and the property is not otherwise tainted by Merrill Scott's fraudulent conduct.

The persuasive evidence in the record indicates that Merrill Scott had much more than mere managerial control over the assets claimed by the Receiver. The assets were obtained by Merrill Scott as part of its practice of holding assets in a "decontrolled" environment, ostensibly

for the benefit of its clients.  As stated by Dr. Gerber, "[Merrill Scott's] 'ownership' of any assets was fiction, necessary to make the scheme work."  (Memo. in Opp'n to Receiver's Supp. Briefing in Supp. of Receiver's Mot. for Summ. Disposition 3 (dkt. #868).)  Indeed, "to make the scheme work," Merrill Scott labored to create situations enabling clients to either plausibly deny or claim ownership of assets as it suited them.  In this fundamental way, Dr. Gerber is similarly situated to other Merrill Scott clients who relinquished control over assets or who never obtained legitimate control over assets acquired by the Merrill Scott system.

"Once the equity jurisdiction of the court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy."  SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2d Cir. 1972).  "The district court has broad powers and wide discretion to determine relief in an equity receivership." Id. (citing SEC v. Safety Fin. Serv., Inc., 674 F.2d 368, 372 (5th Cir. 1982); SEC v. Lincoln Thrift Ass'n, 577 F.2d 600, 609 (9th Cir. 1978); SEC v. United Fin. Group, Inc., 474 F.2d 354, 358 (9th Cir. 1973)).  It is appropriate for the court to use summary proceedings when establishing a relief plan.  See id. ("A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets."); see also Smith v. Am. Indus. Research Corp., 665 F.2d 397, 399 (1st Cir. 1981) (use of single receivership proceeding best serves the parties' and the government's interest in judicial efficiency).

To fashion an appropriate remedy in this case, it is necessary for the Receiver to first gather all Merrill Scott assets in advance of a distribution to clients.  In fact, the Receiver was specifically charged with the task of gathering all assets within Merrill Scott's control.  (See

Stipulated Order Appointing Receiver 2-3 (dkt. #15) ("The Receiver shall take control of Merrill Scott's funds, assets and property . . . belonging to or in the possession of or control of Merrill Scott . . . .").) The Receiver's authority to marshal assets extends to "Merrill Scott & Associates, Ltd., Merrill Scott & Associates, Inc., and Phoenix Overseas Advisers, Ltd, and all subsidiaries and affiliated entities." (Id. at 2.) But Dr. Gerber correctly points out that the Receiver's power, though broad, is not unlimited. In this respect, Dr. Gerber asserts that the Receiver's reach cannot extend to the FSP stock held in the name of Dark Amethyst, the Porsche, or the San Diego County home.

In support of his position, Dr. Gerber relies primarily on SEC v. Black, 163 F.3d 188 (3rd Cir. 1998). In Black, an SEC enforcement action similar to the present case, the Third Circuit affirmed a district court's decision to lift freeze orders over certain accounts after concluding that the accounts were not truly within the control of the defendants in that action. Id. at 196. Specifically, the trustee appointed by the court categorized accounts affected by the defendants' acts into four categories and concluded that accounts in three of the four categories were segregated and held in the name of individual clients. See id. The court lifted the freeze order on the three segregated account types, but continued the freeze order insofar as it applied to the additional account type, which was a pooled fund held in the name of one of the defendant entities. See id.

In affirming the district court's decision to lift the freeze order as it applied to the segregated accounts, the Third Circuit noted that "in no case referenced by the SEC has it been granted a freeze ex parte of assets where those assets were anything other than property, or deemed property, of a defendant or of a culpable third party." Id. (citing SEC v. Cherif, 933 F.2d

403, 413-14 (7th Cir. 1991) ("Nothing in the statute or case law suggests that 15 U.S.C. § 78u(d) or (e) authorizes a court to freeze the assets of a non-party, one against whom no wrongdoing is alleged.")).

The Second Circuit, analyzing <u>Black</u> and other cases in which the assets of some victims were returned in full while the assets of other victims were not, stated that "[i]n those cases the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated in the manner of true trust accounts and/or have never been placed in the defrauder's control."  <u>SEC v. Credit Bancorp, Ltd.</u>, 290 F.3d 80, 90 (2nd Cir. 2002).

The present situation is not analogous to <u>Black</u> or the other cases that have concluded that certain assets are beyond the reach of a federal equity receiver.  In <u>Black</u>, an appointed trustee concluded that certain segregated accounts were not within the control of the defendants and that the defendants had augmented those accounts with tainted funds without the account owners' knowledge.  Here, the investigation of the Receiver indicates that the assets the Receiver seeks through this motion were under the direct control of Merrill Scott and that Dr. Gerber knowingly relinquished control over those assets.  The position of the Receiver is amply supported by the record, including the deposition testimony of Dr. Gerber himself.

The record reflects Dr. Gerber's desire to use Merrill Scott as a means of protecting his assets from potential creditors and enjoying tax-free, offshore wealth growth.  At the time he contacted Merrill Scott, Dr. Gerber was in the midst of a divorce and he testified that his soon-to-be ex-wife "was out to take everything [he] had."  (<u>See</u> Gerber Depo. 14-15.)  Dr. Gerber's deposition testimony reveals that he understood that an essential component of Merrill Scott's

9

asset protection scheme was the requirement that he relinquish control over key assets. Dr. Gerber's testimony also indicates that he understood that the protections offered by Merrill Scott had attendant risks; specifically, that Merrill Scott was not necessarily obligated to honor the requests that Dr. Gerber made with regard to assets transferred into Merrill Scott's control:

> Q: Is there any document that obligates Merrill Scott & Associates or David Ross to follow your recommendations?
>
> A: No. And of course there would not and must not be such.
>
> Q: Otherwise, it wouldn't be a decontrolled environment, right?
>
> A: That's correct.

(Gerber Depo. 496:21-497:3.)

Although Dr. Gerber, in his deposition, acknowledged that he had no transparent means of controlling Merrill Scott's decisions, in his memorandum he explains away that acknowledgment by stating "that it was important that he have no direct control over the assets. But that is not an indication that [Merrill Scott] had the requisite control." (Memo. in Opp'n to Receiver's Mot. for Summ. Disposition 15 (dkt. #796).) But in the same paragraph in which Dr. Gerber trumpets the importance of his own lack of control over assets, he asserts that "[i]t is clear that he had authority to make any and all decisions regarding the assets . . . ." (Id.) These contradictory statements are wholly consistent with Merrill Scott's modus operandi of creating an atmosphere of "plausible deniability," in which clients can either claim or deny ownership of a given asset to satisfy the exigencies of any situation. If the court accepted Dr. Gerber's contention that the Receiver cannot take control of property owned "beneficially" by Merrill Scott clients (and therefore merely managed by Merrill Scott), the effectiveness of this receivership would be irreparably compromised.

Dr. Gerber's acknowledgment that the usefulness of Merrill Scott's services depended in large part on Dr. Gerber's inability to assert control over assets is telling and substantially undercuts his ability to convincingly argue that Merrill Scott lacked the requisite amount of control over the assets the Receiver claims. The record reveals that Merrill Scott purchased the assets in question with commingled funds and retained more than simple managerial authority over those assets.

A.   *FSP Interests*

Dr. Gerber testified that he transferred a personal interest in FSP into the Merrill Scott system and that he directed Merrill Scott to make additional purchases of FSP interests. (Gerber Depo. 167:1-11 ("[I] foolishly . . . transferred [my FSP interest] into [the Merrill Scott] structure, because there's no actual benefit other than asset protection. But I did, and went on directing them to invest more money in it. And so [Merrill Scott] bought the interests that I had in December of 1999.").) Merrill Scott used funds from a variety of sources to purchase the FSP interests. As detailed in the Expert Report and Disclosure of Gil A. Miller, the funds used were either transferred directly from a commingled account or passed through a commingled account just before the FSP purchase was made. (See Expert Report & Disclosure of Gil A. Miller 6-12 (attached as Ex. A to Memo. in Supp. of Receiver's Mot. for Summ. Disposition (dkt. #781).)

Further, all the FSP shares that the Receiver claims are held in the name Dark Amethyst. Dr. Gerber testified that Merrill Scott created Dark Amethyst on his behalf for the purpose of holding the FSP interests. On Dark Amethyst's articles of incorporation, Mr. Ross is listed as the sole incorporator and the sole manager. Additionally, Dr. Gerber testified that Mr. Ross was the signatory on Dark Amethyst's bank account. Although Dr. Gerber testified that Merrill Scott

purchased the FSP interests at his direction, Dr. Gerber concedes that Merrill Scott was not legally compelled to follow his instructions. In fact, Dr. Gerber testified plainly that he holds no legal interest in Dark Amethyst. Given all of the above, the shares held in the name of Dark Amethyst are properly considered part of the receivership estate and subject to distribution.

B.     *The Porsche*

The Porsche was purchased with funds from Emerald Cabochon, a Merrill Scott entity in which Dr. Gerber has no interest. The title to the Porsche is held by MSA Leasing, another Merrill Scott entity in which Dr. Gerber has no interest. Dr. Gerber testified that he has made no payments in relation to the car. The Porsche is properly considered part of the receivership estate and is subject to distribution.

C.     *The San Diego County Home*

The Receiver has submitted persuasive evidence showing that commingled Merrill Scott funds were used to provide a down payment on the San Diego County home. All evidence indicates that the home is owned by Grey Diamond Marketing, although notably absent from the record is a current deed or information concerning the present state of the financing arrangement underlying the home's purchase.[3]

As the record now stands, it appears that all money paid in relation to the San Diego County home came from commingled funds held by Merrill Scott that Dr. Gerber neither owned nor controlled. Accordingly, the San Diego County home is properly considered a part of the

---

[3] A search of Westlaw's real estate transaction databases shows that the current owner of the San Diego County home, is, indeed, Grey Diamond Marketing. Further, the address listed for Grey Diamond Marketing on the real property transaction record is the same address as Merrill Scott's office in Salt Lake City, Utah. A tax assessor record lists as Grey Diamond Marketing's address a townhouse in Washington, D.C. that is apparently owned by Dr. Gerber.

receivership estate and should be included in any distribution.

## Conclusion

All of the assets identified by the Receiver were either purchased with commingled Merrill Scott funds or with funds that passed through commingled accounts. The record fully supports the Receiver's contention that Merrill Scott exercised substantial, if not absolute, control over the assets. Accordingly, all FSP shares held in the name of Dark Amethyst, the Porsche automobile, and the San Diego County home should properly be included within the receivership estate and are subject to distribution. For the foregoing reasons, the Receiver's Motion for Summary Disposition (dkt. #780) is GRANTED and Dr. Gerber's Cross Motion for Summary Disposition (dkt. #797) is DENIED.

SO ORDERED this 21st day of December, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge