IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>                             Plaintiff, <br><br><br>      vs. <br><br> MERRILL SCOTT & ASSOCIATES, LTD.; MERRILL SCOTT & ASSOCIATES, INC.; PHOENIX OVERSEAS ADVISORS, LTD.; DAVID E. ROSS II; and MICHAEL G. LICOPANTIS; <br><br>                         Defendants. | ORDER AND MEMORANDUM DECISION <br><br><br> Civil No. 2:02 CV 39 |

      This matter is before the court for the resolution of several matters involving Thomas

Shelton Powers, M.D.  Dr. Powers is one of many clients of the now-defunct financial company

Merrill Scott & Associates, Ltd. ("Merrill Scott").[1]  Merrill Scott went into receivership after the

Securities and Exchange Commission filed a civil lawsuit against Merrill Scott and its principals,

alleging that Merrill Scott misappropriated investor funds and was actively operating a Ponzi

scheme.  A short time after the SEC filed its complaint, the court entered an order freezing the

assets of Merrill Scott and appointing David K. Broadbent to serve as the company's receiver.

Currently, the Receiver is actively engaged in gathering Merrill Scott's assets and reviewing

---

[1]Merrill Scott is actually comprised of multiple nominally distinct entities.  For the sake of convenience, this Order and Memorandum Decision refers collectively to Merrill Scott and Merrill Scott-related entities as "Merrill Scott."

claims against the company submitted by Merrill Scott victims.  Additionally, the SEC has

submitted a proposed plan of partial distribution that generally contemplates dividing, on a pro

rata basis, the recovered assets of Merrill Scott among the clients defrauded by the company.

As the Receiver attempted to marshal Merrill Scott assets, a dispute arose between the

Receiver and Dr. Powers regarding the ownership of two separate pieces of real property.  The

Receiver filed two ancillary suits against Dr. Powers claiming that the two properties should be

included within the receivership estate.  (See Broadbent v. Powers, 2:05 CV 375 (D. Utah);

Broadbent v. Powers, 2:05 CV 539 (D. Utah).)  The court later consolidated those ancillary suits

with the primary SEC enforcement action.  (See Order & Memorandum Decision Consolidating

Cases (dkt. #829).)

In addition to the dispute surrounding the real property, the SEC, in its proposed plan of

partial distribution, seeks to exclude Dr. Powers from receiving any distribution from the

receivership estate.  The SEC claims that Dr. Powers's intimate involvement with Merrill Scott

and the fact that Dr. Powers allegedly took money that was in Merrill Scott's control after the

entry of the asset-freeze order precludes Dr. Powers's participation in any distribution.

The court has held extensive hearings on the issues involving Dr. Powers, where live

testimony was presented and documentary evidence received.  (See Order Regarding September

20, 2006 Hearing 3-4 (dkt. #749) (notifying parties that all issues involving Dr. Powers would be

addressed during a two-day hearing at which the court would take evidence and hear argument).)

After considering all the evidence and the argument of the parties, the court concludes that the

real property claimed by the Receiver is properly included within the receivership estate.

Further, because of Dr. Powers's involvement with Merrill Scott, and because Dr. Powers has

already recovered a substantial amount of money that was under Merrill Scott's control at the

time the asset-freeze order was entered, Dr. Powers is excluded from receiving any further

distributions from the receivership estate.

## Background

Dr. Powers first learned of Merrill Scott after seeing an advertisement in a financial

publication.  At that time, Dr. Powers owed a substantial amount of money to a company called

Coastal Medicine.  Dr. Powers had recently sold an emergency physician providers group to

Coastal Medicine for approximately $16 million.  As part of the sale, Dr. Powers promised to

pay several million dollars to cover self-insurance contracts.  Dr. Powers never paid the money

and Coastal Medicine began to take steps toward collection.

In addition to a desire to decrease tax liability, Dr. Powers was interested in using Merrill

Scott's asset protection services as a method to shield assets from Coastal Medicine and other

potential creditors.  Dr. Powers testified during a deposition that he felt he could improve his

ability to negotiate with Coastal Medicine if his assets were unreachable.  (See Depo. of Thomas

Shelton Powers, M.D., Vol. II, July 11, 2005 [hereinafter "Powers 2005 Depo."] at 309:8-13).)

Consistent with its general practice, Merrill Scott held discussions with Dr. Powers to

assess his financial situation and to identify financial planning goals.  An entry on an internal

Merrill Scott bulletin board summarized Dr. Powers's situation in the following manner:

> A number of years ago Dr. P sold an emergency physician providers group
> (Medicus) to Coastal Medicine for about 16mm.  Part of the deal was that Dr. P
> was to pay ~4mm to cover self-insurance contracts.  Dr. P did not pay the money
> and the "chase was afoot".  He has been fighting them ever since.
>
> Dr. P came to [Merrill Scott] and over the past 2.5 years has not lost a
> dime to Coastal Medicine.  He has paid over 200k in fees to [Merrill Scott] and is
> an important client for [Merrill Scott].

(Implementation Steps, Bulletin Board Regarding Jan. 20, 1999 conference call, attached as Ex.

1 to Decl. of David K. Broadbent, Receiver, in Supp. of Mot. for Order Requiring Defs. To Pay

Rents & for Contempt Against Thomas Shelton Powers, M.D., filed in <u>Broadbent v. Powers</u>,

2:05 CV 539 (D. Utah) (dkt. #6) [hereinafter "First Broadbent Declaration"].)

     As with many of its other clients, Merrill Scott's asset protection strategy for Dr. Powers

involved the creation of a convoluted organization of multiple entities established for the purpose

of holding assets.  During his 2005 deposition, Dr. Powers explained how he understood the

Merrill Scott strategy would work:

> Q.    (By Mr. Melton) Sure.  What was your understanding of how Merrill Scott would protect your assets from creditors?
>
> . . . .
>
> A.    Well, I guess simply put, just having different entities.
>
> Q.    (By Mr. Melton) And those entities would be held offshore?
>
> A.    Not necessarily.  Some were onshore.
>
> Q.    Okay.  And would you actually be required as part of the strategy to transfer the assets that you were attempting to protect into an entity controlled by Merrill Scott?
>
> . . . .
>
> A.    Well, I'm not an attorney so I don't know what--what would the legal definition of--there's a different--as a layman, I thought I controlled them because I was making all the decisions at all times.

(Powers 2005 Depo. 263:6-264:3.)  A handwritten chart, dating from September of 1998,

outlines a proposed financial structure through which to funnel Dr. Powers's assets.  (<u>See</u> Notes,

Sept. 28, 1998, attached as Ex. 2 to Decl. of David K. Broadbent, Receiver, in Supp. of Mot. for

Order Requiring Def. Powers to Pay Rent & Mot. for Contempt Against Thomas Shelton Powers, M.D., filed in <u>Broadbent v. Powers</u>, 2:05 CV 375 (D. Utah) (dkt. #26) [hereinafter "Second Broadbent Declaration"].)  Notes appearing at the bottom of the chart state that "*'Commingling' of funds* is the pressure point."  (<u>Id.</u>)

   It is undisputed that, at some point after Dr. Powers began to use Merrill Scott's services, an entity called Mira Vista, LLC, took ownership of two pieces of real property: a condo in San Francisco, California (the " San Francisco Condo") and a house in Salt Lake City, Utah (the "Salt Lake City House").  The Receiver contends that Mira Vista was one of the many entities created by Merrill Scott on behalf of Dr. Powers and that Dr. Powers, by design, has no legally recognizable interest in Mira Vista.  Dr. Powers's position is that he has an ownership interest in Mira Vista as a result of financial contributions that he made to the entity.

A.    *The Creation of Mira Vista and the Purchase of the San Francisco Condo and the Salt Lake City House*

   The chain of events leading to the purchase of the San Francisco Condo and the Salt Lake City House began when Dr. Powers sold a home on Twin Peaks Boulevard in San Francisco, California (the "Twin Peaks Home").  While being deposed in relation to the Coastal Medicine transaction, Dr. Powers testified that he sold the Twin Peaks Home to an entity called Marshall Properties, Inc. in lieu of foreclosure.  (<u>See</u> Deposition of Thomas Shelton Powers, M.D., in <u>Coastal Emergency Sevs. of the West, Inc. v. Powers</u>, 96-23779 in the District Court of Harris County, Texas, 164th Judicial District [hereinafter "Powers 1998 Depo."], 29:17-30:10.)

   Just before the sale of the Twin Peaks Home, Pat Brody and David Ross, both Merrill

Scott principals became directors of Marshall Properties.[2]  (See Unanimous Consent Resolution

of the Directors of Marshall Properties, Inc., attached as Ex. 5 to Supp. Decl. of David K.

Broadbent, Receiver, in Supp. of Mot. for Order Requiring Defs. To Pay Rents for [sic]

Contempt Against Thomas Shelton Powers, M.D., attached as Ex. A to Memo. Regarding the

Hearing of May 19, 2006, filed in Broadbent v. Powers, 2:05 CV 539 (D. Utah) (dkt. #19)

[hereinafter "Third Broadbent Declaration"].)

       After acquiring the Twin Peaks Home, Marshall Properties mortgaged the property to an

entity called Homestead Mortgage Trust for $700,000.  (See Trust Deed & Trust Note, Aug. 14,

1998, attached as Ex. 1 to Second Supp. Decl. of David K. Broadbent, Receiver, in Supp. of

Receiver's Mot. for Summ. Disposition, filed in Broadbent v. Powers, 2:05 CV 375 (D. Utah)

(dkt. #68) [hereinafter "Fourth Broadbent Declaration"].)  In his 2003 deposition, Dr. Powers

identified Homestead Mortgage Trust as a "mortgage company that had a mortgage on my house

in San Francisco."  (Powers 2003 Depo. 43:23-44:1-2.)  But he could not identify the name of

either the trustee or the beneficiary of the Homestead Mortgage Trust.  (See id. 44:6-17.)  In a

recently filed affidavit, Dr. Powers now contends that he served as both the grantor and

beneficiary of Homestead Mortgage Trust.  (See Aff. of Thomas Shelton Powers, ¶ 15, filed in

---

[2]In his 1998 deposition, Dr. Powers repeatedly testified that he had no ownership interest in Marshall
Properties.  (See, e.g., Powers 1998 Depo. at 35:9-15; 56:7-11; 58:13-22.)  Nevertheless, a review of the 1998
deposition transcript reveals the Dr. Powers was apparently authorized to make "loans" on behalf of Marshall
Properties to an entity called Tri-Star that was owned by Dr. Powers.  These loans were never documented and,
although Dr. Powers testified that the assets of Tri-Star were used as collateral, his deposition testimony indicates
that Marshall Properties never made any attempt to seize the collateral to satisfy loan payments.  In fact, when Tri-
Star sold all its assets, the obligations to Marshall Properties apparently did not survive the transaction.  (See Powers
1998 Depo. 59:19-63:25; 101:6-104:25.)  When he was deposed in 2003, Dr. Powers testified that he had, in fact,
owned Marshall Properties, but that he no longer held an interest in the company, apparently due to the dissolution
of the company.  (See Deposition of Thomas Shelton Powers, M.D., Sept. 26, 2003, [hereinafter "Powers 2003
Depo."] 44:18-45:18.)

Broadbent v. Powers, 2:05 CV 539 (D. Utah) (dkt. #24) [hereinafter "First Powers Aff."] .)

Marshall Properties sold the Twin Peaks home to Evergreen Management, Ltd. ("Evergreen Management") and took a trust deed in the amount of $28,000.  (See Exs. 6-7, 10, attached to Third Broadbent Declaration; Exs. 2-3, attached to Fourth Broadbent Declaration (documenting approval and sale of Twin Peaks Home).)  Evergreen Management was yet another entity created by Merrill Scott in an effort to meet Dr. Powers's financial objectives.  (See Powers 2005 Depo. at 367:12-17.)  Evergreen Management was set up as a Bahamian company over which Mr. Brody and Mr. Ross exercised control.  (See, e.g., various corporate resolutions attached as Exs. 4, 11-12, 14, 16, 21, 23, 30-31 to Third Broadbent Declaration.)

Evergreen Management eventually sold the Twin Peaks Home to a third party.  As a result of the sale, Homestead Mortgage Trust received $501,145, Marshall Properties received $28,000, and Evergreen Management received the balance of $36,306.52.  (See Ex. 13 to Third Broadbent Declaration; Settlement Statement, attached as Ex. 4 to Fourth Broadbent Declaration.)  There is no indication on the Settlement Statement that Dr. Powers, personally, received any money from the sale of the Twin Peaks Home.

A few months before Evergreen Management sold the Twin Peaks Home, Mr. Ross created two Nevada limited liability companies: Solutions Planning Group and Mira Vista.  (See. First Powers Aff., ¶ 8.)  At the time of Mira Vista's creation, Mr. Ross was named as the manager and sole member.  (See Operating Agreement, Mira Vista, LLC, attached as Ex. 3 to Second Broadbent Declaration.)  The articles of incorporation for Solutions Planning Group list Mr. Ross as the manager and Sean Ross, Mr. Ross's son, as the registered agent.  (See Articles of Incorporation, attached as Ex. 7 to Second Broadbent Declaration.)  Several months after the

creation of Mira Vista, Mr. Ross executed two assignments through which he transferred half of
his interest in Mira Vista to Merrill Scott and the other half of his interest to Solutions Planning
Group.  (See Assignments, attached as Exs. 4-5 to Second Broadbent Declaration.)

After Mr. Ross assigned his interest in Mira Vista, the entity purchased two
condominiums, the San Francisco Condo and a condo in Lake Tahoe.  Dr. Powers and Mr. Brody
initially entered into a contract to buy the San Francisco Condo, but later assigned their interest
in the purchase contract to an entity called Pacific Northwest Holding, Co., LLC.  Pacific
Northwest Holding then assigned its interest in the purchase contract to Mira Vista, which went
through with the purchase.  (See Contract for the Sale and Purchase of Real Property, attached as
Ex. 8 to First Broadbent Declaration.)  Mira Vista was also the entity that purchased the condo in
Lake Tahoe.  (See Grant Deed, attached as Ex. 22 to Second Broadbent Declaration.)  Mira Vista
eventually sold the Lake Tahoe condo and used the proceeds to purchase the Salt Lake City
House.  (See Powers 2003 Depo. at 224:4-11; Warranty Deed, attached as Ex. 8 to Second
Broadbent Declaration.)  It is the ownership of these two properties, the San Francisco Condo
and the Salt Lake City House, that is currently in dispute.

Dr. Powers contends that the money used to purchase the San Francisco Condo and the
Lake Tahoe condo came from the sale of his Twin Peaks Home.  (See First Powers Aff., ¶ 17;
Powers 2003 Depo. at 92:21-22, 222:19-223:23.)  But the record establishes that the funds
actually used for the purchases originated from a pooled account held by Phoenix Overseas
Advisors, Ltd. ("POA"), a Merrill Scott entity.  The POA account held money from other Merrill
Scott clients, including Richard Gerber, M.D., and the transfer of funds facilitating the purchases
was treated for internal accounting purposes as a loan from the POA account to Merrill Scott.

8

(See Deposition of Janet Ackerson, Aug. 22-23 and 27, 2002 [hereinafter "Akerson Depo."], Vol. II at 472:10-24.)  Internal Merrill Scott documents indicate that Merrill Scott intended to allocate half of the obligation incurred through the purchase of the San Francisco Condo to Dr. Powers. (See Memo. from David Stirling to Mr. Brody, Rod Reed, Michael Licopantis, Brad Parkin, and Ms. Ackerson, Sept. 22, 1999, attached as Ex. 26 to Third Broadbent Declaration.)  During her deposition, Ms. Ackerson, a former Merrill Scott employee who was heavily involved in tracking Merrill Scott's finances, attempted to shed light on the transaction:

> Q.    So it was a loan from Powers or from the account that had Powers or others' money to Gerber and then paid back?
>
> A.    Right.
>
> Q.    Or–
>
> A.    Well, Gerber to Powers I think is this one.  And further down here it references the San Francisco residence, of which there is still a loan due to Gerber for that San Francisco property.
>
> Q.    Okay.  Back up to 2, the question is about Powers and Gerber.  Were Powers and Gerber associates?
>
> A.    No.
>
> Q.    Did they know each other in any way?
>
> A.    No.
>
> Q.    So the decision to take money from Powers' account or Gerber's account and back and forth was made by whom?
>
> A.    Pat Brody and Dave Ross and Michael Licopantis.
>
> Q.    Okay.  Number 5 refers to the San Francisco residence?
>
> A.    Correct.
>
> Q.    You were telling me something about that.

9

A.      Apparently--well, Powers and [Merrill Scott] entered into an agreement to buy this condo in San Francisco.  As with all of the tracings of this earlier period, money would be used and I would have to determine basically that these were separate accounts so I could say, okay, out of account 1320, which was originally the Seely/Gerber account, money was taken out and utilized for this purpose, and the San Francisco condo was one of those. Powers on the 625-0095, which was allocated to Powers at some point.  If money came in and out of there then I would have to address that as Powers'--loans from Powers or repayments back to Powers.  So it just--in these particular cases it was money that was utilized for purposes and I just had to, as best as Mike and I could work out, trace those funds through.

(Ackerson Depo. at Vol. II, 470:2-471:15 and Ex. 34 thereto.)  In addition to the money from the

POA account, Mira Vista took a mortgage on the San Francisco Condo, guaranteed by Mr.

Parkin, to obtain financing for the balance due on the condo's purchase price.  (See Master Loan

Application, attached as Ex. 10 to First Broadbent Declaration.)

Because the Salt Lake City House was purchased with funds from the sale of the Lake

Tahoe condo, Dr. Powers asserts that he owns the entirety of Salt Lake City House.  But, just as

with the money used to purchase the San Francisco Condo, the money used to buy by the Lake

Tahoe condo came from the primary POA account.

While Dr. Powers asserts sole ownership over the Salt Lake City House, he

acknowledges that he had an "understanding" with Merrill Scott that the San Francisco Condo

was purchased as a partnership and he therefore claims only a one-half interest in that condo.  Dr.

Powers's understanding appears to be consistent with internal Merrill Scott documents that

attempt to allocate the cost of the San Francisco Condo between Dr. Powers and Merrill Scott.  It

is also consistent with other record evidence showing that Merrill Scott principals made use of

the San Francisco Condo for their own purposes.  (See Ackerson Depo. at Vol. III, 539:4-8;

Powers 2003 Depo. at 99:15-100:13.)]

Complicating matters further, Jonezen Enterprisze, Inc. claims to have a valid encumbrance on the title of the Salt Lake City House.  The lien in question was placed on the property after Dr. Powers received a personal loan from Jonezen using the Salt Lake City House as security.  Dr. Powers was able to obtain the loan after he signed a deed purportedly transferring title of the Salt Lake City House from Mira Vista to himself.  Dr. Powers signed on behalf of Mira Vista and also on behalf of himself.

B.      *Recovery of Evergreen Management Funds After Issuance of the Asset-Freeze Order*

As part of its argument that Dr. Powers should not participate in any distribution from the receivership estate, the SEC contends that Dr. Powers managed to obtain a substantial sum of money from Evergreen Management after the issuance of the asset-freeze order.  According to the SEC, by obtaining money from Evergreen Management, Dr. Powers has, in essence, already received a distribution from the receivership estate and no further payments are warranted.

The facts surrounding the extraction of money from a Wall Street Financial Group, Inc. account held in the name of Evergreen Management Services, Ltd. was discussed at considerable length in a previous order entered in this case and there is no evidence now before the court that calls into doubt the facts presented in that order.  (See Order 5-10 (dkt. #275).)  Suffice to say, Dr. Powers and Mr. Ross, through a series of complex actions, managed to receive funds held in the name of Evergreen Management.  Those funds were subject to the asset-freeze order and should have remained within the control of the Receiver.  In fact, the court held Mr. Ross in contempt for the actions he took relating to the Evergreen Management funds.  (See id. at 16-17, 19.)  Dr. Powers has already spent the $389,884.01 that he personally recovered from Evergreen Management.

11

In addition to the recovery of Evergreen Management funds, the SEC argues that Dr. Powers's unusually close relationship with Merrill Scott and his activities in referring potential clients make him an "insider" who should be equitably excluded from any distribution. The record indicates that Dr. Powers was listed as a financial advisor on some Merrill Scott documents, and that solicitation letters were prepared bearing Dr. Powers's name. (See Exs.2-3 attached to Plf.'s Memo. in Opp'n to Intervenor Powers' Mot. for Summ. J. & in Supp. of Powers' Designation as a Merrill Scott Insider (dkt. #774).)

Complicating this matter further is the fact that Dr. Powers has assigned his interest in any distribution from the receivership estate to Thomas J. Mynar.[3]  The SEC has filed a stipulated position regarding Mr. Mynar in which it does not object to Mr. Mynar's participating in a distribution, so long as Dr. Powers does not receive anything.

## Analysis

The issues involving Dr. Powers fall into two categories. The first involves the dispute between Dr. Powers and the Receiver over the ownership of the San Francisco Condo and the Salt Lake City House. Included within that dispute is the status of the encumbrance that Jonezen claims it holds on the Salt Lake City House. The second issue is whether Dr. Powers should be allowed to participate in a distribution from the receivership estate. Included within that issue is the question of whether Mr. Mynar should be allowed to participate in a distribution from the

---

[3]The assignment is the result of a Consent Decree entered between Mr. Mynar and Dr. Powers in an unrelated matter. (See Objection of Thomas J. Mynar to Receiver's Proposed Plan of Partial Distribution 2 (dkt. #541) ("Helen F. Mynar[] was a low-level employee of a medical clinic owned by . . . an entity under [Dr. Powers's] control in 1996. She was diagnosed with lung cancer and was undergoing treatment when she was laid off. Although she continued paying premiums to keep her health insurance in force, [her employer] pocketed these payments and left Mrs. Mynar without health insurance. Around this time, Dr. Powers became a Merrill Scott customer.")

receivership estate.

**I.      The San Francisco Condo and the Salt Lake City House**

"Once the equity jurisdiction of the court has been properly invoked by a showing of a

securities law violation, the court possesses the necessary power to fashion an appropriate

remedy." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2d Cir. 1972).  "The

district court has broad powers and wide discretion to determine relief in an equity receivership."

Id. (citing SEC v. Safety Fin. Serv., Inc., 674 F.2d 368, 372 (5th Cir. 1982); SEC v. Lincoln

Thrift Ass'n, 577 F.2d 600, 609 (9th Cir. 1978); SEC v. United Fin. Group, Inc., 474 F.2d 354,

358 (9th Cir. 1973)).  It is appropriate for the court to use summary proceedings when

establishing a relief plan.  See id. ("A summary proceeding reduces the time necessary to settle

disputes, decreases litigation costs, and prevents further dissipation of receivership assets.");  see

also Smith v. Am. Indus. Research Corp., 665 F.2d 397, 399 (1st Cir. 1981) (use of single

receivership proceeding best serves the parties' and the government's interest in judicial

efficiency).

To fashion an appropriate remedy in this case, the Receiver must first collect all Merrill

Scott assets in advance of a distribution to clients.  In fact, the Receiver was specifically charged

with the task of gathering all assets within Merrill Scott's control.  (See Stipulated Order

Appointing Receiver 2-3 (dkt. #15) ("The Receiver shall take control of Merrill Scott's funds,

assets and property . . . belonging to or in the possession of or control of Merrill Scott . . . .").)

The Receiver's authority to marshal assets extends to "Merrill Scott & Associates, Ltd., Merrill

Scott & Associates, Inc., and Phoenix Overseas Advisers, Ltd, and all subsidiaries and affiliated

entities."  (Id. at 2.)

Dr. Powers's argument that the San Francisco Condo and the Salt Lake City House should not be included within the receivership estate rests on his contention that Mira Vista was not a Merrill Scott entity, but was, in actuality, owned by Dr. Powers. There is no evidence in the record that supports Dr. Powers's position. Rather, the persuasive evidence shows that Dr. Powers, like many other Merrill Scott clients, relinquished control over assets in an effort to gain tax advantages and to protect assets from creditors. Once Merrill Scott gained control over assets, it frequently pooled funds and used assets originally obtained from one client to facilitate transactions on behalf of another client. At the evidentiary hearing, Ms. Ackerson testified generally about this practice:

> When I started working for Merrill Scott there were problems with various clients because no one seemed to know what was happening with their money. So I started with the asks, and then started moving into the various clients because I'm very good at tracing things.
>
> So I would look at their program as to what was supposed to have happened, track what happened to the money. When I started seeing money was being diverted into other places, at the time I thought it was innocent, you know. I didn't know that--that part of all of this chaos was because it was supposed to be chaos.

(Transcript of Evidentiary Hearing, Nov. 2, 2006, 180-81 (dkt. #845) (emphasis added).) The general chaos surrounding Merrill Scott was particularly present in the purchases of the San Francisco Condo and the Salt Lake City House.

When questioned by the court at the evidentiary hearing concerning the funds used to purchase the San Francisco Condo, Ms. Ackerson responded:

> The Witness:   When it was time to buy the San Francisco place, what occurred was the money came out of the [POA] 1320 account to facilitate that purchase, which was Dr. Gerber's account.
>
> The Court:   And I think in your deposition you said that some of that money in the 1320 account was the Seely/Gerber Account. Was there any

14

Powers' money in it[?]

The Witness:  No.  That was money that came from the--I think it's called various stock that was sold by Dr. Gerber.

(Id. at 183.)  When counsel for the Receiver asked Ms. Ackerson to explain the significance of a memorandum authored by Mr. Licopantis, a Merrill Scott employee heavily involved with POA, discussing the source of money used for purchases involving Dr. Powers, she responded as follows:

A.    This is a memo from Michael Licopantis to me.  It's dated November 1999.  This was part of where he was trying to explain to me what was supposed to have happened to these monies and where they were supposed to have come from.

Q.    When you say these monies, which ones are you talking about?

A.    The explanation of the Gerber account and the monies that were used to do a variety of things, like the loan--the loan that was supposed to go to Shelton Powers, the--I mean he's got a lot of things in here that he's trying to reconcile the 1320 account.  There are things that didn't make sense.  I kept trying to tie them out.

(Id. at 183-84.)

Dr. Powers argues that the tangled money movement orchestrated by Merrill Scott was nothing more than the implementation of "loans" from Merrill Scott to Mira Vista to facilitate the property purchases and that Dr. Powers later repaid those portions of the loans properly allocated to him.  In other words, Dr. Powers's position is that, even if the purchase money came from commingled accounts, any taint flowing from the use of that money was cured when Dr. Powers caused Merrill Scott to be repaid.  But there is simply no evidence that Dr. Powers, whether personally or on behalf of Mira Vista, was the source of the loan repayments.  During the evidentiary hearing, Dr. Powers's counsel and Mr. Broadbent had the following exchange

15

concerning the "loans" used to fund the purchase of the San Francisco Condo and the Salt Lake

City House:

> Q.    Okay.  Okay.  Now, yesterday, Mr. Broadbent, the court asked you if you
>        admitted that the loans that were made from--let's see.  Just a second.  Let
>        me--from [Merrill Scott] and [the POA account] to Mira Vista were
>        repaid?
>
> A.    Did the court ask me that?
>
> Q.    Yes, the court did.
>
> A.    Yes.
>
> Q.    And what was your answer?  It was yes, wasn't it?
>
> A.    I believe I said that based on the documents we were looking at, the same
>        documents we'd received, that I had believed that they were repaid.  I will
>        tell you it never made a difference to me, but that was the response I gave.
>        . . . .  And the reason is it looked like one of many Merrill Scott entities
>        was transferring money to another Merrill Scott entity, and it really didn't
>        matter.

(Transcript of Evid. Hearing, Nov. 3, 2006, at 23 (dkt. #846).)  When presented with evidence

indicating that the POA account received a deposit consistent with the repayment of loaned

money, Mr. Broadbent testified as follows:

> A.    To me it shows that it was repaid.  <u>It doesn't show that it was repaid by
>        Dr. Powers.</u>  The wire--I mean by its own statement these are wire
>        instructions from Pat Brody and David Ross, who obviously controlled the
>        assets being transferred.  So, you know, I disagree on this, but this is why-
>        -is one of the reasons why I think it doesn't matter because it was from
>        one Merrill Scott pocket to one of several other Merrill Scott pockets.

(<u>Id.</u> at 26 (emphasis added).)  The record bears out Mr. Broadbent's position.  The money

transfers were initiated under the authority of Merrill Scott principals.  Dr. Powers, consistent

with Merrill Scott's plan of operation, exerted no control over the funds beyond expressing his

wishes to Merrill Scott.  Regardless of the merits of Dr. Powers's theory that an innocent party

16

can cleanse the taint flowing from the use of commingled funds, that theory has no meaningful application here, where tainted money was used in an attempt to cure a taint.

This point was illustrated nicely during the evidentiary hearing when Dr. Powers's counsel questioned the Receiver about a hypothetical situation in which Merrill Scott distributed funds before the entry of the asset-freeze order to an entity owned by a Merrill Scott client, but controlled by Merrill Scott. The Receiver's response echoed Ms. Ackerson's assessment that Merrill Scott was purposefully chaotic.

> A.   I don't want to say you're mixing up, but the question mixes up two different universes. One is the universe occupied by Merrill Scott. The other you're asking me questions about is the way corporations really work. And I'm going to have a hard time answering the hypothetical when you're blending Merrill Scott's bizarre universe of entities and the real world of entities.

(Transcript of Evidentiary Hearing, Nov. 3, 2006, 51 (dkt. #846).)

The purpose of Merrill Scott's alternate universe was to enable Merrill Scott clients to plausibly deny ownership of any particular asset. This strategy was the driving force behind the creation of Mira Vista and its acquisition of both the San Francisco Condo and the Salt Lake City House. It is undisputed that Mira Vista held the title to both properties. And while on the witness stand, Dr. Powers acknowledged that his name does not appear on any of the documents relating to Mira Vista's incorporation or its operation.

> Q.   Mira Vista owned the [San Francisco Condo] and the [Salt Lake City House]; right?
>
> A.   Yes.
>
> Q.   And the named member of Mira Vista was David Ross?
>
> A.   Yes. He was a noneconomic member.

Q.    But he was a named member; right?

A.    Noneconomic member, right.

Q.    We can discuss that distinction if you like, but he was the one who was named on the records of the company as a member; correct?

A.    That's correct.

Q.    Your name doesn't show up anywhere . . . ; correct?

A.    That's correct.

Q.    And that's because you were trying to avoid anybody being able to see that it was something that you had a beneficial interest in; right?

A.    Well, it's for privacy, yes.  I think it's not uncommon among business people to do that.

Q.    Well, whether it's common or not, it's what you did in this case; correct?

A.    Yes.

(Id. at 95-96.)

Dr. Powers's argument, at its core, rests on the theory that he has an ownership interest in Mira Vista because he was the true source of funds used by Mira Vista to purchase the San Francisco Condo and the Salt Lake City House.  But the funds used were actually pulled from within the Merrill Scott financial structure.  And the entities involved in the transactions had no legal connection to Dr. Powers whatsoever.  Dr. Powers chose to relinquish meaningful control over his assets in the hope that Merrill Scott would honor his wishes with respect to the transferred assets.  Dr. Powers's apparent desire to secretly own assets was not legally realized. The evidence overwhelming supports the conclusion that Mira Vista was wholly owned and controlled by entities with which Dr. Powers had no legally recognizable connection. Accordingly, the assets of Mira Vista, including the San Francisco Condo and the Salt Lake City

18

House, are properly considered part of the receivership estate.

## II.  Jonezen's Purported Encumbrance on the Salt Lake City House Is Ineffective

Given the conclusion that Dr. Powers had no legal interest in Mira Vista, it follows that Dr. Powers had no authority to act on behalf of Mira Vista when he purportedly deeded himself the Salt Lake City House.  In an earlier order, the court denied Jonezen's motion for summary judgment, which requested that Jonezen's lien be honored on the ground that Jonezen is a bona fide encumbrancer.  (See Order & Memorandum Decision, docketed in Broadbent v. Powers, 2:05 CV 375 (D. Utah) (dkt. #61).)  There, the court denied summary judgment because the factual record did not clearly establish whether Dr. Powers had the authority to transfer the Salt Lake City House from Mira Vista to himself.  The court concluded, "[i]f the Receiver is correct that Dr. Powers had no authority to make the transfer in question, the deed upon which Jonezen relied was void."  (Id. at 5.)

After taking additional evidence, it is now apparent that Dr. Powers lacked the power to act on behalf of Mira Vista.  Jonezen therefore relied upon a void deed at the time it made its loan to Dr. Powers.  Because the deed was void, Jonezen cannot rely upon the protections typically afforded to bona fide purchasers.  See First Interstate Bank v. First Wyoming Bank, 762 P.2d 379, 382 (Wyo. 1988) ("A bona fide purchaser is protected against infirmities in a deed which would render the deed voidable.  23 Am. Jur.2d Deeds § 188 (1983). . . .  While a void deed cannot pass title even in favor or an innocent purchaser or a bona fide encumbrancer for value.") (further citation omitted).  Here, the trust deed granted by Dr. Powers is the type considered "void."  See Messenger v. Sundell-Guy, 1999 WL1253057 (D. Kan., Dec. 1, 1999) ("'Moreover, if the purchaser has no interest in the property, because of the invalidity of the

19

deed, a subsequent purchaser from him or her is not entitled to protection as a bona fide

purchaser.  Legal interests of the vendor are protected as against the person claiming through the

purchaser, under the general rule that a vendor can, as against persons having a superior legal

interest, convey only such interest as he or she has.'" (quoting 77 Am.Jur.2d Vendor and

Purchaser § 417)).

For the foregoing reasons, the San Francisco Condo and the Salt Lake City House are

included within the receivership estate and Jonezen's lien on the Salt Lake City House is

ineffective.

## III.    Dr. Powers Is not Entitled to Receive Distributions from the Receivership Estate

In its proposed plan of partial distribution, the SEC excludes Dr. Powers from receiving

any funds from the receivership estate.  The SEC justifies its exclusion of Dr. Powers by arguing

that Dr. Powers was a Merrill Scott "insider" and by claiming that Dr. Powers has already

managed to take money from the receivership estate and has engaged in additional acts

antithetical to the equitable operation of the receivership.  But the SEC has also stated its position

that Mr. Mynar, a creditor of Dr. Powers to whom Dr. Powers assigned his interest in any

distribution from the receivership estate, should be allowed to participate in a distribution.  After

considering the evidence and argument, the court is convinced that Dr. Powers should not be

allowed to participate in any distribution from the receivership estate.  But, recognizing the

SEC's desire to avoid an inequitable result from Mr. Mynar, the court will allow Mr. Mynar to

participate in the distribution.

The SEC put forward considerable evidence indicating that Dr. Powers was involved with

Merrill Scott at a much more intimate level than typical Merrill Scott clients.  As discussed, Dr.

Powers seemingly joined with Merrill Scott in pursuing the purchase of the San Francisco

Condo.  Additionally, Dr. Powers was identified as a financial consultant on Merrill Scott

organizational charts.  (See Ex. 2, attached to Plf.'s Memo. in Opp'n to Intervenor Powers' Mot.

for Summ. J. & in Supp. of Powers' Designation as a Merrill Scott Insider (dkt. #774).)  The

SEC also provided unsigned form letters in which Dr. Powers's name is used in an effort to

convince medical doctors to use Merrill Scott's services to protect their assets.  (See, e.g., Don't

be [sic] the Physician Who Loses Everything to Litigation or Taxes, attached as Ex. 3 to Plf.'s

Memo. in Opp'n to Intervenor Powers' Mot. for Summ. J. & in Supp. of Powers' Designation as

a Merrill Scott Insider (dkt. #774).)  During the evidentiary hearing, the SEC questioned Dr.

Powers about his participation in soliciting new business for Merrill Scott:

> Q.    Now, Dr. Powers, your name was used for marketing purposes with
>        Merrill Scott, wasn't it?
>
> A.    I'm not sure.
>
> Q.    Well, you allowed your name to be used as a reference, didn't you?
>
> A.    I think it was used for--in a limited capacity, yes.
>
> Q.    And in fact you've admitted that it was used in--for marketing purposes;
>        correct?
>
> A.    Yes.
>
> Q.    Okay.  And you've admitted that you contacted potential clients on behalf
>        of Merrill Scott, haven't you?
>
> A.    I contacted several clients, yes.
>
> Q.    And you've admitted that, haven't you, Dr. Powers?
>
> A.    Yes.
>
> Q.    And you've admitted that Merrill Scott clients contacted you seeking

21

information relating to the sale of Merrill Scott claims; correct?

A.      Yes, for a short period of time.

(Transcript of Evid. Hearing, Nov. 2, 2006, 10-11 (dkt. #845).)

Beyond Dr. Powers's involvement with Merrill Scott's client development, the SEC also contends that Dr. Powers's actions after the entry of the asset-freeze order should prevent him from participating in any recovery from the receivership estate.  Indeed, the record reveals several troubling actions taken by Dr. Powers after the issuance of the asset-freeze order.  First, Dr. Powers participation, and perhaps instigation, of the various steps taken to remove Evergreen Management money from the receivership estate.  As discussed, that transaction was described in detail in an earlier order issued in this case.  The record shows that Dr. Powers managed to receive nearly $400,000 as a direct result of the various transactions that facilitated the removal of money from Evergreen Management's account.

Further, after the asset-freeze order, Dr. Powers took substantial steps toward selling the San Francisco Condo, even though he was aware that the Receiver claimed an interest in that property and even though Dr. Powers himself has consistently maintained that Merrill Scott has a one-half interest in that condo.  Dr. Powers was also late in complying with this court's order that he deposit with the court all rental income flowing from the San Francisco Condo until the ownership of that condo could be resolved.  (See Order Re: May 19, 2006 Hearing, docketed in Broadbent v. Powers, 2:05 CV 539 (D. Utah) (dkt. #26).)  During the evidentiary hearing, the court learned that Dr. Powers had not been depositing the rent payments as ordered.  Dr. Powers deposited the required money the following day.  Dr. Powers also tried to transfer the title of the Salt Lake City House from Mira Vista to himself, well after the asset-freeze order was in place.

22

Dr. Powers then sought and received a personal loan, using the Salt Lake City House as security.

Dr. Powers maintains that, throughout his association with Merrill Scott, he believed that the services Merrill Scott offered were legitimate and that he would never solicit business on behalf of an illegitimate business.  Dr. Powers also pleads innocence in relation to the Evergreen Management transaction and the transfer of the title of the Salt Lake City House, claiming that in both situations he sincerely believed that he was the rightful owner of the assets.  He also asserts that he intended to inform the Receiver of the potential sale of the San Francisco Condo if it looked like the sale might go forward.[4]

Under the circumstances, the court agrees with the SEC that it is equitable to exclude Dr. Powers from any distributions from the receivership estate.  The record establishes that Dr. Powers was more intimately involved with Merrill Scott than the vast majority of clients and his activities extended to marketing and solicitation on Merrill Scott's behalf.  His actions have shown disregard for the receivership proceeding and have resulted in his personal recovery of nearly $400,000 already.

Nevertheless, the court agrees with the SEC that Mr. Mynar should not suffer because of the exclusion of Dr. Powers from a receivership distribution.  Dr. Powers used Merrill Scott, in part, to avoid paying the judgment due to Mr. Mynar.  And Mr. Mynar has diligently attempted

---

[4]Dr. Powers's testimony concerning his attempts to sale the San Francisco Condo was less than credible. Dr. Powers acknowledged that sale negotiations had progressed to the point that an escrow account was actually set up.  He also acknowledged that he used an acquaintance to act as the managing member of Mira Vista and that acquaintance was presented as the managing member of Mira Vista during sale negotiations.  Dr. Powers took all of these steps even though he knew that the Receiver claimed an interest in both the San Francisco Condo and Mira Vista.  (See Transcript of Evid. Hearing, Nov. 3, 2006, 83-84 (dkt. #846).)

to preserve the interest that he has in the receivership estate.[5]  It is equitable that Mr. Mynar be allowed to participate in any distribution.  The court accepts and adopts the stipulated position of Mr. Mynar and the SEC, requesting that Mr. Mynar be treated as a Class 3 claimant under the SEC's Proposed Plan of Partial Distribution.

### Conclusion

For the foregoing reasons, the San Francisco Condo and the Salt Lake City House are properly considered part of the receivership estate and Jonezen's lien on the Salt Lake City House is ineffective against the Receiver.  Additionally, Dr. Powers will be excluded from any participation in distributions from the receivership estate.  But the court will consider Mr. Mynar a Class 3 claimant, with a claim equal to that of the amount of the unsatisfied judgment he has obtained against Dr. Powers.  Accordingly, Dr. Powers's Motion For Modification of Proposed Plan of Partial Distribution (dkt. #764) is DENIED.  The Receiver's Motion for Summary Disposition (dkt. #831) is GRANTED.

SO ORDERED this 21st day of December, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge

---

[5]Mr. Mynar previously filed an objection to the SEC's proposed plan of partial distribution, claiming that a turnover order entered by a Texas state court granted Mr. Mynar an interest in receivership property superior to that of the Receiver.  But Mr. Mynar has produced no evidence that Dr. Powers was the owner of the assets in which Mr. Mynar claims an interest.  Accordingly, while Mr. Mynar may receive distributions from the receivership estate, his contention that his interest in certain assets is superior to the Receiver must be rejected.