IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br><br><br>        vs.<br><br><br>MERRILL SCOTT & ASSOCIATES, LTD.,<br>MERRILL SCOTT & ASSOCIATES, INC.,<br>PHOENIX OVERSEAS ADVISERS, LTD.,<br>GIBRALTAR PERMANENTE<br>ASSURANCE, LTD., PATRICK M.<br>BRODY, DAVID E. ROSS II, and<br>MICHAEL G. LICOPANTIS,<br><br>                    Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:02-CV-39-TC |

Plaintiff Securities & Exchange Commission (SEC) seeks summary judgment against individual defendant Patrick M. Brody in this civil securities fraud action.  Mr. Brody is the only remaining defendant in this five-year-old case.

As demonstrated below, the undisputed facts prove that Mr. Brody violated the anti-fraud provisions and broker registration requirements of the federal securities laws.  Accordingly, the SEC is entitled to judgment as a matter of law, and the court GRANTS SEC's Motion for Summary Judgment Against Defendant Patrick M. Brody.

The SEC seeks permanent injunctive relief against future violations of the federal securities laws, disgorgement of Mr. Brody's ill-gotten gains, prejudgment interest on those

gains, and a civil monetary penalty.  Because the court finds liability on the part of Mr. Brody, the court hereby enters the requested permanent injunction against Mr. Brody and orders Mr. Brody to pay $16,622.163.11 in disgorgement and pre-judgment interest.  The court defers ruling on SEC's request for a civil monetary penalty until further briefing and a hearing are completed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background is set forth at length in the written submissions of the parties.  The court will repeat only those facts necessary to explain its decision.

The facts are undisputed,[1] not because of any stipulation between the parties but because the court strikes the evidence (that is, sworn discovery responses) that Mr. Brody submitted in an attempt to controvert facts set forth in SEC's Motion.[2]  The reasons for striking Mr. Brody's evidence are discussed below in the section addressing Mr. Brody's last minute attempt to waive his Fifth Amendment privilege against self-incrimination, which he asserted in 2003.

But before the court sets forth the facts, it must address Mr. Brody's evidentiary objections.

## A.      Mr. Brody's Evidentiary Objections

Mr. Brody makes specific objections in response to specific evidence and statements of

---

[1]All facts are taken from the undisputed facts in the record and the ninety-four exhibits submitted by the SEC (that is, Exhibits 1-93 and Gil Miller's Expert Report).

[2]Because the statement of facts set forth by the SEC in its Motion were not controverted with any admissible evidence, the facts set forth in the Motion are deemed admitted.  See Local Rule DUCivR 56-1(c) ("All material facts of record meeting the requirements of Fed. R. Civ. P. 56 that are set forth with particularity in the statement of the movant will be deemed admitted for the purpose of summary judgment, unless specifically controverted by the statement of the opposing party identifying material facts of record meeting the requirements of Fed. R. Civ. P. 56.").

fact in the SEC's memorandum.  This section addresses those objections.

But he also makes a very broad objection in his opposition memorandum, in which he states that the ninety-three exhibits provided by the SEC "are, for the most part, improperly before the court and this defendant moves that [with narrow exceptions identified by Mr. Brody] they be stricken because they lack foundation, are not based on personal knowledge, do not affirmatively show the affiant or the deponent is competent to testify as to the matters stated therein, and because the documents are not authenticated . . ., lack foundation, or are privileged so as to make them inadmissible in evidence."  (Brody's Opp'n Mem. at 14 n.28.)  The court will not consider such a blanket objection.

### 1.    Best Evidence

Mr. Brody contends that the SEC fails to meet the best evidence requirements of the Federal Rules of Evidence because SEC did not produce written agreements between the investors and Merrill Scott & Associates, Ltd. (MSAL).  (<u>See</u> Brody Opp'n Mem. at 2 n.25.)  As SEC notes, Mr. Brody's objection misses the mark.  Rule 1002 of the Federal Rules of Evidence requires a party to provide an original writing to prove the writing's contents.  But, in this case, the SEC is not attempting to prove the contents of the written contracts between MSAL and investors.  Rather, MSAL and Mr. Brody made oral promises to investors, and the best evidence of those verbal representations is the investors' testimony about what Mr. Brody and MSAL said to them.[3]

---

[3]To some extent, the same can be said for the SEC's Paragraph 89, in which SEC relies on investor testimony that financial statements were unprofessional and inaccurate at best.  But even if the court were to disregard the evidence based on Mr. Brody's best evidence objection, the SEC's evidentiary case would still be complete.

**2.      Hearsay**

Mr. Brody further contends that MSAL employee and investor testimony regarding

MSAL's and Mr. Brody's oral representations about the use and control of investor funds is

inadmissible hearsay.  (Id.)  Mr. Brody is incorrect.  Admissions by party-opponents are

admissible, even if they are not based on personal knowledge.  Fed. R. Evid. 801(d)(2); Grace

United Methodist Church v. City of Cheyenne, 451 F.3d 643, 665-67 (10th Cir. 2006).

**3.      Foundation**

Mr. Brody objects to certain deposition testimony that, he contends, is inadmissible

because it lacks foundation.  (See, e.g., Brody's Opp'n Mem. at pp. 14 n.28, jj-mm, pp-tt.)  Rule

32 of the Federal Rules of Civil Procedure provides that:

> Objections to the competency of a witness or to the competency, relevancy, or
> materiality of testimony are not waived by failure to make them before or during
> the taking of the deposition, <u>unless the ground of the objection is one which might
> have been obviated or removed if presented at that time.</u>

Fed. R. Civ. P. 32(d)(3)(A) (emphasis added).  Foundation is one type of objection that could

have been "obviated or removed" if Mr. Brody had attended any of the depositions.  See, e.g.,

Jordan Medley, 711 F.2d 211, 218 (D.C. Cir. 1983) ("What the exception [in Rule 32(d)(3)(A)]

obviously envisions is a situation in which a timely objection (e.g., on the ground of failure to lay

an adequate foundation) could have enabled the problem to be remedied so that the same

testimony could be received in accordance with law.") (internal citation omitted; emphasis in

original).  But Mr. Brody did not attend any depositions and so he did not make the objection at

the appropriate time.  Even assuming there was a problem with foundation, Mr. Brody has

waived the objection.

4

4.      **Miscellaneous Evidentiary Objections**

Mr. Brody makes other types of evidentiary objections in his response.  For example, he objects to the admissibility of e-mails cited in paragraphs 75-78 of the SEC's supporting memorandum.  He also objects to evidence cited in paragraph 79, which he asserts are "hearsay legal conclusions" presented by deponent O.E. (Bud) Stoner, III.  But even if the court were to disregard this evidence, the record is replete with other evidence to support the SEC's overall case against Mr. Brody.

5.      **Expert Report**

Mr. Brody challenges certain aspects of Gil A. Miller's May 2006 Expert Report (setting forth results and opinions derived from a forensic accounting).  (See, e.g., Brody Opp'n Mem. at p. ee (stating in conclusory fashion that "plaintiff and its expert CPA [are] taking an incomplete fact and misrepresenting it."); id. at p. xx ("The expert accounting report of Gil A. Miller, CPA, was not prepared to a summary judgment standard and was not prepared by gathering all available accounting evidence, organizing it in the manner most favorable to Mr. Brody, and then drawing all reasonable inference in the light most favorable to Mr. Brody."); id. at pp. zz, aaa-ddd (same); id. at p. zz ("Mr. Miller is without any expertise to review depositions and weigh witness credibility and his report should be stricken in that regard, especially as to the highly dubious witnesses."); id. at pp. ddd, 2 n.26 (same); id. at pp. 14 n.28, 15 (requesting court to strike all of the Miller Report except "those portions of the expert witness report . . . that constitute actual accounting").

Mr. Brody did not file a Motion in Limine under Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993), or Federal Rule of Evidence 702.  He did not participate in expert

5

discovery.  He did not file an opposing expert report.  Instead, he offers unqualified, conclusory criticism by himself and his attorney.  This is not sufficient to challenge the admissibility of Mr. Miller's report, and the court disregards his objections.  (See also SEC's Reply Mem. (Docket # 936) at 98-101 (setting forth proper analysis as to why Mr. Miller's report should be considered by the court in analyzing the motion for summary judgment).)

Having ruled on Mr. Brody's objections, the court now sets forth the facts from the record.

**B.      SEC's Enforcement Action**

In January 2002, the SEC brought this enforcement action against four corporate entities, as well as some principals of those entities (for example, Mr. Brody).  Those corporate entities—collectively referred to as "Merrill Scott"—are Merrill Scott & Associates, Ltd. (MSAL), Merrill Scott & Associates, Inc. (MSAI), Phoenix Overseas Advisers, Ltd. ("Phoenix"), and Gibraltar Permanente Assurance, Ltd. ("Gibraltar").

In its complaint, SEC alleged that MSAL and its affiliated entities (MSAI, Phoenix, and Gibraltar), and certain of their principals, had misappropriated investor funds and were actively operating a Ponzi scheme[4] (that is, they were using money obtained from new clients to pay obligations owing to other clients).  A short time after the SEC filed its complaint, the court entered an order enjoining the defendants, freezing the assets of the Merrill Scott, and appointing

---

[4]"The term 'ponzi scheme' refers to an investment scheme whereby returns to investors are financed, not though the success of an underlying business venture, but from the principal sums of newly attracted investors."  In re Primeline Sec. Corp., 295 F.3d 1100, 1104 n.2 (10th Cir. 2002) (citing Hill v. Kinzler, 275 F.3d 924, 926 (10th Cir. 2001)).

David K. Broadbent as the receiver.[5]

The court recently issued a Partial Consent Judgment and Permanent Injunction against Merrill Scott.  (See May 2, 2007 Order at 3 (Docket # 970).)  Judgment has also been entered against Mr. Brody's individual co-defendants—Mr. Licopantis and Mr. Ross.[6]  Mr. Brody is the only remaining defendant.

As for Mr. Brody, the SEC specifically contends that at least since 1998, Mr. Brody misappropriated investor funds and securities by way of misrepresentations made to investors.  SEC says that instead of holding investor funds in trust for investors' benefit, Mr. Brody used those funds to pay for his extravagant lifestyle, to pay operating expenses and obligations of MSAL (through which Mr. Brody conducted his scheme), and to make investments in high risk start-up companies.  He also used client funds to pay MSAL's obligations to other investors who demanded their promised profits or a return of their funds.  In other words, Mr. Brody used MSAL to operate a Ponzi scheme.

### 1.    The Merrill Scott Entities

Corporate formalities were not observed among Merrill Scott entities, which included not only the named corporate defendants but other entities such as Estate Planning Institute, Ltd. (EPI) (purportedly a Bahamian law firm).  Funds moved freely from one entity to another and funds placed in separate entities were frequently commingled.  Nevertheless, the following

---

[5](See Jan. 14, 2002 Order (Docket # 8) (granting temporary restraining order and freezing assets); Jan. 23, 2002 Order (Docket # 15) (appointing temporary receiver); Jan. 23, 2002 Stipulation (Docket # 17) (extending restraining order, asset freeze, and appointment of receiver until resolution of case on merits).)

[6](See Aug. 15, 2006 Final Judgment as to Defendant David E. Ross, II (Docket # 728); Dec. 22, 2006 Final Judgment as to Defendant Michael G. Licopantis (Docket # 875).)

describes the purported roles of the defendant entities.

a.    MSAL and its Master Financial Plan (MFP) Product

MSAL was a Bahamian company that claimed to be a leading firm in the business of providing tax reduction and asset protection through the establishment of offshore entities and accounts.  It described itself and its affiliated entities as "advisors to the affluent."[7]

MSAL offered a product known as a Master Financial Plan (MFP).  One of the functions of the MFP was to provide a means by which the investor could invest cash and securities offshore, usually in the Bahamas or another Caribbean nation, and receive purported tax-free gains from the investment activity.  The MFP established the framework through which the MSAL investor invested and protected cash and assets, avoided payment of taxes, and repatriated funds.  The basic structure of the MFP involved the transfer of an investor's income or assets into offshore entities established on behalf of the investor but controlled by MSAL.  These funds and assets were then used to purchase investments and other products offered by MSAL and its affiliates.

MSAL advertised its services in publications such as *The Robb Report*, *Fortune*, *Forbes*, *Money Magazine*, *Barrons*, and *The Wall Street Journal*.  MSAL also retained financial advisers who solicited investors either through personal contracts or by referrals.  Numerous clients were attracted by promises of decreased tax liability and services designed to shelter assets.

MSAL made money through fees for initial development of a client's MFP (clients paid between $15,000 and $50,000 for an MFP), sale of investment contracts, creation of offshore

---

[7](MSAL Brochure (attached as Ex. 14 to SEC's Mem. Supp. Mot. Summ. J.) at 2.)

entities, and transactions and maintenance associated with implementation of MFPs.  But, ultimately, MSAL operated as a Ponzi scheme.  (See SEC's Mem. Supp. Mot. Summ. J. at p. 26, ¶¶ 137-141.)

    b.  Merrill Scott & Associates, Inc. (MSAI)

MSAI was a corporation based in Salt Lake City, Utah.  Its function was to provide office space and staff to run the MSAL organization.  MSAI also served as the office through which MSAL solicited investors.

    c.  Phoenix Overseas Advisers, Ltd.

Phoenix was a Bahamian entity that acted as an investment adviser and a mutual fund company for MSAL investors.  Mr. Brody's co-defendant Michael Licopantis was officially listed as General Manager of Phoenix, which managed the mutual funds sold to MSAL investors. Phoenix also maintained brokerage accounts into which it placed investors' securities and funds, including numerous accounts with TD Waterhouse Canada Inc. ("TD Evergreen"), a Canadian brokerage.  The MSAL accounts at TD Evergreen were later consolidated into a single account.

    d.  Gibraltar Permanente Assurance, Ltd.

Gibraltar was an entity organized under the laws of Dominica, a Caribbean island.  Mr. Licopantis was officially listed as General Manager of Gibraltar.  Gibraltar ostensibly acted as an issuer of many of the investment products sold to MSAL investors, such as loss of income (LOI) insurance policies and foreign variable annuities.  Gibraltar also controlled the funds of MSAL investors that were to be repatriated to those individuals from accounts located in the Bahamas.

2.      **Patrick M. Brody's Involvement**

Mr. Brody was a Salt Lake City-based promoter for MSAL.  But he was not registered

with the SEC as a broker or affiliated with a registered securities dealer.

Although he was officially listed as the Managing Director of MSAL, he also controlled

the operations of other entities affiliated or associated with MSAL, including MSAI, Phoenix,

and Gibraltar.  Mr. Brody was intimately familiar with the operations of MSAL and the affiliated

entities, and he exercised free reign over client cash and assets.  He was intimately familiar with

MSAL finances because the accounting staff provided Mr. Brody with daily reports regarding

account balances.

a.      <u>Misrepresentations</u>

Mr. Brody personally solicited wealthy clients, but he misrepresented to these investors

that their assets would be safe if invested with MSAL, that the money would be invested

according to their wishes as laid out in the MFP created for that client, that their assets would be

held in segregated accounts (client funds were commingled in various accounts) and that they

were guaranteed a specific rate of return on investments made with MSAL.  The details of those

misrepresentations are laid out in the SEC's briefs, but the following provides a good summary.

First, Mr. Brody failed to inform the investors that their money would be used to pay for

his personal expenses.  For example, from September 1999 to June 2000, Mr. Brody took

approximately $261,378.00 from clients to pay his credit card bills.  He transferred $659,000.00

from various corporations established for the benefit of his clients to Alex Jones, Ltd., a company

established for his own personal benefit.  He made similar transfers in the amount of

$1,246,061.42 to Web Services Ltd., another shell corporation established for Mr. Brody's

personal benefit.  He used misappropriated funds to furnish a home, purchase art, take extravagant vacations, lease expensive cars, pay for a housekeeper, and pay for a personal masseuse/nurse.

Second, Mr. Brody failed to inform the investors that their money would be used to pay the operating expenses and obligations of MSAL (at his direction).  According to MSAL's financial statements, it had been operating at a loss for several years.  Mr. Brody used client funds to cover operating expenses.  He would often take client funds to pay MSAL's payroll.  He would also margin securities maintained on behalf of MSAL clients and use those proceeds to pay the company's obligations.  To keep his actions hidden from clients, Mr. Brody instructed MSAL employees to conceal those payments from clients.

Third, Mr. Brody failed to inform the investors that their money would be used to make unauthorized investments in high-risk start-up companies (at his direction).  Mr. Brody was the sole decisionmaker in determining which prospects to invest in and how much to invest.  He used investor funds to purchase speculative securities, but those purchases were not authorized by the clients.  At times, the investors were not even denominated the owners of the newly purchased securities.  Mr. Brody purchased these high-risk stocks in a failed attempt to raise revenue to meet investor demands for the return of their money.

Fourth, Mr. Brody failed to inform the investors that their money would be used to fund a Ponzi scheme (at his direction).  During 2001, many clients demanded the return of their money. In order to accommodate these demands, Mr. Brody decided to use newly invested client funds to pay more recent obligations because MSAL did not have the money to return funds to clients. According to former MSAL Chief Financial Officer S. Drew Roberts, "had Merrill Scott always

11

transacted client funds in accordance with each client's MFP, Merrill Scott should not have

encountered an inability to meet client obligations." (SEC's Mem. Supp. at 17, ¶ 73.) But

because Brody had misappropriated client funds to pay for his personal expenses or for the

operations of MSAL, the obligations on those client MFPs had to be met with money coming in

from new clients or the ongoing sale of MSAL investment products. When MSAL did provide

statements to clients, the accounting information was either false or inaccurate.

        b.        In Connection With the Purchase or Sale of Securities

All of Mr. Brody's activities were in connection with the purchase or sale of securities.

For example, as part of the MFP, Mr. Brody offered clients the opportunity to invest in the

Phoenix family of mutual funds. Also as part of the MFP, he promised investors a specific return

on their investments, he recommended specific stock purchases to clients, and he bought and sold

securities on a client's behalf. He told some investors to place their funds in securities accounts

with TD Evergreen (but, unbeknownst to investors, their securities were placed in commingled

accounts at TD Evergreen). And MSAL offered investment advice to its clients through its asset

management program.

        c.        With Full Knowledge and Intent

Mr. Brody acted with the necessary scienter. He controlled all aspects of MSAL and its

affiliates. He developed the MFPs, recommended strategies, and met with clients. He exercised

free reign over MSAL's accounts and directed the transfer of investor funds to pay MSAL's

operating expenses and his personal expenses. He received daily reports regarding MSAL

account balances and daily information from TD Evergreen regarding the margin limits of those

securities accounts. He devised the scheme to make payments from new client funds to meet

MSA's obligations to older clients.  Even though he acknowledged (not publicly) at one point that $9 million was missing and owed to clients, he told clients who requested their money back that the funds were safe and refunds forthcoming (this despite knowing the MSAL was insolvent).  And the personal nature of various payments to or on behalf of Brody, who controlled the accounts, were concealed in Merrill Scott's books and records.

> d.    Investor Losses Caused By Brody

The accounting of Merrill Scott's books shows that investor losses caused by Brody amount to $13,140,000.00.  This is set forth at length in the forensic accounting report of expert witness Gil A. Miller.  (See May 1, 2006 Expert Report & Disclosure of Gil A. Miller (Docket # 658); SEC's Mem. Supp. at pp. 25-26, ¶¶ 131-136.)

## C.    Discovery and Mr. Brody's Exercise of his Fifth Amendment Privilege Against Self-Incrimination

After the SEC filed its complaint in January 2002, and after the injunction, appointment of receiver, and asset-freeze went into effect, Mr. Brody and his attorney met with SEC and Department of Justice attorneys in the fall of 2002 to discuss a potential plea agreement to anticipated criminal charges against Mr. Brody.  The SEC did not have the opportunity to examine Mr. Brody during that meeting, nor did Brody discuss the substance of his defense at that time.  No other meetings were held with Mr. Brody, and no criminal charges were filed.[8]

Meanwhile, discovery in the civil enforcement action began, but Mr. Brody did not participate until December 2003.  By December 12, 2003, almost two years after the complaint

---

[8]The record does not reflect why no criminal charges were filed, and the court will not speculate regarding the reasons why.

13

was filed, Mr. Brody had not even answered the SEC's complaint.  The SEC moved for entry of default judgment, but because Mr. Brody answered the complaint approximately three weeks later (he denied the allegations), no default judgment was entered.

Then, on December 15, 2003, the SEC deposed Mr. Brody.  Mr. Brody (who was represented by counsel) asserted his Fifth Amendment privilege against self-incrimination to all substantive questions regarding Merrill Scott and its affiliated entities and regarding all allegations in the Complaint.  Mr. Brody's invocation of the privilege was very broad.  (See Dep. of Patrick Brody, attached as Ex. 82 to SEC's Mem. Supp. Mot. Summ. J. (Docket # 678); SEC's Mem. Supp. Mot. Summ. J. at pp. 21-22, ¶¶ 101-113; SEC's Reply Mem. in Supp. Mot. Summ. J. (Docket # 936) at pp. 2-78, 80-82.)

Following Mr. Brody's fruitless deposition, the SEC, from February 2004 to December 2005 (when fact discovery ended), took fifty-two depositions of individuals, including investors, former Merrill Scott employees, independent contractors, and other third parties.  (Plus SEC had participated in more than twenty depositions before Mr. Brody's deposition).

On August 11, 2004, the SEC filed its first motion for summary judgment against Mr. Brody.[9]  Mr. Brody filed an opposition memorandum in November 2004, but he did not submit an affidavit or declaration or in any other way testify as to the facts for which he had previously asserted his Fifth Amendment privilege against self-incrimination.  Then, months later and only a few days before the March 18, 2005 hearing, Mr. Brody filed an affidavit in opposition to the motion.  The Commission moved to strike Mr. Brody's affidavit for the same reasons that it now

---

[9]The motion currently being considered by the court is the SEC's second motion for summary judgment against Mr. Brody.

14

seeks to strike Mr. Brody's sworn discovery responses.  The court denied the SEC's motion for summary judgment during the March 2005 hearing, but not for reasons related to Mr. Brody's affidavit.  Accordingly, SEC's motion to strike the affidavit was moot, although the court did not expressly deny it as such.[10]  Still, Mr. Brody had notice of SEC's position on his attempt to waive his Fifth Amendment privilege right before the court considered a motion for summary judgment.

After the court denied the SEC's initial motion for summary judgment, SEC conducted more discovery, including dozens of depositions.  Many of the witnesses reside outside the District of Utah.  According to the SEC, it has taken over seventy depositions in the United States and Canada since discovery began.

On November 28, 2005, SEC served Mr. Brody with interrogatories and requests for admissions.  The fact discovery deadline was January 1, 2006.  Mr. Brody did not respond to or participate in any discovery during the three years of discovery.  Instead, around the time the SEC served Mr. Brody with its discovery request, Mr. Brody engaged the SEC in settlement discussions and, consequently, sought an extension of time to respond to the discovery request. SEC agreed to the extension.

In the meantime, the SEC filed its second motion for summary judgment against Mr. Brody (the one currently before the court) a few days before the motion filing deadline of June 2, 2006.  Because of settlement discussions, the SEC also granted extensions to Mr. Brody to file his opposition brief.

After continual delays from Mr. Brody in the settlement negotiations, SEC requested (and

---

[10]Instead, the motion to strike was "terminated" on the electronic docket by court personnel because it was moot.

15

received) a status conference from the court.  During the November 13, 2006 status conference, the court ordered Mr. Brody to either deposit the settlement funds requirement by the SEC into his counsel's trust account (as had been discussed and tentatively agreed to during settlement negotiations) or respond to the second motion for summary judgment by December 13, 2006.

After Mr. Brody was compelled to act, he did respond to a portion of the SEC's discovery responses on December 9, 2006.  Still, despite the court's order, Mr. Brody requested (and received) two more extensions of time to respond to the SEC's summary judgment motion.

In the interim, Mr. Brody found time to file numerous other motions, including a motion for sanctions, a motion for summary judgment dismissal based on lack of subject matter jurisdiction, a motion to stay disbursements by the Receiver, and motion for certification of an issue to the Utah Supreme Court.  The court summarily denied all of these motions because they lacked merit.

Finally, on February 9, 2007, Mr. Brody filed his opposition to the motion for summary judgment and served SEC with his response to the remainder of the SEC's discovery responses. Attached to his opposition memorandum was his sworn response to the SEC's discovery responses, upon which he relies to defeat the SEC's current motion.  Mr. Brody's submissions came less than a month before the March 8, 2007 hearing on SEC's summary judgment motion. SEC filed a reply brief before the hearing, contending, among other things, that Mr. Brody was not entitled to submit testimonial evidence at this stage in the proceeding after asserting his privilege only to waive it at the "eleventh hour," with resulting prejudice to the SEC.

On March 8, 2007, the court heard argument on the SEC's Motion for Summary Judgment.  During the hearing, the court requested supplemental briefs on the issues relating to

waiver of the Fifth Amendment privilege against self-incrimination.  Having received the

supplemental briefs, and having reviewed the relevant pleadings and case law, the court now sets

forth its decision.

## II. ANALYSIS

In its Motion for Summary Judgment, the SEC contends that Mr. Brody violated the anti-

fraud provisions and the broker registration requirements of the federal securities laws.[11]

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c);  see Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670

(10th Cir. 1998).  The court must "examine the factual record and reasonable inferences

therefrom in the light most favorable to the party opposing summary judgment."  Applied

Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  "The

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient

[to overcome a motion for summary judgment]; there must be evidence on which the jury could

reasonably find for the plaintiff."  Liberty Lobby, 477 U.S. at 252; see also Anderson v. Coors

Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the

nonmoving party's theory does not create a genuine issue of material fact.").

---

[11]Despite Mr. Brody's contentions, this court has subject matter jurisdiction.  (See May 2, 2007 Order (Docket # 971) (denying Mr. Brody's summary judgment motion challenging the court's subject matter jurisdiction).)

Before the court discusses the merits of SEC's claims, the court must address the threshold issue regarding Mr. Brody's last minute waiver of his Fifth Amendment privilege against self-incrimination.

**A.**      **The Fifth Amendment Privilege Issue**

In February 2007, Mr. Brody submitted sworn discovery responses (specifically, responses to SEC's Interrogatory No. 1 and Interrogatory No. 6) as evidence to support his opposition to the SEC's summary judgment motion.  By submitting what essentially amounts to an affidavit, he waived the Fifth Amendment privilege that he asserted during his 2003 deposition.  In his discovery response, he denies many of the allegations that SEC now seeks to prove in its motion.  And he cites to the discovery response as evidence that controverts the voluminous evidence cited by the SEC in its motion.  His discovery response is the only evidence he submits (although he does occasionally cite to SEC exhibits in his opposition).

The SEC argues that the court must strike Mr. Brody's discovery response.  Specifically, SEC contends that Mr. Brody's "last minute attempt to testify on his own behalf would prejudice the Commission and is nothing more than the legal gamesmanship that has characterized Brody's belated defense."  (SEC's Supp. Mem. Regarding Fifth Am. Privilege (Docket # 948) at 2.)

**1.**      **Mr. Brody's Motion to Strike**

After SEC filed its supplemental memorandum regarding the Fifth Amendment privilege issue, Mr. Brody moved to strike two aspects of SEC's memorandum.  First, he moves the court to strike "Point II" of the memorandum (which argues in the alternative that Mr. Brody's discovery responses, even if not stricken, are insufficient to controvert the SEC's undisputed facts) on the ground that it exceeds the scope of the issue the court asked the parties to brief.

18

Second, he moves the court to strike "all commentary in that memorandum purporting to set forth the course and the contents of settlement discussions on the grounds that it exceeds the scope of the Fifth Amendment issue" the court asked the parties to brief.

Regarding his request to strike "Point II," that issue is moot because the court is striking Mr. Brody's discovery response and does not consider SEC's alternative argument. As for the "commentary" set forth in the SEC's supplemental memorandum, that information is very pertinent to the Fifth Amendment privilege waiver issue, as will become apparent during the discussion below about factors the court should consider when determining whether to strike the discovery response. For these reasons, the court denies Mr. Brody's Motion to Strike.

**2.      Merits of SEC's Request to Strike the Discovery Response**

A party may assert the privilege against self-incrimination during civil as well as criminal proceedings. But during civil proceedings, "because the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent." SEC v. Graystone Nash, Inc., 25 F.3d 187, 190 (3d Cir. 1994).

Certainly the court may not punish Mr. Brody for invoking his privilege during his deposition. The civil procedures recognize the need for exercise of the privilege and "provide no basis for inflicting sanctions when there is a valid invocation of the Fifth Amendment." Id. at 191. It would be improper to impose a complete bar on presenting any evidence, or to grant summary judgment solely in response to a valid invocation of the privilege.

But a limitation on sanctions does not immunize the party invoking the privilege from adverse consequences in the civil litigation setting. For instance, according to the United States

Supreme Court, it is permissible to draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." Baxter v. Palmagiano, 425 U.S. 308, 318 (1976). The Supreme Court has also noted that "the fact that a litigant may be forced to choose 'between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.'" United States v. Certain Real Property and Premises Known as 4003-4005 5th Ave., Brooklyn, NY, 55 F.3d 78, 83 n.3 (2d Cir. 1995) (quoting Williams v. Florida, 399 U.S. 78, 83-84 (1970)). "In a civil trial, a party's invocation of the privilege may be proper, but it does not take place in a vacuum; the rights of the other litigant are entitled to consideration as well." Graystone Nash, Inc., 25 F.3d at 191. Consideration of the other litigant's rights continues even when the party invoking the privilege attempts to waive it later in the proceedings, as in Mr. Brody's case. "The Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions." SEC v. Zimmerman, 854 F. Supp. 896, 899 (N.D. Ga. 1993) (distinguishing situation where party invoking privilege is a defendant in both civil and criminal cases and is forced to choose between waiver of the testimonial privilege in the criminal case and automatic entry of an adverse judgment in a civil case).

To determine whether Mr. Brody's discovery response should be stricken, the court should examine how and when the privilege was invoked, how and when it was waived, the nature of the proceeding, and any resulting prejudice to the opposing party. 4003-4005 5th Ave., 55 F.3d at 84-86. Further, the court must "carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment. Because the privilege is constitutionally based, the detriment to the party asserting it should be no

20

more than is necessary to prevent unfair and unnecessary prejudice to the other side." <u>Graystone Nash, Inc.</u>, 25 F.3d at 192.

Nothing in the record indicates that Mr. Brody improperly invoked the privilege in December 2003 when he was deposed.[12]  And SEC does not argue otherwise.

But the timing and context within which Mr. Brody waived his privilege is troubling.  Mr. Brody did not submit his sworn "testimony" until approximately one year after the period for fact discovery had concluded.  More importantly, he waived the privilege after the SEC had moved for summary judgment, and, consequently, had an opportunity to tailor his response to the motion.[13]  Moreover, he only waived the privilege after the court compelled him to either deposit settlement money or respond to the summary judgment motion.  Faced with this "eleventh hour" waiver, particularly in light of the many delays arguably attributable to Mr. Brody, the court believes that striking the discovery response is an appropriate measure.  Other courts have done the same in similar circumstances.  <u>See, e.g.</u>, <u>SEC v. Hirshberg</u>, 173 F.3d 846, Case Nos. 97-6171 & 97-6259, 1999 WL 163992 (2d Cir. 1999) (table decision) (precluding evidence of

---

[12]Although the court notes that he invoked his privilege only after he narrowly avoided a default judgment by answering the complaint nearly two years after it had been filed.

[13]Mr. Brody's offer to submit to a deposition now is not sufficient to remedy the problems created by his "eleventh hour" waiver.  (<u>See</u> Tr. of Mar. 8, 2007 Hearing at 60-61, 64 (SEC's counsel requested that if Mr. Brody were allowed to testify at a deposition, discovery be "completely reopened so that we can then go back to our witnesses and talk about what Mr. Brody said they said.").  <u>See also</u> <u>Parcels of Land</u>, 903 F.2d 36, 45 (1st Cir. 1990) (rejecting civil forfeiture defendant's contention that district court erred when it failed to consider defendant's "last-minute agreement to answer deposition questions," noting that the motivation for the defendant's "change of heart" "seems to have been [defendant's] realization that the court was not going to consider his affidavit in light of his refusal to answer deposition questions . . . . [The defendant's] last-minute backpedaling on his longstanding refusal to be deposed is not enough to save his properties.")

defendant who waived Fifth Amendment privilege after SEC filed summary judgment motion, finding that it would be prejudicial to SEC to allow defendant, who waited four years to respond to the motion, to tailor his affidavit to create an issue of fact for trial); 4003-4005 5th Ave., 55 F.3d at 85 (noting that if litigant's waiver of privilege comes at "eleventh hour" and "appears to be part of a manipulative, 'cat-and-mouse' approach to the litigation, a trial court may be fully entitled . . . to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege"); In re Edmond, 934 F.2d 1304, 1308 (4th Cir. 1991) ("By selectively asserting his Fifth Amendment privilege, [the defendant] attempted to insure that his unquestioned, unverified affidavit would be the only version [of his testimony]. But the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion."); United States v. Parcels of Land, 903 F.2d 36, 43-44 (1st Cir. 1990) (affirming order striking affidavit opposing government's summary judgment motion when witness "shielded his account of the 'facts' from scrutiny by invoking the Fifth Amendment at his deposition."); SEC v. Softpoint, Inc., 958 F. Supp. 846, 857 (S.D.N.Y. 1997) (noting that defendant's waiver of privilege three months after SEC moved for summary judgment was "convenient" and that defendant "simply may not invoke his privilege against self-incrimination to impede the government's discovery efforts and then seek to waive the privilege when faced with the consequences of his refusal to testify."); SEC v. Grossman, 887 F. Supp. at 660 (precluding evidence at summary judgment stage on the issues for which the defendants had "declined to provide discovery for several years" under the guise of the Fifth Amendment privilege against self-incrimination); SEC v. Zimmerman, 854 F. Supp. 896, 899 (N.D. Ga. 1993) ("The Fifth

22

Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions.").

As SEC notes in its supplemental brief, cases where a court declined to preclude the testimony are distinguishable. For instance, one court denied preclusion when the defendant was pro se at the time he invoked his Fifth Amendment privilege and did not fully understand the consequences. See Graystone Nash, Inc., 25 F.3d at 192-93. Here, Mr. Brody was represented by counsel during his deposition, and has been represented by counsel throughout the litigation. No doubt his counsel fully informed him of the ramifications of invoking the privilege. Also, in Graystone Nash, the court noted that the SEC's summary judgment motion was the first indication to the pro se defendants that invocation of the privilege could prevent them from offering evidence in their defense. Id. at 193. Again, Mr. Brody (perhaps uniquely in this case) had actual notice that the issue would arise this time because it arose when the SEC filed its initial motion for summary judgment in 2004. He cannot now argue that he had no indication, either through advice from counsel or from the actual unfolding of events in this case, that he may not be able to present last-minute testimony to oppose a motion for summary judgment. And during all that time, there was no indication from Mr. Brody that he would waive the privilege he asserted in 2003.

As for the nature of the proceeding, Mr. Brody does not face the dilemma that a defendant in parallel civil and criminal proceedings faces. For example, SEC has the burden of proof here, unlike in civil forfeiture proceedings that typically track a criminal prosecution. In civil forfeiture proceedings, courts may be less inclined to strike evidence proffered at the last-minute. See, e.g., 4003-4005 5th Ave., 55 F.3d at 83 ("The tension between self-incrimination concerns

and the desire to testify may be especially acute for a claimant in a civil forfeiture proceeding."). Here, Mr. Brody is not being forced to waive his privilege in order to meet an affirmative burden, because SEC retains the burden of proof in this enforcement action.  See, e.g., Graystone Nash, Inc., 25 F.3d at 190 (noting that SEC must still prove its case when defendant invokes the Fifth Amendment).  And, as the Supreme Court noted many years ago, forcing a litigant to choose "between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination." Williams v. Florida, 399 U.S. 78, 83-84 (1970). Regardless, Mr. Brody is not precluded from remaining silent and, at the same time, testing the government's proof and offering evidence (other than his last-minute testimony) to rebut such proof.

Finally, acceptance of Mr. Brody's waiver would cause substantial prejudice to the SEC. This case has been pending for over five years.  SEC has taken over seventy depositions throughout the United States and Canada.  Mr. Brody did not attend a single deposition that the SEC noticed (other than his own).  The SEC no doubt incurred significant costs and expenses in connection with that discovery.  Indeed, arguably the SEC took more depositions as a result of Mr. Brody's refusal to testify in 2003.  But SEC took many of the depositions without the benefit of Mr. Brody's version of events.  While the SEC developed its own case, it did not have the opportunity to rebut Mr. Brody's newly presented case.  It certainly would be prejudicial to the SEC to allow Mr. Brody to testify at trial without first being deposed.  And it would be prejudicial to require SEC to rely on discovery that was developed without the benefit of knowing Mr. Brody's assertions.  So the court would have to re-open discovery, at least for Mr. Brody's deposition.  But SEC has requested that the court open all discovery so that SEC can test

24

Mr. Brody's assertions about what other witnesses allegedly did or said.  To allow SEC the

opportunity to rebut Mr. Brody's case through additional discovery would not only open a

Pandora's box but would result in substantial additional costs and delay.  But otherwise, without

that additional discovery, at trial the SEC would in some instances have to rely on transcripts of

depositions where they lacked the ability to test Mr. Brody's recent assertions.[14]  This is so

because many of the witnesses reside outside the District of Utah and so are outside the subpoena

power of the court.

Mr. Brody waited over three years from the date of his deposition to waive the Fifth

Amendment privilege and attempt to offer evidence in his defense.  Before filing his opposition

to the SEC's summary judgment motion, Mr. Brody never indicated that he intended to waive the

privilege.  Indeed, he never sought assistance from this court to accommodate any Fifth

Amendment concerns he might have.  See Softpoint, 958 F. Supp. at 856 (precluding last-minute

testimony from defendant and noting that defendant, despite ample time and opportunity to do

so, failed to seek the court's assistance in accommodating his Fifth Amendment concerns).  As a

result of his behavior, SEC has been prejudiced.  Given case law precedent and the facts of this

case, the court rejects Mr. Brody's attempt to waive his privilege in this context, and,

consequently, strikes Mr. Brody's discovery response.[15]

----

[14]The SEC, in its supplemental brief, specifically lays out examples of assertions that SEC
would not be able to explore with other witnesses.  (See SEC's Supp. Mem. Re: Fifth Am.
Privilege at 22-23.)

[15]SEC also urges the court to draw an adverse inference based on Mr. Brody's Fifth
Amendment broad privilege assertion, arguing that "Brody's silence and failure to contest these
assertions is evidence of his acquiescence to the fact that he was conscious of his fraudulent
activities and of his active involvement in the scheme to defraud MSA investors."  (SEC's Mem.
Supp. Mot. Summ. J. at 49-50.)  The court is allowed to draw such an inference.  Baxter v.

**B.**      **SEC's Claims of Securities Laws Violations**

The SEC contends that Mr. Brody violated the anti-fraud provisions of the Securities Act
of 1933, the Securities Exchange Act of 1934, Rule 10b-5, and the Investment Advisers Act of
1940.  It also contends that he violated the broker registration requirements under the Securities
Exchange Act of 1934.  The court will address each in turn.

> **1.**      **Mr. Brody violated the anti-fraud provisions of Section 17(a) of the
> Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of
> 1934, and Rule 10b-5.**

To prove that Mr. Brody violated Sections 17(a) of the Securities Act of 1933 ("Securities
Act") and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), the SEC must
establish that (1) in connection with the offer and sale of securities; (2) Mr. Brody engaged in a
scheme to defraud when he made untrue statements, omitted material facts, and engaged in
transactions, practices or courses of business that operated as a fraud or deceit upon the investor;
(3) Mr. Brody's misrepresentations or omissions were material, such that a reasonable investor
would consider the misrepresented or omitted facts to be important in making an investment
decision; and (4) Mr. Brody acted with the requisite scienter, in that he intended to deceive,
manipulate or defraud investors, and acted recklessly.  15 U.S.C. §§ 77j(b) and 77q(a);  TSC
Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Basic Inc. v. Levinson, 485 U.S. 224,
231-32 (1988); Aaron v. SEC, 446 U.S. 680, 701 (1980); Ernst & Ernst v. Hochfelder, 425 U.S.
185, 193 (1976); Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 595-97 (10th Cir. 1979)
(defining scienter as reckless conduct).  The SEC must also show that Mr. Brody used the means

---

Palmigiano, 425 U.S. 308 (1976).  But given the overwhelming and uncontroverted evidence in
the record, the court need not do so here.

and instrumentalities of interstate commerce in connection with the fraud.  15 U.S.C. §§ 77q(a),

78j(b); 17 C.F.R. § 240.10b-5.  SEC must prove these elements by a preponderance of evidence.

Herman & MacLean v. Huddleston, 459 U.S. 375, 387 (1983).

        a.        Means and Instrumentalities of Interstate Commerce

The jurisdictional requirements of Section 17(a) of the Securities Act and Section 10(b)

of the Exchange Act (and Rule 10b-5) are satisfied by the use of the mails or telephone in

connection with the fraud.  The fraud or misrepresentation itself need not have been

communicated over the telephone or through the mail, as long as the defendant's use of the

telephone or mail "furthered the fraudulent scheme."  Aquionics Acceptance Corp. v. Kollar, 503

F.2d 1225, 1228 (6th Cir. 1974).  Here, there is ample evidence in the record that this

jurisdictional requirement is met.  For example, Mr. Brody made misrepresentations to investors

over the telephone, used the mail to transmit correspondence with investors, and wired money

between accounts both in the United States and off-shore.

        b.        In connection with the offer and sale of securities

Mr. Brody's actions to defraud were done "in connection with the offer and sale of

securities."  First, Mr. Brody was dealing with "securities."  The term "security" is defined as an

"investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  The United States Supreme Court has

defined an "investment contract" as (1) "an investment of money"; (2) "in a common enterprise";

and (3) with a reasonable expectation of profits to be derived "solely from the efforts of others."

SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946);  United Hous. Found., Inc. v. Forman, 421

U.S. 837, 852 (1976).  Mr. Brody's foreign investment schemes were "investment contracts" as

defined under Howey.

First, there was an investment of money.  Mr. Brody's clients each invested money or securities with MSAL in order to obtain promised tax advantages, asset protection or profits. Each client paid a fee to obtain an MFP, which outlined the framework and strategies that MSAL would follow in order to help the client achieve his desired objectives.  The basic structure of most MFPs involved transfer of a client's income and/or assets into various offshore entities established on the client's behalf.  So when the MFP was finalized, the client transferred the money he was investing to MSAL.  This money was then used to purchase various MSAL products such as Loss of Income insurance policies (LOIs), Equity Management Mortgages (EMMs), and Foreign Variable Annuities (FVAs).

Second, the investors' assets were commingled in a common enterprise.  Once MSAL received money from its clients, it would transfer it into various bank accounts where it would be commingled with other investors' money.  These bank accounts were in the names of various Merrill Scott entities.  Also, if a client transferred stock to MSAL as part of his investment, those securities were mixed with other clients' stocks.  Mr. Brody controlled these accounts.

Third, the clients had a reasonable expectation of profits to be derived solely from the efforts of others.  Mr. Brody and Merrill Scott representatives told investors they would receive a return on their investments in the form of tax liability benefits, asset protection and management, and income from investments made by Merrill Scott entities on the client's behalf.

Mr. Brody made misrepresentations "in connection with" the purchase or sale of securities.  The "in connection with" requirement should be broadly and flexibly construed to effectuate the remedial purpose of the federal securities laws.   SEC v. Zandford, 535 U.S. 813, 819, 822 (2002) ("It is enough that the scheme to defraud and the sale of securities coincide.").

28

The "in connection with" requirement is satisfied when someone uses a device "that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities."  <u>SEC v. Texas Gulf Sulphur Co.</u>, 401 F.2d 833, 860 (2d Cir. 1968).

Here, Mr. Brody's "device" was Merrill Scott promotional and sales literature, including the MFP.  There was a direct and intended link between the MFP and the purchase and sale of securities by MSAL clients.  Based on the court's review of the record, SEC has established the "in connection with the offer and sale of securities" requirement.

c.      <u>Scheme to Defraud through Misrepresentations</u>

Mr. Brody's misrepresentations and omissions were actively used to defraud investors out of at least $13 million, and this constitutes a scheme to defraud.  Clients were told that their money would be safe, segregated, and handled in accordance with the strategies outlined in their MFPs.  Mr. Brody failed to inform his investors that their money would be used to pay for such things as Mr. Brody's own personal expenses, the operating expenses and obligations of MSAL, unauthorized investments in high-risk start-up companies, and the funding of a massive Ponzi scheme.  He further misled investors when he failed to disclose that their money would be commingled with funds from other investors and that their stocks would be margined with the proceeds being used to fund the operating expenses of MSAL.

d.      <u>Material Misrepresentations or Omissions</u>

The misrepresentations and omissions presented in the record and summarized above were material, in that there was a substantial likelihood that a reasonable investor would consider the misrepresented or omitted facts to be important in making an investment decision.  <u>See</u> <u>TSC</u>

29

Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  The testimony of a segment of the investors shows that the facts such as rate of return, the purported tax benefits, asset protection, and segregated accounts were important to them in making their decision to invest their money through MSAL.  Many said they would not have invested their money with MSAL if they had known that Mr. Brody would handle their money the way he did.  And some who learned what was actually being done with their money asked for their investments to be unwound and refunded.

     e.     <u>Scienter</u>

Mr. Brody acted with scienter when he made misrepresentations and omissions that caused clients to invest in Merrill Scott.  Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Aaron v. SEC, 446 U.S. 680, 686 n.5 (1980) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)).  Scienter has also been defined as recklessness.  Edward J. Mawod & Co., 591 F.2d at 595-97; Hackbart v. Holmes, 675 F.2d 1114, 1117 (10th Cir. 1982) (ruling that threshold mental state for specific "intent to deceive" is "recklessness" and noting that all circuits facing the issue have held the same). Recklessness is "conduct which falls far short of the standard of ordinary care and which carries a danger of misleading purchasers such that [the defendants] knew or must have known of its propensity to mislead." C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1435 (10th Cir. 1988).

Mr. Brody knew that investor funds were not being used as represented.  Despite this knowledge, Mr. Brody continued to tell clients that their money would be invested according to the MFPs.  He participated in presentations made to clients and so was well aware that clients expected their money to be invested according to the representations made by MSAL.  He

specifically told investors their funds were safe.  Yet he took much of that money for his own personal use.  Mr. Brody developed and authored many MFPs and worked with attorneys and financial advisers to plan others.  He knew the type of investment strategies that were being presented to clients, but he ignored the plan once the client's money was received.

Mr. Brody knew that MSAL operated at a loss.  He received daily cash status reports from MSAL staff.  He knew that client money was being used to meet the company's payroll and operating expenses.  He had access to MSAL's accounts, and he frequently exercised his control by transferring funds.

In short, the court finds that Mr. Brody acted with the requisite scienter.

> f.      Conclusion

SEC has established, by a preponderance of evidence, all of the elements required to prove that Mr. Brody violated the anti-fraud provisions of Section 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder. Accordingly, it is entitled to summary judgment on those claims.

**2.      Mr. Brody violated Sections 206(1) and (2) of the Investment Advisers Act of 1940.**

Section 206 of the Investment Advisers Act prohibits investment advisers from employing devices, schemes or artifices to defraud, or engaging in any transaction, practice, or course of business that operates as a fraud or deceit on clients or prospective clients.  15 U.S.C. §§ 80b-6(1) & (2).  To establish that Mr. Brody violated Section 206(1) of the Investment Advisers Act, the SEC mush prove that (1) Mr. Brody was an investment adviser; (2) Mr. Brody utilized the mails or instrumentalities of interstate commerce to employ a device, scheme or

artifice; (3) the device, scheme or artifice violated Mr. Brody's fiduciary duty to his clients in that

he made false and misleading statements to his clients; and (4) Mr. Brody acted with scienter.

Id.; Morris v. Wachovia Sec., Inc., 277 F. Supp. 2d 622, 644 (E.D. Va. 2003). The same

elements apply for Section 206(2), except that no scienter is required. All that need be shown is

that the investment adviser failed to disclose a material fact. Morris, 277 F. Supp. 2d at 644.

Concerning the first element, SEC has established that Mr. Brody acted as an investment

adviser. An investment adviser is "any person, who for compensation, engages in the business of

advising others, either directly or through publications or writings, as to the value of securities, or

who for compensation and a part of a regular business, issues or promulgates analyses or reports

concerning securities." 15 U.S.C. § 80b-2(a)(11).

Mr. Brody frequently advised clients as to the value of securities, recommended

investments, and encouraged clients to invest in an MSAL-controlled mutual fund. He either

wrote or helped to write most of the MFPs prepared for clients. These MFPs contained

numerous recommendations regarding various investment products. He promoted investment in

various start-up companies and used investor money to purchase stock in many of the companies

he was promoting. Mr. Brody made investment decisions for Phoenix and Gibraltar, both of

which held client money. His conduct falls within the definition of an investment adviser.

As for the remaining elements, which mirror the elements of a violation of Section 10(b)

discussed above, the SEC has established them as well.

Accordingly, SEC is entitled to summary judgment on this claim.

3.     **Mr. Brody violated the broker registration requirements under Section 15(a) of the Securities Exchange Act of 1934.**

Section 15(a)(1) of the Exchange Act prohibits a broker or dealer from making use of the mails or any means or instrumentality of interstate commerce to effect or attempt to induce transactions in securities unless registered with the SEC in accordance with Section 15(b). 15 U.S.C. § 78o(a)(1). Scienter is not required to prove a violation of Section 15(a). See, e.g., SEC v. Martino, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); SEC v. National Exec. Planners, Ltd., 503 F. Supp. 1066, 1073 (M.D.N.C. 1980). So the SEC need only establish that Mr. Brody acted as a broker or dealer in offering and selling Merrill Scott investment products and that he failed to register with the SEC under Section 15(b) of the Exchange Act.

A "broker" is any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). The evidence demonstrates that Mr. Brody acted as a broker. The elements of interstate commerce and "inducing transactions in securities" have been established, as discussed above in previous sections. And it is undisputed that Mr. Brody was not registered with the SEC. Accordingly, the court finds that Mr. Brody violated Section 15(a)(1) of the Exchange Act, and the SEC is entitled to summary judgment on that claim.

**C.     The Remedy**

Now that the court has found Mr. Brody liable of the acts alleged by the SEC, it must fashion a remedy. SEC seeks a permanent injunction against future violations of the federal security laws, disgorgement and prejudgment interest on that amount, and a civil monetary penalty.

## 1.    Permanent Injunction

The court is authorized to grant permanent injunctions against future violations of the securities laws, particularly in cases such as this, where liability is based on "systematic wrongdoing" accompanied by a high "degree of the defendant's culpability and continued protestations of innocence." See, e.g., SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1477 (2d Cir. 1996).  Having reviewed the totality of the circumstances presented in the record, the court finds that the SEC has shown a substantial likelihood of future violations by Mr. Brody. Accordingly, Mr. Brody is permanently enjoined from violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240-10b-5; Sections 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1) and (2); and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a).

## 2.    Disgorgement and Prejudgment Interest

The court may also order the equitable remedy of disgorgement of ill-gotten gains in SEC enforcement actions, along with prejudgment interest on those gains, to prevent unjust enrichment.  E.g., First Jersey Sec., Inc., 101 F.3d at 1474.  "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation,' [and] 'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" Id. at 1475 (internal citations omitted).

According to the undisputed calculations of SEC's expert, Mr. Brody caused investors to lose $13,140,000.00.  The basis for this amount is set forth at length in the forensic accounting report of expert witness Gil A. Miller.  (See May 1, 2006 Expert Report & Disclosure of Gil A.

34

Miller (Docket # 658); SEC's Mem. Supp. at pp. 25-26, ¶¶ 131-136.)

Further, the SEC calculates the prejudgment interest to total $3,482,163.11.  (See Dec. of

Matthew A. Himes ¶ 3 and accompanying Prejudgement Interest Report, attached as Ex. 93 to

SEC's Mem. Supp. Mot. Summ. J.)  The court finds that this is an appropriate calculation,

because the interest rate was based on IRS published rates on tax underpayments for individuals.

See First Jersey Sec., Inc., 101 F.3d at 1476 ("courts have approved the use of the IRS

underpayment rate in connection with disgorgement").

Equity supports the court's holding that Mr. Brody must pay $16,622,163.11, which

consists of disgorgement fees ($13,140,000.00) plus prejudgment interest ($3,482,163.11).

**3.      Civil Monetary Penalty**

The court will determine whether to impose a civil monetary penalty upon motion by the

SEC, along with full briefing of the issue and a hearing.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      Mr. Brody's sworn discovery responses (see Attachment 1 to Mr. Brody's

opposition memorandum (Docket # 925)) are STRICKEN from the record.

2.      SEC's Motion for Summary Judgment Against Defendant Patrick M. Brody

(Docket # 677) is GRANTED.

3.      Mr. Brody's Motion to Strike portions of SEC's supplemental memorandum

regarding the Fifth Amendment privilege (Docket # 953) is DENIED.

4.      Mr. Brody's Objection to February 21, 2007 Order of United States Magistrate

Judge (Docket # 942) is MOOT, and the court will not consider it.

5.     It is hereby ORDERED that Mr. Brody is permanently enjoined from violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240-10b-5; Sections 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1) and (2); and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a).

6.     It is further ORDERED that Mr. Brody shall pay $16,622,163.11 as disgorgement fees and prejudgment interest.

DATED this 21st day of May, 2007.

BY THE COURT:

TENA CAMPBELL
Chief Judge