IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>                     Plaintiff, <br><br><br>               vs. <br><br><br> MERRILL SCOTT & ASSOCIATES, LTD.; MERRILL SCOTT & ASSOCIATES, INC.; PHOENIX OVERSEAS ADVISERS, LTD.; GIBRALTAR PERMANENTE ASSURANCE, LTD.; PATRICK M. BRODY; DAVID E. ROSS II, and MICHAEL G. LICOPANTIS, <br><br>               Defendants. | ORDER <br><br> AND <br><br> MEMORANDUM DECISION <br><br><br> Case No. 2:02-CV-39-TC |

In this civil enforcement action brought by the Securities and Exchange Commission (SEC), interested party Access Telecom Inc. seeks recovery of the financial loss it suffered as a result of the fraud committed by the Defendants (collectively "Merrill Scott").[1]

Merrill Scott is in receivership as a result of the court's order freezing Merrill Scott assets and appointing David K. Broadbent as the Receiver. Access Telecom filed a claim with the Receiver for payment of its loss, contending that its claim falls within the SEC's Plan of Partial

---

[1]Merrill Scott & Associates, Ltd. (MSA), et al. refers to MSA and its related entities—Merrill Scott & Associates, Inc., Phoenix Overseas Advisers, Ltd., and Gibraltar Permanente Assurance, Ltd. For convenience, the court refers to them collectively as "Merrill Scott."

Distribution Category No. 3 ("Non-Insider Investor Claims").  The Receiver denied the claim on the basis that Access Telecom's loss consisted solely of fees, which are expressly excluded from the Plan of Partial Distribution.  Access Telecom now challenges the Receiver's characterization of its loss and seeks an order requiring the Receiver to pay the claim.

For the reasons set forth below, including the fact that Access Telecom has presented no evidence that it purchased an investment product from Merrill Scott, the court finds that Access Telecom's claim consists of fees and is not eligible for the Receiver's interim distribution. Accordingly, Access Telecom's Motion for Allowance and Payment of Amended Claim is DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2002, the SEC alleged in its complaint that Merrill Scott and certain of its principals had misappropriated investor funds and were actively operating a Ponzi scheme (that is, using money obtained from new clients to pay obligations owing to other clients).  The court appointed Mr. Broadbent as the Receiver of Merrill Scott assets, and, since then, he has been marshaling those assets for the benefit of those defrauded by Merrill Scott.

In October 2004, Access Telecom submitted a claim to the Receiver.  The Receiver denied the claim on the basis that it is not eligible for payment under SEC's Plan of Partial Distribution.  Now Access Telecom seeks an order requiring the Receiver to pay Access Telecom's Amended Claim of $323,123.35[2] as part of the Receiver's interim distribution.

---

[2]The original claim was for $455,000.00.  Access Telecom thereafter reduced its claim based on subsequent events and further analysis, as described in its Amended Investor Claim Form.  (See Ex. 1 to Access Telecom's Mem. Supp.)

2

**Access Telecom's Transactions With Merrill Scott**

The Merrill Scott organization touted itself as "advisors to the affluent." (See Merrill

Scott & Associates, Ltd. Brochure at 2 (attached as Ex. 14 to Dkt # 678).) Numerous clients

were attracted by promises of decreased tax liability and services designed to shelter assets.

Merrill Scott provided investment products to its clients. But it also offered financial

advice, tax planning, and other non-investment services, and it charged fees for services that did

not result in a direct investment with the company.

In 2001, Access Telecom became a client of Merrill Scott.[3] Bradley Tirpak was (and still

is) the President and sole shareholder of Access Telecom. (See Am. Claim Form at 9, attached

as Ex. 1 to Access Telecom's Mem. Supp.)

One of the products Merrill Scott provided to its clients was the Master Financial Plan

(MFP). In general, an MFP established the framework through which a Merrill Scott client

could, for example, invest and protect cash and assets, and participate in tax reduction programs.

Access Telecom hired Merrill Scott to create an MFP outlining tax planning strategies.

Although there is no evidence of an MFP for Access Telecom, clearly some plan was developed

and communicated to Mr. Tirpak,[4] because on November 30, 2001, Access Telecom wired

$1,130,000.00 to EPI for the purpose of participating in the Ventnor Trading Strategy and Market

---

[3]It worked with Estate Planning Institute (EPI), one of the Merrill Scott entities whose assets are part of the receivership estate.

[4]The record shows that Access Telecom contracted for creation of an MFP. (See Master Financial Plan (MFP) Development Agreement, signed by Mr. Tirpak on October 4, 2001 (attached to Am. Claim Form, Dkt # 1192 at pp. 25-26).)

Linked Deposit (MLD) investment program.[5]  (See id. at 4-5 (listing EPI account at Deutsche

Bank Alex Brown as recipient of wire transfers);  Nov. 30, 2001 wire transfer statement issued

by Frost National Bank (Dkt # 1192 at p. 29);  Ventnor Trading Program Private Offering

Memorandum at 13 (discussing investment strategy related to market linked instruments),

attached as Ex. E to Receiver's Mem. Opp'n.)

      The Ventnor program investment products were not created or managed by Merrill Scott.

Rather, third-party Coastal Trading LLC designed the structure, investment objectives, and

investment strategies of the Ventnor Trading Program.  Coastal was also the managing member

of the Ventnor Trading Fund and the Ventnor Program's asset manager and asset allocator.

Another third-party, Multinational Strategies, acted as administrative service provider to the

Ventnor Fund.  (Private Offering Mem. at 1, 8, 14.)  According to Merrill Scott,

> [t]he Ventnor Trading Program is an <u>investment program offered by Coastal
> Trading, LLC</u> to qualified individual investors.  <u>The Program is offered only
> through a Private Offering Memorandum prepared by Coastal Trading, LLC, and
> only Coastal Trading, LLC representatives are authorized and able to offer the
> Program to investors.</u>  <u>Any Merrill Scott client who might be interested</u> in the
> Program and who meets the investor criteria set by Coastal Trading, LLC, <u>will be
> referred to Coastal Trading, LLC</u> to deliver the Private Placement Memorandum
> to the client and contact the client directly to present the offering. . . .  <u>No one
> associated with Merrill Scott & Associates is permitted to offer or sell any interest
> in the Ventnor Trading Program directly to clients. . . .</u>

("Ventnor Trading Program (Ordinary Transactions) Information Sheet" [hereinafter

"Information Sheet"] at 1 (emphasis added), attached as Ex. B. to Receiver's Mem. Opp'n.)

      Merrill Scott was the "middle man," and documents presented by the Receiver show that

---

[5]For a description of the Ventnor Trading Program's MLD transaction, see the Receiver's
Memorandum in Opposition at 3-5.

Merrill Scott charged substantial fees for its services to clients participating in the Ventnor

Trading Program.[6]  In what appears to be a draft letter to Mr. Tirpak,[7] the company expressly

stated that:

> Phase I of the Master Financial Plan involves investment in a Market Linked
> Deposit program, to which you will be introduced.  Merrill Scott & Associates is
> ***not*** acting as an investment advisor or offering investment advice in connection
> with the Program.  Our sole function is to advise and assist you with financial, tax,
> and asset protection planning and to coordinate the implementation of your Plan.

(Schedule A, attached to draft letter from EPI to Mr. Tirpak Re: Agreement for Implementation

of Phase I – Master Financial Plan (emphases in original) (attached as Ex. H to Receiver's Mem.

Opp'n.).)

    The Merrill Scott fees for those services were exorbitant.  The Merrill Scott Information

---

[6]Robert Hipple, one of the Merrill Scott principals with whom Access Telecom dealt, was named as a defendant in a class action suit filed in federal district court in the Southern District of New York.  (See Ling v. Deutsche Bank AG, Civil Action No. 04-CV-4566 (S.D.N.Y.).)  The action focused on dealings in the Ventnor Trading Program, and Access Telecom was a member of the Plaintiff class.  Mr. Hipple and a co-defendant named John Capaso were referred to as the "Merrill Scott Defendants," although Merrill Scott was not named.  (See First Am. Compl. in Ling at ¶¶ 1, 49-50 (attached as Ex. A to Receiver's Mem. Opp'n.).)  According to the class action complaint,

> Plaintiffs are not bringing any claims though this Amended Complaint against
> Merrill Scott & Associates, Ltd., Merrill Scott & Associates, LLC, Merrill Scott &
> Associates, Inc., or any of their affiliated entities (collectively, "Merrill Scott")
> because Merrill Scott's funds, assets and property are in a Receivership, and an
> order staying any litigation against Merrill Scott is currently in place.

(Id. at p. 3 n.1.)  The class action complaint called Merrill Scott a "Marketing Participant" that marketed MLD transactions to clients and earned "incredibly high fees . . . based solely on 'the size' of the transaction."  (Id. ¶¶ 135-139, 143, 181.)  Although these statements are only allegations, they bolster the Receiver's position that Access Telecom's claim falls into the fee category.

[7]The letter is unsigned and undated, but still part of the Merrill Scott documents produced by the Receiver.

Sheet contains a summary of fees Merrill Scott would charge clients who invested in the Ventnor

Trading Program.  The fees were calculated according to the amount of the investment plus an

estimate of the loss to be generated.[8]  For example, for an investment of $1 million, which would

purportedly generate a loss of $6,666,667.00, the fee would be $433,333.00.  (Information Sheet

at 3.)  Accordingly, the client would have to transfer $1,433,333.00 to Merrill Scott to participate

in the Ventnor Program.  (Id.)  Merrill Scott would keep the $433,333.00 and forward the

$1 million to Coastal Trading.

Similarly, in Schedules A and B of the draft letter to Mr. Tirpak, Merrill Scott listed a

"Merrill Scott & Associates Implementation Fee" of $131,250 and a "Cantley & Sedacca

Transaction Fee" of $206,250 in association with a $500,000 investment.  (Ex. H to Receiver's

Mem. Opp'n.)  While these numbers are not completely consistent with what Access Telecom

actually sent to Merrill Scott,[9] they indicate the hefty fees associated with participation in the

MLD program.

Access Telecom contends that it never received the Information Sheet.  (Mr. Tirpak

probably did not receive the draft letter, with Schedules A and B, either.)  It further contends that

it only agreed to pay Merrill Scott $70,000 in fees ($15,000 for an MFP, $50,000 for a legal

---

[8]Investors who participated in the MLD transactions were apparently told that they would generate a substantial loss that could be offset against capital gains to reduce or eliminate tax liability, and, in some cases the precise amount of the loss was chosen beforehand.  (See Class Action Compl. ¶¶ 173-75.)  Merrill Scott offered this tax reduction scheme to its clients.  Indeed, an internal Merrill Scott MLD Strategy Sheet sets forth the steps to generate a $1 million loss. (See MLD Strategy Sheet, attached as Ex. C to Receiver's Mem. Opp'n.)

[9]Access Telecom invested more than the amount Schedules A and B anticipated.  Because the fees were apparently calculated based on the amount of investment plus anticipated loss, Access Telecom's fees may have been more than quoted in Schedules A and B.

opinion on the tax consequences of the proposed transactions, and $5,000 for "other legal expenses"). (Am. Claim Form at 10; See also Oct. 4, 2001 MFP Development Agreement (Dkt # 1192 at pp. 25-26).)

In 2003, after the SEC exposed the fraud at Merrill Scott, and after the court issued its order freezing Merrill Scott assets, Access Telecom recovered its $675,000 investment in the MLD program from third-party Ventnor Hedge Fund. (See Am. Claim Form at 7, 10 (noting that $750,000 was received by Multinational Strategies/Ventnor, which deducted a $75,000 fee, for investment of $675,000).) Now Access Telecom seeks the remainder of the money it wired to Merrill Scott in 2001.

**The SEC's Plan of Partial Distribution**

In 2005, after the Receiver had recovered a substantial amount of Merrill Scott assets, the court approved SEC's proposed Plan of Partial Distribution ("Plan").[10] The Plan creates five classes of eligible claims, including Class 3 "Non-Insider Investor Claims," in which Access Telecom places its claim.

The Plan excludes claims for fees paid to Merrill Scott:

"Investor Claims" shall mean a Claim for monies deposited with Merrill Scott for investment purposes. . . . This term shall not include monies paid to Merrill Scott in the form of fees, or any other payment, for financial advice, tax or estate planning, or other non-investment purposes.

(Plan of Partial Distribution at pp. 3-4, ¶ 13 (emphasis added) (attached as Ex. A to Dkt # 472).)

The court, in its order approving the proposed plan, stressed the line drawing in which the

---

[10]The Plan was later amended, but not in a manner relevant here. (See Plan of Partial Distribution, as amended by Oct. 30, 2007 Order.)

7

SEC had to engage and found the exclusion of fees to be reasonable:

> Merrill Scott charged its clients planning fees for analyzing clients' financial situations and proposed financial plans to help clients reach various objectives.  In some cases, <u>Merrill Scott charged fees for services that did not result in a direct investment with Merrill Scott.  For example, some Merrill Scott clients paid for tax planning services and the implementation of the Merrill Scott tax plan **involved funneling money not into the Merrill Scott system but to third parties.**  In such situations, the only money received directly by Merrill Scott was the fee the client paid for the tax planning services.</u> . . .

> <u>[T]he SEC defended its exclusion of fees as part of the difficult but necessary task of drawing lines to best facilitate an equitable resolution</u>. . . . The SEC is undoubtedly correct that a plan allowing for recovery of fees paid to Merrill Scott would be fair and reasonable.  But the exclusion of claims for fees is also reasonable under the circumstances. . . . [F]ee payments differ from investments in the Merrill Scott system.  During oral argument, the SEC indicated that, depending on the final size of the receivership estate, it may appropriate to include fee claims in a subsequent distribution. . . .

(Jan. 2, 2007 Order & Mem. Dec. at 7-8 (emphases added).)

**<u>The Receiver's Denial of Access Telecom's Claim</u>**

In June 2007, the Receiver submitted a Proposed Interim Distribution for court approval.

(<u>See</u> Dkt # 1002.)  In that pleading, the Receiver noted that Access Telecom's claim was "wholly

disallowed" because it consisted of fees and investments made with third parties,

> such as the Market Linked Deposit ("MLD") tax shelters sold by Merrill Scott. . . .
> In the case of the MLD . . . products, Merrill Scott did not receive the proceeds of
> the investment . . . . [R]ather, it received only a commission.

(<u>Id.</u> at 5, 5 n.2, 6.)

Access Telecom objected.  (<u>See</u> Dkt # 1024.)  After a hearing on the proposed interim

distribution and the objections, the court approved the Interim Distribution.  The court

> determined that the Interim Distribution should go forward notwithstanding
> Access Telecom's objections . . . [The court] denied Access Telecom's objections
> without prejudice.  The Court encouraged the parties to attempt to resolve the

8

objection and indicated that in the event that such efforts failed that additional briefing would be needed on the issue of whether Access Telecom's claim should be categorized as a Class 3 Non-Insider Investor Claim.

(Oct. 30, 2007 Order Re: Interim Distribution & Objections (Dkt # 1105) at p. 3, ¶ 7.)  The

parties were not able to resolve the dispute, and the issue is now back before the court.

## ANALYSIS

Access Telecom contends that its Amended Claim should be categorized as a Class 3

Non-Insider Investor Claim.  The court disagrees and holds that the Receiver properly disallowed

Access Telecom's claim.  Despite Access Telecom's objection, the court finds that the money

Access Telecom gave to Merrill Scott was paid in connection with Access Telecom's investment

with a third party, and consisted of fees charged by Merrill Scott and funds transferred to that

third party.

### Merrill Scott Receivership and Partial Distribution

Many individuals and entities lost money due to the fraudulent schemes of Merrill Scott.

To accomplish a fair and reasonable distribution to those defrauded by the Defendants' schemes,

the Receiver and SEC have had to engage in the unfortunate but necessary line drawing exhibited

in the SEC's Plan of Partial Distribution.  Such line drawing is necessary because the Receiver is

working with a set of claims that exceed the finite amount of money he has been able to recover

to date.  Defrauded clients will no doubt receive pennies on the dollars they lost through Merrill

Scott.

The court has already determined that the Plan's exclusion of claims for fees is

"reasonable under the circumstances," particularly because the interim distribution under the Plan

likely will not be the last.  (Jan. 2, 2007 Order at 8 (noting that "[d]uring oral argument, the SEC

indicated that, depending on the final size of the receivership estate, it may be appropriate to include fee claims in a subsequent distribution.").)  And the fact that Access Telecom recovered $675,000.00 of its original $1,130,000.00 wire transfer is evidence that the line drawing was reasonable, because Access Telecom had a remedy not available to those who invested with Merrill Scott directly.

**Access Telecom's Claim**

Access Telecom contends that the November 30, 2001 wire transfer of $1,130,000.00 was an investment with Merrill Scott.  The court disagrees.

The record shows that Access Telecom hired Merrill Scott to perform non-investment services.  Specifically, Access Telecom hired Merrill Scott to create and implement an MFP that funneled money to Coastal's Ventnor MLD program.  The money Merrill Scott retained was the fee it charged Access Telecom for services enabling Access Telecom to participate in the Ventnor Program.  All investment activity occurred with Ventnor.  The fact that Access Telecom recovered $675,000 from the Ventnor Hedge Fund after the order freezing Merrill Scott assets supports the conclusion that Access Telecom was not investing the $1,130,000.00 with Merrill Scott.

Also, if Access Telecom were an investor with Merrill Scott (that is, if the residual money was for investment rather than fees), it would have had a Merrill Scott product to show for its investment.  But it does not.  Evidence of a Merrill Scott investment might include, for example, a mutual fund account with Phoenix Overseas Advisers, Ltd. (a Merrill Scott entity that acted as an investment adviser and mutual fund company for Merrill Scott investors), or a brokerage account at TD Evergreen (a Canadian brokerage) that was maintained by Phoenix.  Other indicia

of an investment with Merrill Scott could have included a loss of income policy or foreign variable annuity set up and controlled by Gibraltar Permanente Assurance, Ltd. (another Merrill Scott entity).  There is no indication that Access Telecom's money was placed in any such account or used to purchase any such product.  There is no evidence that it invested in any product other than the MLD, which the record clearly shows was created and managed by a third-party.

The fact that Merrill Scott kept a disproportionate amount of the $1,130,000.00, and the fact that the unrecovered amount does not equal the amount of fees Mr. Tirpak was told about, does not necessarily indicate that the money was for investment.  Access Telecom's unsupported conclusion is contradicted not only by Merrill Scott documents such as the Information Sheet, but also by one of the central premises of the class action suit in which Access Telecom was a class member.  The plaintiff class in that suit alleged that exorbitant fees were charged in connection with the Ventnor MLD program.  Specifically, the plaintiff class alleged that

> the Marketing Participants[, including Merrill Scott, were] eager to participate in selling these [MLD] strategies [because of] the opportunity to earn incredibly high fees.  The fee to each of the participants in these tax strategies was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on 'the size' of the transaction.  In other words, the bigger the deal, the larger the fee shared by the Defendants.  Thus, these Defendants had a motive to sell as many tax shelters as possible, as large as possible.

(Class Action Compl. ¶ 139.)  The class complaint further alleged, on information and belief, that "the Marketing Participants [including Merrill Scott] entered into an arrangement where each would receive a certain portion of the fee for each MLD transaction sold . . . ."  (Id. ¶ 143; see

also id. ¶¶ 123, 135-39.)[11]  (Although these are only allegations, their specificity, similarity to the facts in this case, and Access Telecom's willing participation in the class action, gives them some weight.)

Furthermore, Access Telecom's argument that there was no notice of such large fees, much less any bill for such fees, does not carry the day in the world of Merrill Scott.  Underlying Access Telecom's argument is the incorrect assumption that Merrill Scott was a legitimate business with all of the proper documentation and controls in place.  The reality is that client money went in, was commingled, and oftentimes was used for improper (and, of course, undisclosed and unauthorized) purposes (some as egregious as personal vacations and payments to personal credit cards).[12]  Non-disclosure was a characteristic element of the Merrill Scott scheme.  Given the nature of Merrill Scott, there is no neat explanation or documentation of exactly where Access Telecom's money went, but the documentation available (whether or not it was disclosed to Mr. Tirpak) supports the finding that Access Telecom's money was earmarked for fees, not for an investment with Merrill Scott.

The court does not in any way suggest that Access Telecom paid reasonable fees or that Access Telecom's loss is not legitimate.  Access Telecom is understandably dismayed by the situation.  In the event of a second round of distribution, Access Telecom may be able to recover some, if not all, of its claim.  But the terms of the Plan of Partial Distribution, and the record of Access Telecom's dealings with Merrill Scott, foreclose its recovery now.

---

[11]Access Telecom received a settlement in that action, but the settling defendants did not include Mr. Hipple or his co-defendant, who were referred to as the "Merrill Scott Defendants."

[12](See May 21, 2007 Order & Mem. Dec. (Dkt # 977) at 10-11.)

**ORDER**

For the foregoing reasons, Access Telecom Inc.'s Motion for Allowance and Payment of

Amended Claim (Dkt # 1191) is DENIED.

DATED this 15th day of July, 2008.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge