IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION, | |
| Plaintiff, | ORDER |
| | AND |
| vs. | MEMORANDUM DECISION |
| MERRILL SCOTT & ASSOCIATES, LTD., et al., | Case No. 2:02-CV-39-TC |
| Defendants. | |
| _____ | |
| DAVID K. BROADBENT, as Receiver for MERRILL SCOTT & ASSOCIATES, LTD., et al., | |
| Plaintiff, | |
| vs. | |
| ADVANTAGE SOFTWARE, INC.; PORTIA SEELY; and GREG SEELY, | |
| Defendants/Claimants. | |

In October 2004, investors Greg and Portia Seely, who own Advantage Software, Inc.

(ASI),  filed a claim against the Merrill Scott receivership estate.  Court-appointed Receiver

David Broadbent denied their claim, contending that the estate owns the rights to market and

distribute stenography software that ASI and the Seelys had licensed to one of the Merrill Scott entities now under receivership, that the Seelys owe royalties to the estate through a sub-license agreement, and that their monetary claim is fully offset by the royalties owed.

Because the parties were not able to resolve their dispute, the matter is now before the court on cross-motions for summary judgment.  The Seelys seek allowance of their claim and a declaration that the software license agreement is not valid or enforceable under contract law, that the Receiver's claims are barred by the applicable statute of limitation, and that they, not the Receiver, own and control the software rights.  The Receiver moves the court for disallowance and offset of the Seelys' and ASI's claim, but he does not seek the actual software rights.

Because this is an equitable matter, the Seelys' traditional contract law and statute of limitations arguments carry little weight.  Instead, the court is persuaded by the Receiver's position that the Seelys be treated like similarly-situated Merrill Scott investors, thereby requiring disallowance and offset.  For reasons more fully set forth below, the Receiver's Motion for Summary Judgment is GRANTED and the Seelys' and ASI's Motion for Summary Judgment is DENIED.

## FACTUAL BACKGROUND[1]

On January 23, 2002, the court appointed David K. Broadbent as the Receiver in this civil enforcement action brought by the Securities & Exchange Commission (SEC) against Merrill Scott & Associates Ltd. and its related entities (collectively "Merrill Scott") as well as certain Merrill Scott principals.  The court issued an order freezing all the assets of Merrill Scott and

---

[1]There are no genuine disputes of material facts.

directing the Receiver to identify, marshal, consolidate and ultimately distribute, through an

equitable pro rata distribution, the assets of the Merrill Scott organization to victims of Merrill

Scott's Ponzi scheme.

**The Seelys' and ASI's Transactions with Merrill Scott and Tax Benefits**

Greg Seely, along with many other Merrill Scott victims, filed a timely Client/Investor

Claim Form ("Seely Claim Form") with the Receiver in October 2004.  (See Ex. 12 to May 23,

2006 Sealed Decl. of David K. Broadbent [hereinafter "Broadbent Decl."] (Docket No.  673).)

Mr. Seely filed the claim on behalf of himself, his wife Portia Seely, and their company

Advantage Software, Inc. (ASI).  Their claim is based on transactions that occurred after 1998,

when the Seelys became clients of Merrill Scott for the purpose of obtaining tax, estate, and asset

protection planning services.  In the claim form, they seek return of approximately $1.7 million.

On the form, Mr. Seely signed a declaration stating, "I hereby declare and verify that the facts

and information set forth herein are true to the best of my knowledge, information and belief, and

subject to penalty of perjury pursuant to 28 U.S.C. § 1746."  (Seely Claim Form at p. 1 & ¶¶

11.a, 13.b.)

ASI sells stenographic software sometimes referred to as "Eclipse Software."  Although

an individual named Jeremy Thorne (whose company is called Singularity Software) owns the

software copyright, ASI has an exclusive license from Mr. Thorne to market and distribute the

software (the "Software Rights").  Mr. Thorne collects royalties from the Seelys through an oral

agreement granting the Seelys an exclusive license to market and sell the software.  According to

the Seelys, ASI pays Mr. Thorne royalties calculated as ten percent of software sales.[2]

In August 1998, Merrill Scott created for the Seelys, as it did for many clients, a Master Financial Plan (MFP) setting forth the "services" it would provide to the Seelys and modes for accomplishing the desired objectives.  (See Aug. 4, 1998 "Analysis & Recommendations" report created by Merrill Scott for the Seelys [hereinafter "Seely MFP"], attached as Ex. 1 to Broadbent Decl.)  In the Seelys' case, some of those services included "asset protection" and "tax planning" for the valuable Software Rights.

As directed by their MFP, the Seelys caused ASI to transfer control ("license") the Software Rights to Lennox Squire & Associates, Ltd.—a Merrill Scott entity—in an attempt to defer (or avoid) paying taxes on income from the Software Rights and to protect (or hide) the asset from creditors.  Greg Seely, in his deposition, testified:

> . . . [H]ere was the basic strategy as I understood it from Merrill Scott.  They were going to create a number of foreign corporations.  And the concept was that if any one were to sue us, they would have to jump through so many levels before they ultimately got to us, which they would, that it just wouldn't be worth their time and expense.  That's really where we were going with this thing.

(Dep. of Ronald Greg Seely dated October 31, 2006 ("2006 G. Seely Dep.") at 42 (attached as Ex. C to Receiver's Mem. Supp. Mot. Summ. J.).)

Specifically, in the Seely MFP, Merrill Scott recommended that the Seelys sell the

---

[2]The Seelys do not dispute the figure of ten percent, but they contend that an issue of fact exists as to whether the royalty is calculated based on "retail price," "profits," or "sales."  (See Opp'n Receiver's Mot. Summ. J. (Sealed Docket No. 1288) at 4.)  The issue is immaterial because the Receiver has provided, and authenticated, Mr. Thorne's calculations of income he received from ASI.  (See Ex. 1 attached to Sealed Aff. of Katherine Hansen.)  (Incidentally, the court denies the Seelys' and ASI's request to strike the Hansen Affidavit.  Ms. Hansen is competent to testify in the manner set forth in her affidavit, and the documents attached to the affidavit are admissible for the purposes used by the court.)

Software Rights to an international business company (IBC) and pay royalties to the same in

order to reduce their taxes:

> Step 4: Sell software rights to IBC 3
>
> By selling the software rights to IBC 3 . . ., royalties will no longer be paid to you.
> This will reduce your taxable income considerably.  Instead, royalties will be paid
> to IBC 3, allowing the income stream to be transferred offshore where it can grow
> and be reinvested tax-free . . . .

(Seely MFP at p. 2-2.)

Client-related entities (i.e., corporate entities created specifically for clients), such as the

IBC 3, were an integral part of Merrill Scott's asset protection and tax avoidance plans, and were

created and controlled by Merrill Scott for the purposes of shielding client assets and reducing

their tax liability.  (Broadbent Decl. ¶ 9.)  In the Seelys' case, IBC 3 became known as Lennox

Squire & Associates, Ltd. (although it was originally called Island Oasis Ventures, Ltd.), one of

the many Merrill Scott entities in the Receivership estate.[3]

As part of the Seely MFP recommendations, ASI and Lennox Squire entered into what

the parties call the License Agreement.  (See Dec. 19, 1998[4] License Agreement, attached as Ex.

6 to the Broadbent Decl.)  The License Agreement transferred control of the Software Rights to

Lennox Squire.  (See id. ¶ 3.01 (granting Lennox Squire "worldwide rights to all sales, marketing

---

[3]The Seelys and ASI dispute the notion that Lennox Squire was a valid corporation.  (See
Mem. Opp'n to Receiver's Mot. Summ. J. at 7 ("There is no admissible evidence that Lennox
Squire was actually formed as a Bahamian IBC.").)  Their dispute is immaterial because the court
is operating as a court of equity in this context.  Moreover, the Seelys' self-serving litigation
position contradicts their earlier actions in carrying out the MFP and filing their claim with the
Receiver.

[4]The parties acknowledge that the License Agreement was backdated and more likely was
signed in April 1999.  But this distinction is not material for purposes of the motions before the
court.

and distribution rights to the Software.").)  In exchange, Lennox Squire agreed to pay ASI ten

yearly installments of $250,000 and 5% of any net profits over $1,000,000.  (Id. ¶¶ 4.01, 7.01-

7.03.)  This portion of the agreement was not fully performed, but Lennox Squire did pay ASI

$250,000.00 on February 16, 2000.  (See Seely Claim Form, Attachment B at 2, Ref. No. B-6.)[5]

At that point, the Software Rights became part of what would ultimately become the

Receivership Estate.[6]

      Then, following the Seely MFP's recommendation, Lennox Squire gave permission to

ASI and the Seelys to use the Software Rights in the United States  in exchange for "royalties."[7]

(See Seely MFP at pp. 5-3 & 5-4.)  ASI and the Seelys recognized such an arrangement in their

Client/Investor Claim Form, which Greg Seely signed under penalty of perjury, noting that the

information in the form was true to the best of his knowledge:

      Information regarding "Investment" in Lennox Squire:

          Merrill Scott & Associates ("MSA") recommended that Advantage
          Software, Inc. ("ASI") and the Seelys establish an offshore business entity to

---

      [5]It also appears that some international sales of the stenographic software were actually
made by Lennox Squire.  (Seely Claim Form, Attachment C, Ref. No. C-1.)

      [6]Despite some foibles of the License Agreement, the court finds that it, along with the
Seely MFP and the parties' actions carrying out certain aspects of the agreement (at least before
the Merrill Scott scheme was interrupted by the SEC enforcement action), are sufficient evidence
that an agreement to transfer control of the Software Rights to Merrill Scott was intended by both
parties and carried out.

      [7]As the Receiver points out, "[h]owever the payments are characterized, there is no
question that the Seelys understood that they would be remitting funds through ASI to Lennox
Squire in order to reduce their company's taxable income, that these funds would then be
returned to them at a later date (apparently to fund their retirement), and that the Seelys either
approved of, or directed, [their CPA Wayne Riella's] treatment of these payments as royalty
obligations.  These transfers 'to themselves' as Ms. Seely testified, were the *sine qua non* of their
asset protection scheme."  (Receiver's Reply Supp. Mot. Summ. J. (Docket No. 1295) at 9.)

purchase a royalty interest in certain intellectual property rights pertaining to ASI's products.  Lennox Squire, Ltd. ("Lennox"), which the Seelys understand was a Bahamas corporation, was set up by MSA to act as that entity. . . .

Pursuant to this arrangement, ASI made various payments to Lennox . . . totaling $1,557,044, which ASI understood were to be royalties due under the agreement with Lennox.

(Attachment B to Seely Claim Form.)  This arrangement was part of their tax reduction and asset

protection strategy.

Now that the Receiver seeks to offset the Seelys' claim with "royalties" still owed, ASI

and the Seelys attempt to dispute the existence of any such arrangement through citation to Greg

Seely's 2006 deposition testimony and his Nov. 22, 2006 Affidavit, where he states that such

payments were not intended to be royalty payments and that he does not believe "that [licensing

agreements contemplated by the Seely MFP, such as a royalty agreement between Lennox Squire

and ASI] were ever executed or prepared." (See Mem. Opp'n to Receiver's Mot. Summ. J. at 22-

24; Nov. 22, 2006 Aff. of Greg Seely (Sealed Docket No. 809) ¶ 34; Oct. 31, 2006 Dep. of Greg

Seely at 67:9-22, attached as Ex. 3 to Mem. Opp'n. Receiver's Mot. Summ. J. (Docket No.

1288).)

Greg Seely's self-serving statements in his deposition testimony and affidavit are not

supported by corroborating evidence and are not sufficient to create a disputed issue of material

fact.  See, e.g., Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001)

(recognizing "situations where a district court may be justified in disregarding certain

contradictory testimony, noting that courts will disregard a contrary affidavit when they conclude

that it constitutes an attempt to create a sham fact issue") (internal quotation marks and citation

omitted);  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (holding that non-

movant's conclusory and self-serving affidavits insufficient to create a genuine dispute of

material fact).  Moreover, the court finds that ASI and the Seelys are equitably estopped from

taking a position directly contrary to the sworn statement in their claim form.  See, e.g., New

Hampshire v. Maine, 532 U.S. 742, 749-51 (2001) (noting equitable rule "prohibiting parties

from deliberately changing positions according to the exigencies of the moment") (internal

quotation marks and citation omitted).

      The Seelys and ASI also contend that the Receiver has not presented documentary

evidence of any such royalty agreement.  This is not completely accurate.

      The Seely Claim Form and the Seely MFP constitute evidence of a secondary, or sub-

license, arrangement between the two parties, under which the Seelys would send money to

Lennox Squire for deposit offshore and that ASI and the Seelys would continue with business as

usual.  According to Greg Seely,

> Based upon my discussions with [Merrill Scott principal and attorney] Mr. Ross, I
> understood that the "Master Plan" set up a legal way for ASI to pay royalties to an
> offshore entity, which would be to our benefit.  In addition, revenues from
> international sales would be retained by an offshore entity (for our benefit).  Mr.
> Ross explained to me that it would operate like a 401(k) plan, where the monies
> placed in the offshore entity would grow tax-deferred until we brought the funds
> back into the United States.

(2006 G. Seely Aff. ¶ 28.)  (See also, e.g., Dep. of Wayne Riella  (attached as Ex. E to Receiver's

Mem. Supp. Mot. Summ. J.) at 60.)  Indeed, in the Seelys' and ASI's memorandum supporting

their own motion for summary judgment, they rely on the statement quoted above to support their

"undisputed fact" that "[t]he Seelys and ASI understood that [ASI's four payments to Lennox

Squire totaling $1,556,044.00] were to pay royalties owed to Lennox Squire under the Master

Plan, as explained to ASI by Ross and [ASI's] CPA [Wayne Riella]."  (Mem. Supp. Seely/ASI

Mot. Summ. J. (Docket No. 1243) at p. 11 ¶ 38.)

Financial statements and tax returns of ASI (prepared by ASI's CPA Wayne Riella)[8] also show that in 1999 and 2000 ASI paid royalties to Lennox Squire for the use of the software and then claimed the royalties as tax deductible expenses. (See Broadbent Decl. ¶¶ 22-25 & Exs. 8-11; Dep. of J. Wayne Riella (attached as Ex. E to Receiver's Mem. Supp. Mot. Summ. J.) at 37-38, 52.) And the Seelys and ASI acknowledge receipt of at least one installment payment of $250,000. (See, e.g., Seely Claim Form Attachment B; Riella Dep. at 38-39.)

In short, ASI claimed beneficial tax treatment based upon the transfer of the Software Rights.[9] For example, the financial statements and tax returns of ASI show that in 1999 and 2000 ASI sold an asset for which it received income, including interest income, which was reported to the IRS. (See Broadbent Decl. ¶¶ 22-25 & Exs. 8-11; Riella Dep. at 38-39.) And in

_____

[8]Mr. Riella advised ASI and the Seelys to obtain asset protection and then referred them to Merrill Scott. (See Nov. 11, 2006 Aff. of Greg Seely (Sealed Docket No. 809) ¶ 12 ("Eclipse was successful, and ASI grew to become a significant competitor in the CAT software market. Our CPA, Wayne Riella, was aware of our prior experience with Stenograph, and aware that ASI was a significant competitor to Stenograph. In 1998, Mr. Riella strongly recommended to us that we consult with . . . Merrill Scott & Associates, regarding asset protection issues. Mr. Riella told us that . . . he believed they could assist us in protecting our assets from lawsuits and claims from entities like Stenograph."); 2002 Aff. of Portia Seely (attached as Ex. F to Receiver's Mem. Supp.) ¶ 3 ("Merrill Scott & Associates, in connection with Mr. Riella, created a tax and estate plan for [ASI], Mr. Seely and me.").) The court denies any objections the Seelys and ASI have raised as to the competency of Mr. Riella to testify about certain topics in his deposition or the reliability of numbers he provides. The court does not rely on Mr. Riella's testimony to determine what arrangement the Seelys and ASI actually had with Merrill Scott and Lennox Squire, although his participation and preparation of financial documents qualifies him to discuss the numbers as he understood them and to discuss how he was instructed by the Seelys and Merrill Scott.

[9]ASI's and the Seelys' corrections made on tax returns after the Merrill Scott scheme was uncovered by the SEC do not change the fact that they readily used the Merrill Scott arrangement to their benefit.

1999 ASI reported to the IRS that it had $1,718,489 in deferred income installment gain, which is consistent with the sale of the software to Lennox Squire.  (Broadbent Decl. ¶ 22 & Ex. 8 attached thereto.)

**Stenograph Litigation and Asset Protection Benefit**

In June 1999, ASI was sued by a competitor, Stenograph LLC, in the United States District Court for the District of Florida for copyright infringement and other unfair competition claims.  (The Seelys expected the lawsuit, although it was filed much sooner than they anticipated.)  During the course of the litigation with Stenograph, the Seelys denied owning the Software Rights or even having an understanding of the Merrill Scott transactions and client-related entities created on their behalf.

For example, in response to questions about the installment income reported on ASI's tax returns, Greg Seely testified during a deposition in the Stenograph litigation as follows:

> Q.      . . .  There's income reported in Part II.  And then there's a gross profit and contract price of a transaction that's reported in Part I.
>
> . . .
>
> THE WITNESS:  Part II is entitled: Installment sale income.  Anyway, your question, sir?
>
> Q.      What is that transaction, sir?
>
> A.      I do not know.
>
> Q.      Now, is Island Oasis – does that firm have any of the – hold any of the intellectual property rights for Eclipse software?
>
> A.      I don't know.
>
> Q.      I believe and I'm not swearing by this, but that your wife referred to Island Oasis as a marketing firm?

A.      Island Oasis does market our software internationally.

Q.      So any monies received for those transactions would be received by Island Oasis, correct?

A.      Probably.

Q.      And do you have an ownership interest in Island Oasis?

A.      I don't know how it's structured legally.

Q.      Either legally or beneficial?  In other words either you're the owner or beneficial owner?

A.      I don't know.

Q.      Was there a written agreement between Advantage and Island Oasis that enabled Island Oasis or authorized Island Oasis to market Advantage products internationally?

A.      I gave this to our attorneys [at Merrill Scott] to take care of.

. . .

Q.      Now, who holds the intellectual property rights for Eclipse software?

A.      A foreign corporation.

Q.      And who is that?

A.      It's not Island Oasis.  I think it's Nordic Swan.

. . .

Q.      At that time [when Nordic Swan was incorporated] were certain intellectual property rights assigned to that company?

A.      I'm not sure when they acquired the rights.  And I'm not sure the method by which they got them.

Q.      Now, do they make annual payments –

11

A.      I don't know.

Q.      – for those in return for those rights?

A.      I honestly don't know.  I have nothing whatsoever to do with the financial.  I haven't seen a paycheck in 20 years.  My wife just stuffs my wallet when I run out of money.

. . .

Q.      Now, the very back [of ASI's 2000 tax return], Mr. Seely, three pages from the back there's something called software royalties.  It's line item 25.

A.      Yes.

Q.      And it looks, if I'm understanding, it looks to be an expense item?

A.      Okay.

Q.      To whom were these software royalties paid to?

A.      I'm not sure.  Could have been me.  Could have been Jeremy Thorne.  This one looks like it's probably me.  Although I have never seen it.

Q.      Why would you be paid royalties?

A.      I don't know.  Again, it has to do with our asset management company [Merrill Scott].

(Nov. 15, 2001 Dep. of Greg Seely at 175:8-180:7, attached as Ex. G to Receiver's Mem. Supp.

Mot. Summ. J.)

        Subsequently, during the Stenograph litigation, ASI denied ownership of the Software

Rights and admitted that the rights had been transferred to Lennox Squire.  Specifically, in

response to Stenograph's interrogatory requesting the identification of transactions in which any

intellectual property rights in software were transferred, the Seelys responded:

        The defendants are unable to answer this Interrogatory at this time for the

12

following reason:  the defendants, in consultation with <u>Merrill Scott</u>, a Utah tax and estate planning advisory company and with their accountant, Wayne Riella, created a tax and estate plan under which <u>the copyright to the Eclipse software were [sic] transferred and/or sold to an international corporation known as Lennox Squire.  The defendants do not have specific knowledge of the terms or nature of this transaction or the effect that this transaction had on the ultimate ownership of the copyright</u>.

(Mar. 2002 Seely/ASI Answers to Stenograph's Second Set of Interrogatories, attached as Ex. D to Receiver's Mem. Opp'n Seely/ASI Mot. Summ. J. (emphasis added).)

## Calculations of Income, Royalties, and Allowable Claim

Based on records produced by Jeremy Thorne, the Receiver calculated that ASI's gross profit from sale of the stenographic software from the time the Seelys hired Merrill Scott until the end of 2006 exceeded $25,000.000.00.  (See Aff. of Katherine N. Hansen ¶¶ 3-6.)  ASI's financial statements for 1999 and 2000 report ASI's gross sales revenue to be $4,614,594 and $4,642,784 respectively.  (See Exs. 8 & 10 to Broadbent Decl.)  Based on a review of ASI's financial statements for those two years, which report ASI's two annual royalty payments to Lennox Squire, it appears that the annual royalties ASI paid to Lennox Squire totaled approximately eighteen percent of ASI's gross sales revenue.  (See id.)  The eighteen percent figure was reached by dividing the amount of "royalties" ASI paid to Lennox Squire in 1999 and 2000 ($847,690 and $844,070 respectively) by the amount of gross sales revenues reported on the same financial statements.  (See id.)

For reasons not explained to the court, ASI did not provide the Receiver with financial information for years 2001 onward.  But if the court takes Mr. Thorne's estimates of annual gross profit for the year 2001 (when the Seelys and ASI still had beneficial use of the Software Rights before Merrill Scott assets were frozen in early 2002), the amount of "royalties" owed to the

13

Receiver for selling the software would exceed $530,000 (i.e., 18% of $2,949,565.36 gross profits for 2001). (See Hansen Decl. ¶¶ 3-6; Receiver's Mem. Supp. Mot. Summ. J. at 14.)

The Seely Claim Form reports an investment of $2,001,060.23 (of which $1,557,044, according to the claim form, constituted royalties paid to Lennox Squire). (Seely Claim Form at Pt. 4.a. & Attachment B.) Once the $2 million figure is reduced by the $250,000 the Seelys admit they received as a return from Lennox Squire in February 2000, the net "investment" on the claim form is approximately $1,751,000. (See id.) But the Receiver properly disallowed the $1,557,044 in royalty payments for the same equitable reasons he disallowed similar payments by investors (see discussion below about Equity Management Mortgages (EMMs)). The remaining allowable claim is $194,016.23. That amount is more than offset by, for example, the $530,000 ASI owed for the year 2001. And even if the Receiver were to credit the Seelys for unpaid installment payments of $250,000 each for subsequent years, 18% of their income for 2001 through 2006[10] (i.e., 18% of roughly $25 million) dwarfs any remaining allowable claim.

## ANALYSIS

This matter comes before the court on cross motions for summary judgment. Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The court

---

[10]The Seelys continued to financially benefit from the Software Rights for the period 2001 to at least 2006, even after the asset became part of the Receivership estate.

must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

What should be a relatively straightforward issue has been clouded by formalistic arguments focusing on whether the License Agreement between ASI and Lennox Squire was a valid transaction and whether a true "royalty agreement" was documented and performed.  In this equitable context, such arguments miss the point.

The court approved a plan of distribution that is based on equitable principles.  The Seelys' and ASI's formal contract law and statute of limitation arguments do not work here because they are trying to fit a round peg into a square hole (Merrill Scott's representations were a sham in a world where legal formalities were ignored and funds were commingled).

To add to the confusion, the Receiver admits that he only seeks part of the "royalties" owed to Lennox Squire and that he no longer intends to liquidate the Software Rights.  Still, as is made clearer in the Receiver's Reply Memorandum (Docket No. 1295), his pragmatic argument is consistent with the equitable considerations applied earlier in the case to similarly-situated claimants.  In essence, the Receiver seeks court approval of his decision to (a) disallow the Seelys' claim for return of the royalty payments and (b) offset the remainder of the claim with unpaid royalties still owed to the estate in return for beneficial use of the Software Rights even after Merrill Scott assets were frozen.

**The ASI/Seely Motion for Summary Judgment**

ASI and the Seelys contend that the License Agreement is not valid and enforceable and that no royalty agreement existed.  In the alternative, they assume for purposes of argument that

the License Agreement is valid and argue that the statute of limitations bars the Receiver from

bringing any claim relating to the License Agreement.  The court is not persuaded.

> To allow any individual investor to elevate his position over that of other
> investors similarly "victimized" by asserting claims for restitution and/or reclamation of specific assets ba
> misrepresentation, theft, etc. would create inequitable results, in that certain investors would
> recoup 100% of their investment while others would receive substantially less. . . .

SEC v. Elliott, 953 F.2d 1560, 1569 (11th Cir. 1992) (approving district court's decision to

disallow restitution remedy to investors seeking to trace and reclaim specific assets).  For the

same reasons the court grants the Receiver's motion (as set forth below), the ASI/Seely Motion is

denied.

## The Receiver's Motion for Summary Judgment

The Receiver "seeks a declaration on summary judgment that certain Software Rights

belong to the receivership estate, that the receivership is entitled to royalties for the use of those

Software Rights and an application of those royalties against any distributions to which the

Defendants would be entitled."  (Receiver's Mot. Summ. J. (Docket No. 1260) at 3.)  He also

states that he "does not seek for recovery of the balance of the royalties to which he may be

entitled, nor does the Receiver seek for recovery of the Software Rights."  (Id.)

The Receiver, to be consistent with his handling of analogous investor claims, has chosen

to treat the Seelys' transactions with Merrill Scott as he treated other investors' Equity

Management Mortgage (EMM) transactions with Merrill Scott.  The EMM transactions were

explained by the SEC earlier in the case as follows:

> Here, the Objecting Investors paid MSA [Merrill Scott] purportedly tax deductible
> premiums for Loss of Income ("LOI") insurance policies.  The LOI premiums
> were deposited in an MSA account and commingled with other investor funds.
> The LOIs were not purchased as genuine insurance, but rather as a vehicle to

16

make offshore, tax-free investments which were often repatriated to the investor
through an EMM.  The EMMs were issued . . . from accounts that contained
commingled funds.  The investors deducted the premium paid for the LOI,
encumbered their property through a mortgage, and deducted the mortgage
interest.  The EMM served to shield assets from creditors and to protect the asset
in litigation.  In exchange, the investors provided MSA with a trust deed on their
property.  These "friendly" mortgages created the appearance that the property
was encumbered to deter creditors from enforcing potential judgments.

(SEC Reply Mem. Supp. Mot. Approval of Plan of Partial Distribution (Docket No. 585) at 13.)

The Receiver's approach is also consistent with previous court orders resolving disputes between

the Receiver and third parties who submitted valuable assets to Merrill Scott.  As the court has

recognized on numerous occasions, equity disfavors preferential treatment when the class of

victims is essentially the same.  See Cunningham v. Brown, 265 U.S. 1, 13 (1924).

Rather than address all of the arguments in the parties' motions (most of which argue

contract law and have little to do with the reality of the situation), the court approaches the

analysis from a different perspective.

Specifically, the court considers the overall context in which the transactions occurred.

An essential component of Merrill Scott's asset protection scheme was the requirement that the

client relinquish control over key assets.  The actions of Merrill Scott and its clients were largely

based on the fiction of a "decontrolled environment" which provided clients with "plausible

deniability" (i.e., clients could either claim or deny ownership of a given asset to satisfy the

exigencies of a particular situation).  The lack of control of the assets is what made Merrill

Scott's asset protection services useful.  (See Dec. 26, 2006 Order & Mem. Decision (explaining

similar equitable reasons for disallowing claim).)

Once an asset comes within the control of a company which is subsequently placed in

receivership (as is the case with the Software Rights and Lennox Squire), that asset becomes part of the receivership estate, even if it is traceable to the original owner.  See, e.g., SEC v. Capital Consultants, LLC, 397 F.3d 733, 750 (9th Cir. 2005) (noting "broad powers and wide discretion" of district court in equity receivership, and finding no abuse of discretion in district court's conclusion that assets were in control of receivership entities and district court's decision allowing receiver to deduct value of claimant's assets before paying claim on *pro rata* basis); SEC v. Forex Asset Mgmt. LLC, 242 F.3d 325, 331-32 (5th Cir. 2001) (approving *pro rata* distribution where investors' assets were held in segregated accounts); SEC v. Credit Bancorp, Ltd., 168 F. Supp. 2d 122, 131-32 (S.D.N.Y. 2001) (holding that equity required equal treatment of claimants who would be subject to *pro rata* distribution despite evidence of asset segregation). Indeed, this court has already recognized this concept, as stated in the order approving the SEC's proposed plan of partial distribution in this case.  (See Jan. 3, 2007 Order & Mem. Decision (Docket No. 884) at 9-11.)

Contrary to the Seelys' contention, the Receiver is not stepping into the shoes of Lennox Squire.  Rather, as the court stated in its order approving the proposed plan of distribution,

> Equitable theories of relief are generally premised on the wrongdoing of the party against whom relief is sought.  "While a party may itself be denied a right of defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to a court order or operation of law." FDIC v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir. 1995).  Further, and more fundamentally, granting equitable relief to certain parties thwarts the overall equitable purpose of the receivership estate by skewing distributions from the receivership estate in favor of certain victims at the expense of other victims and not the expense of the entity that committed wrongdoing.  See [SEC v. Elliott, 952 F.2d 1560, 1569 (11th Cir. 1992)].

(Jan. 3, 2007 Order & Mem. Decision at 10.)

The Seelys and ASI have not presented any facts that distinguish them from other non-insider investors.  They are similarly situated and should be treated as such.[11]  That is, they hired MSA to take advantage of the tax, estate, and asset protection services.  They had a Master Financial Plan, which included the requirement that they "sell" the Software Rights to an IBC that would be owned by them, but over which they would have no control.  The Seelys were pursuing, among other things, the "plausible deniability" that Merrill Scott offered.  Evidence of their active participation is set out above, and includes entries on their tax returns, deposition testimony, their MFP, and their denial of ownership of the Software Rights during the Stenograph litigation (which they apparently anticipated at the time they hired Merrill Scott).

The Receiver is properly treating the Seelys in the manner that holders of Equity Management Mortgages (EMMs) have been treated, as described by the Receiver this way:

> The Seelys argue that because there was no written contract obligating them to compensate Lennox Squire for the use of the Software Rights they owe nothing for the benefits they received from the asset they transferred to Lennox Squire. This argument is without merit.  The Seelys must account to the Receiver just as those Merrill Scott clients who conveyed cash to Merrill Scott and then borrowed it back through Legacy Mortgage have been required to repay their loans, with interest, and clients who conveyed their real property to Merrill Scott and continued to occupy it have been required to pay rent for their use of the property. . . .  The royalty payments that the Seelys have included in their claim calculations are analogous to interest payments made by other Merrill Scott clients on their equity management mortgages that the Court has permitted the Receiver to disallow. . . .  Allowing the Seelys to better their position *vis a vis* other [Merrill Scott] victims by their retaining their entire claim is contrary to the maxim governing this receivership – "equality is equity."

---

[11]If anything, as the Receiver notes, "the Seelys were at a distinct advantage over their other investors, however, in that they were able to divert their asset from Lennox Squire once the nature and extent of Merrill Scott's fraud came to light and carry on their business."  (Receiver's Reply Mem. Supp. Mot. Summ. J. (Docket No. 1295) at 19.)

(Receiver's Reply Mem. Supp. Mot. Summ. J. (Docket No. 1295) at 18-19 (internal footnotes

omitted).)  And as the court held more than two years ago in this case,

> Although the specific details of each client's dealings with Merrill Scott may vary,
> the end result is the same:  <u>Merrill Scott misrepresented the manner in which it</u>
> <u>would handle the funds it received, it misrepresented the amount of control the</u>
> <u>client would retain over transferred assets, and the client suffered as a result.</u>
> <u>Given this fundamental similarity between all Merrill Scott clients, it would defeat</u>
> <u>the purposes of the receivership to allow certain claimants to gain equitable relief</u>
> <u>at the expense of other claimants</u>.  Accordingly, all objections based on theories of
> beneficial ownership of certain assets or assertions that tracing should be allowed
> must be rejected in favor of a pro rata distribution where all victims of Merrill
> Scott are treated equally.

(Jan. 3, 2007 Order & Mem. Decision (Docket No. 884) at 10-11 (emphasis added).)

Furthermore, the Seelys and ASI submitted a sworn claim form to the Receiver, in which

they characterized ASI's payments to Lennox Squire as "royalties."  (<u>See</u> Attachment B to Seely

Claim Form ("ASI made various payments to Lennox totaling $1,557,044, which ASI understood

were to be royalties due under the agreement with Lennox.").)  They should not be allowed to

take a contrary position now.

The record shows that the parties intended to, and did, transfer valuable software rights to

Lennox Squire (a Merrill Scott entity) and those became part of the Receivership Estate (i.e.,

Merrill Scott had sufficient control over the asset).  Overall, Merrill Scott and ASI/Seelys entered

into an arrangement that was loosely governed by the Seely MFP.  The purpose of that

arrangement involving the Software Rights was tax liability reduction and asset protection.  And

the Seelys had "permission" from Lennox Squire to use the Software Rights to generate income,

of which a portion would be sent back to MSA pursuant to the Seely MFP.  But because their

asset is intangible, they were able to use the Software Rights (which were an asset of the

receivership estate) and generate income even after the Merrill Scott Ponzi scheme was uncovered. Yet they did not make any payments for use of the receivership's asset.

As for the Receiver's evidence of what "royalties" are owed to the estate, the estimates are just that — estimates.  But they are based on sufficiently reliable evidence (tax returns, financial statements, testimony of CPA who prepared those documents, the sworn Seely Claim Form, and authenticated financial documents from Jeremy Thorne).  And, as the Receiver notes, even if the exact numbers are disputed, there is no doubt that the Seelys and ASI substantially profited from their continued use of the Software Rights, even as they attempted to profit from tax savings and "plausible deniability" in the Stenograph litigation.

The purpose of the Receivership is to treat all non-insider investors the same.  It would not be equitable to allow the Seelys to keep the sales income and the Software Rights and then recoup the full amount of money they deposited with (or paid to) Merrill Scott.  In essence, like the EMMs and loans, they "rented" the Software Rights, just as holders of EMMs "rented" and used the real property owned by Merrill Scott, and later the Receivership Estate.

The court, as it determines the Seelys' equitable distribution, considers the fact that the Seelys were able to recover their asset and continue to capitalize on it even after Merrill Scott assets were frozen.  Although there may be some dispute as to the exact amount of the Seelys' and ASI's liability to the estate, when their claim is properly discounted by the two royalty payments and the revenue information is deciphered from the Seelys' tax returns, financial statements, and Mr. Thorne's financial records, it becomes clear that the amount the Seelys owe the estate vastly exceeds their distribution claim.

21

## **ORDER**

For the foregoing reasons, the court approves the Receiver's decision to disallow the royalty payments of $1,557,044 and offset the remaining allowable claim with the amount owed as "royalties" for the Seelys' and ASI's beneficial use of the Software Rights.  Once the offset is applied, the Software Rights will officially revert back to ASI and the Seelys.

It is further ordered that the Receiver's Motion for Summary Judgment (Docket No. 1260) is GRANTED and the Motion for Summary Judgment filed by ASI, Greg Seely, and Portia Seely (Docket No. 1242) is DENIED.

DATED this 17th day of September, 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge

22