IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>                Plaintiff, <br><br><br>     vs. <br><br><br> MERRILL SCOTT & ASSOCIATES, LTD., et al., <br><br>           Defendants. | **CIVIL CONTEMPT ORDER** <br><br> **AND** <br><br> **MEMORANDUM DECISION** <br><br><br> Case No. 2:02-CV-39-TC |

Plaintiff Securities and Exchange Commission (SEC) seeks an order finding Defendant Patrick M. Brody in civil contempt for violation of the Final Judgment entered against him on February 8, 2011 in this securities fraud case.[1]  SEC contends that, "[d]espite having been ordered to pay disgorgement and prejudgment interest totaling $16,622,163.11, [Mr. Brody] has paid nothing and has not shown any indication that he intends to comply with the payment terms of the Court's Final Judgment . . . ."[2]  SEC further contends that Mr. Brody has acted as an unregistered broker-dealer and has committed fraud through a new securities fraud scheme, all in violation of the Final Judgment.

For the reasons set forth below, the court agrees and finds Mr. Brody in CONTEMPT of

---

[1]See Feb. 8, 2011 Final Judgment (Docket No. 1349) (entered after court granted summary judgment against Mr. Brody in May 2007 (Docket No. 977)).

[2]SEC's Mot. for Order to Show Cause (Docket No. 1388) at 1-2.

court.

## FINDINGS OF FACT[3]

### The Summary Judgment Order

On May 21, 2007, the court granted summary judgment on the SEC's claims against Mr. Brody.[4]  In that ruling, the court permanently enjoined Mr. Brody "from violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240-10b-5; Sections 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1) and (2); and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a)."[5]   The court also ordered Mr. Brody to "pay $16,622,163.11 as disgorgement fees and prejudgment interest."[6]

The Summary Judgment Order remains in full effect, on the record, and was the basis for the Final Judgment entered against Mr. Brody on February 8, 2011.[7]

---

[3]The facts are taken from the evidence submitted in the exhibits attached to the SEC's supporting memorandum (Docket No. 1389), as well as evidence presented in connection with hearings on the intertwined preliminary injunction and civil contempt matters in SEC v. Art Intellect, Inc., Case No. 2:11-CV-357-TC (D. Utah) [hereinafter "Art Intellect"], during which Mr. Brody was represented by counsel.  The evidence from Art Intellect includes declarations (see Appendix to Docket No. 3, and Docket Nos. 12, 24, 64, 70 in Art Intellect), and evidence received during the June 29, 2011, and July 12, 2011, evidentiary hearings (see Hr'g Transcripts (Docket Nos. 75, 88 in the Art Intellect case)).  In this case, Mr. Brody, through counsel, submitted opposition memoranda (see Docket Nos. 1419, 1445, 1452) and acquiesced to a decision without a hearing.  (See June 15, 2011 Order (Docket No. 1446); Third Mem. Response to Mot. for Order to Show Cause (Docket No. 1452).)

[4]See Docket No. 977.

[5]Id. at 36.

[6]Id.

[7]See Docket No. 1349.

2

**The Final Judgment**

The February 8, 2011 Final Judgment enjoins Mr. Brody and his "agents, servants,

employees, attorneys, and all persons in active concert or participation with them who receive

actual notice of this Final Judgment by personal service or other are permanently restrained and

enjoined from violating, directly or indirectly," Section 17(a) of the Securities Act of 1933 (the

"Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 15(a)(1) of the Securities

Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rule 10b-5

promulgated thereunder [17 C.F.R. § 240.10b-5].[8]   The Final Judgment defines such violations

as

> using any means or instrumentality of interstate commerce, or of the mails, or of
> any facility of any national securities exchange, in connection with the purchase or
> sale of any security; (1) to employ any device, scheme, or artifice to defraud; (b)
> to make any untrue statement of a material fact or to omit to state a material fact
> necessary in order to make the statements made, in the light of the circumstances
> under which they were made, not misleading; or (c) to engage in any act, practice,
> or course of business which operates or would operate as a fraud or deceit upon
> any person.[9]

It further prohibits use of "the mails or any means or instrumentality of interstate commerce,

directly or indirectly, to effect any transactions in, or to induce or attempt to induce the purchase

or sale of, any security unless defendant is registered in accordance with Section 15(b) of the

Exchange Act [15 U.S.C. § 78o(b)]."[10]

In addition, it clearly states that Mr. Brody "is liable for disgorgement of $13,140,000.00,

---

[8]Docket No. 1349 at 2-4.

[9]Id. at 2-3.

[10]Id. at 4.

3

representing profits gained as a result of the conduct alleged in the Complaint, together with

prejudgment interest thereon in the amount of $3,482,163.11, for a total of $16,622,163.11."

And it makes clear that payments on the Final Judgment shall be made to the Receiver David

Broadbent in a specified manner at a specified location.[11]

Mr. Brody has done none of the above despite his apparent ability to pay, as demonstrated

below.

**The Mason Hill Scheme**[12]

The SEC contends that Patrick Brody (in concert with Art Intellect (d/b/a Mason Hill and

VirtualMG) ("Mason Hill"), and his wife Laura Roser) has violated the federal securities laws

(and thus the Final Judgment injunction) by acting as unregistered broker or dealer while

fraudulently selling unregistered "investment contract" securities beginning as early as April

2009.

### The "Hassle Free" Turnkey "Mason Hill Real Estate Investment Model"

Patrick Brody and his wife Laura Roser created Mason Hill, a company that solicited

investments in real estate. Ms. Roser was the founder and president of Art Intellect, the CEO of

Mason Hill, and the founder of VirtualMG. Ms. Roser wrote and managed all of the marketing

material of Mason Hill, including the website, brochures, webinars, and press releases.[13]   Mr.

Brody controlled the operations of Mason Hill (for example, he solicited investors, recruited

---

[11]See id. at 4-5.

[12]The great majority of facts in this section are taken from the court's October 20, 2011
Preliminary Injunction Order issued in Art Intellect (Docket No. 134 in Art Intellect).

[13]See Deposition of Gregory Wood (Ex. B to Mem. Supp. Mot. Prelim. Inj. (Docket No.
64 in Art Intellect) [hereinafter "Mem. Supp."] at 19-20, 48, 60, 68, 72-73, 103.

employees, made hiring decisions, was involved in the day-to-day operations of Mason Hill,

called himself a financial director for the company, directed how funds of the company would be

spent, and was referred to as the "de-facto CEO").[14]  Representatives and employees of Mason

Hill solicited investors and acted on behalf of Mason Hill at the direction of Laura Roser and,

most importantly, Patrick Brody.[15]  In this Order, when the court refers to "Mason Hill," the term

includes Ms. Roser and Mr. Brody, whose representatives made the sales pitch at their direction.

 Mr. Brody has never been registered in any capacity with the SEC or any other securities

regulatory agency.  Yet, through Mason Hill (which Mr. Brody had a heavy hand in controlling),

he offered "The Mason Hill Real Estate Investment Model" to prospective investors, who entered

into a "Reservation Agreement" and "Real Estate Purchase Agreement" with Mason Hill.  Mason

Hill attracted approximately 75 investors and raised at least $2.5 million.  Mason Hill solicited

investors through its website, through "webinar" presentations, and through other

---

[14]See, e.g., Wood Dep. at 9-10, 38, 55, 106; Testimony of Gregory Wood as recorded in July 12, 2011 Tr. of Evid. Hr'g [hereinafter "July Tr."] (Docket No. 88 in Art Intellect) at 156-57; Decl. of Thomas Love (Ex. D to Mem. Supp.) ¶¶ 4, 12; Testimony of Thomas Love as recorded in June 29, 2011 Tr. of Evid. Hr'g [hereinafter "June Tr."] (Docket No. 75 in Art Intellect) at 14, 24-25; Decl. of Dave Young (Ex. A to Mem. Supp.) ¶¶ 2, 5; Testimony of Dave Young in June Tr. at 44, 53, 66-67; Decl. of Thomas E. Larkin (Ex. B to Mem. Supp.) ¶¶ 5, 8, 24; Testimony of Thomas Larkin in June Tr. at 92, 105; Decl. of Michael Keith (Ex. E to Mem. Supp.) ¶¶ 2-4, 6; Decl. of Ryan Reilly (Ex. 3 to Mem. Supp. Mot. re: Civil Contempt (Docket No. 24 in Art Intellect) [hereinafter "Civil Contempt Mem."]) ¶¶ 2-3; Decl. of Stacie Parker (Ex. 1 to Civil Contempt Mem.) ¶ 2, 5.

[15]See, e.g., Wood Dep. at 20, 38 ("according to Mason Hill, meaning Pat Brody and Laura [Roser]"), 55; Love Decl. ¶ 12; Love Testimony in June Tr. at 14 ("I was told by various employees that Mr. Brody was in control of everything, that they would not act without his permission. That whenever they promised me that they would do certain things and he countermanded it, that they could no longer do it[.]"); Young Decl. ¶ 2 ("[Patrick Brody] spoke of Mason Hill as his company and gave me the impression that he owned Mason Hill."); Larkin Testimony in June Tr. at 92, 104-06; Keith Decl. ¶ 3 (he was managing based on instructions from Brody); Frost Decl. ¶14; see also supra nn.13-14.

communications with investors.  Mason Hill also engaged a network of "strategic partners" to solicit investors nationwide in exchange for a "referral fee."[16]

The Mason Hill model offered a "turnkey" approach to real estate investing.  Specifically, Mason Hill claimed that it purchased distressed real estate at a low price for investors, rehabilitated the properties and secured tenants.  In addition, Mason Hill said it would collect the rents and maintain the properties, and it promised investors a "hassle free"[17] option for real-estate investing.

Mason Hill told investors that it maintained an inventory of properties in well-desired areas in Florida, Ohio, and Kansas, with increasing property values that it would sell to investors at a substantial discount.  Mason Hill represented that it acquired properties in bulk from banks, allowing it to obtain them at lower prices than could an individual investor.  Mason Hill further represented that the properties were "newer" (built in 2004 to 2007 or later) and that Mason Hill refurbished all properties to "near-new" condition, with new paint, remodeled kitchens, new appliances, and all repairs so that the properties would be attractive to tenants.

Mason Hill claimed that it had an on-site, in-house property management team that screened and placed tenants so that the properties would already be rented and the investor could

---

[16]Appendix to Mot. TRO (Docket No. 3 in Art Intellect) [hereinafter "App."] Ex. 1 at 87.

[17]On its website, Mason Hill published a brochure entitled "What Everyone Should Know About the Mason Hill Real Estate Investment Model."  (App. Ex. 1 at 74.)  It started out with the following: "How a new kind of real estate investment can produce a 14% to 26% cash-on-cash return, year after year . . . even if you never lift a finger to manage the properties, fix the properties or find a tenant. . . ."  (Id. (emphasis added).)  On the same website, under the heading "Turnkey *Cash Flow*," Mason Hill advertised a "LIVE webinar" called "The Hassle Free Investment: Generate Passive Income Through Real Estate."  (Id. at 83; see also id. at 101 ("We do it all for you.").)

immediately obtain an income stream from a purchased property.[18]  Mason Hill explained that it

would also manage the property after purchase, handle all maintenance, services, and rent

collection, and that it would provide clients with a monthly payment and cash flow report.[19]

Mason Hill promised investors returns that ranged from 10% to 30%, with monthly net rental

profits of $650 to $1000 or more.  This was touted as a passive investment, and that is what

attracted and motivated investors.  Given the nature of the investment, the incentives, and the

promised returns, any appreciation in value was of secondary importance.[20]

     Mason Hill told investors that they could reserve a Mason Hill property with a

"reservation deposit" of $20,000.  Investors were given information sheets and photographs of

specific properties that Mason Hill purportedly owned and had available.  Mason Hill created a

sense of urgency to push investors to make reservation deposits by claiming prices would be

going up soon or that there was a waiting list and the property would only be available for a short

time before someone else reserved it.  Once investors decided to invest, they executed

Reservation Agreements and sent Mason Hill $20,000 per property.  Mason Hill claimed that

---

[18]According to Mason Hill: "Reliable renters want to live in these properties – tenants
with a better track record of on-time payments, good employment history, and a clean
background.  We have an on-site property management team with a <u>waiting list of these tenants</u> –
delivering an <u>average occupancy rate of 93% for all of our properties</u>."  (Turnkey Cash Flow
brochure at 117 (emphasis added).)

[19]Although the property management services was not a requirement after the property
was purchased through Mason Hill, it was offered as an incentive to prospective investors, and it
was one of the features that attracted investors.  <u>See, e.g.</u>, Testimony of Gregory Wood in July
Tr. at 152; Love Testimony in June Tr. at 29, 33; Young Testimony in June Tr. at 47; Larkin
Testimony in June Tr. at 94, 102-03.

[20]<u>See, e.g.</u>, Love Testimony in June Tr. at 30; Young Decl. ¶ 10; Young Testimony in
June Tr. at 47, 51, 66-67.

these payments would be placed in an escrow account and applied as down payments toward the purchase of individual properties.  Mason Hill stated that transactions could be completed within 30-60 days and that investors would begin receiving monthly rental payments almost immediately thereafter.  Mason Hill also represented to investors that if they needed a mortgage for part of the purchase price, Mason Hill offered in-house seller financing or it would arrange financing of non-recourse loans from other lenders.  Mason Hill told investors that they could use IRA or 401(k) funds to purchase the properties and that it would assist with these transactions.

**Misrepresentations**

Mason Hill, in fact, did not maintain an inventory of properties that could be sold to investors.  Indeed, many investors were told that Mason Hill had purchased a specific property, only to discover later that Mason Hill had either (a) not purchased the real estate at all or (b) had purchased a different property with their funds.  Many of the properties Mason Hill purchased were not rehabilitated.  Instead, many properties were in a state of disrepair and were not in rentable condition.  Properties were sold to investors without tenants despite Mason Hill's guarantee that the properties would be rented with reliable tenants and long-term leases at the time of closing.

For example, Tom Love, an investor with Mason Hill, signed four reservation agreements for four properties offered by Mason Hill.[21]  Mr. Love gave Mason Hill a total of $80,000 in "reservation deposits."[22] After receiving Mr. Love's deposit money, Mason Hill suggested that

---

[21]Love Testimony in June Tr. at 8.

[22]<u>Id.</u>

8

Mr. Love buy four properties in Florida.[23]  Mr. Love, after reviewing the properties, decided to accept two of the properties and rejected two others. The two properties accepted by Mr. Love, to his surprise, were withdrawn without explanation.[24]

After Mason Hill withdrew the properties and failed to present other properties, Mr. Love reluctantly became a private lender in the amount of the reservation deposits he had already given to Mason Hill.[25]  Mr. Love accepted the private lender agreement for the $80,000 with the expectation that the amount would be repaid with interest.[26]  Mr. Love received six months of payments, totaling approximately $6,800. The payments suddenly stopped. When Mr. Love contacted Mason Hill regarding its failure to make payments to him, various Mason Hill employees told him that Mr. Brody was in control of everything.[27]  In fact, Mr. Brody made the decision to withdraw the properties originally offered to Mr. Love.[28]  Subsequently, Mr. Love discovered that many of the properties previously offered to him were either given to other Mason Hill investors or were not owned by Mason Hill.[29]

During a visit to Florida, Mr. Love discovered that the properties were built decades

---

[23]Id. at 9.

[24]Id.

[25]Id. at 10.

[26]Id. at 11.

[27]Id. at 14.

[28]Id. at 14, 24-25.

[29]Id. at 26.

earlier.[30]   In fact, Mr. Love discovered that none of the properties offered to him was "like new," as Mason Hill represented.[31]   For example, one of the properties was in a state of disrepair – "like a war zone [] with all the trash and junk all around."[32]   Other properties offered did not have the sewer connected, required air conditioning units and significant landscaping.[33]   Most importantly, the properties were not suitable for occupancy by tenants.[34]

Mr. Love had expected to profit from his initial investment of $80,000 with Mason Hill.[35]   His expectations were a direct result of Mason Hill's and its employees' representations to him through various webinars, the national sales manager, Bruce Bowen, the strategic partner director, Steve Saunders, and Michael Keith.[36]   Investors like Love, in turn, expected a passive investment.[37]   Mason Hill promised to find renters and have properties occupied before the property was turned over to the investor. Investors expected to incur no effort in maintaining the property.[38]

---

[30]Id. at 16.

[31]Id. at 21.

[32]Id.

[33]Id. at 23.

[34]Id. at 21.

[35]Id. at 19.

[36]Id. at 20.

[37]Id. at 30.

[38]Id. at 29.

David Young, another investor with Mason Hill, met Mr. Brody in 2009.[39]  Initially, Mr. Brody provided flyers to Mr. Young and actively promoted Mason Hill.  Mr. Brody represented that the real estate owned by Mason Hill was "phenomenally cheap," in good condition, and easy to rent.[40]  Mr. Brody described Mason Hill as a turnkey operation, involving new or like-new properties that could rent for between $625 and $650 a month per unit.[41]  Mr. Brody presented Mason Hill as a "passive investment" in which (1) the investor gives money; (2) Mason Hill manages everything; and, (3) the investor, in turn, generates a return on the investment.[42]  The return was to come from the rents on the properties; any appreciation in the value of the properties was considered merely fortuitous.[43]

Mr. Young purchased thirteen duplex properties.[44]  Mason Hill did not originally own, as represented, many of the thirteen properties later purchased by Young. Rather, Mason Hill would purchase the property shortly after entering into an agreement with the investor.[45]  Some of the properties were switched. Mason Hill would promise certain properties, sign agreements, but purchase different properties.[46]

---

[39]Young Testimony in June Tr. at 48.

[40]Id. at 49.

[41]Id. at 50.

[42]Id. at 51.

[43]Id. at 52.

[44]Id. at 39.

[45]Id. at 41.

[46]Id. at 42.

The rental income, as Mr. Young subsequently learned, was overstated. Young periodically received a monthly rent roll indicating rented properties and the income generated from those properties.[47]  Young relied on the accuracy of the rent rolls.  In reality, little was going as planned.  In particular, one property was left completely unfinished, requiring nearly $75,000 in work.[48]  Yet Mason Hill represented to Young, through the rent rolls, that the unfinished property was generating rent.[49]  Indeed, there were no tenants, and the putative rent payments were falsified by Mason Hill to mislead Mr. Young and other investors.

Thomas Larkin is the former CEO of Mason Hill.  During his tenure at Mason Hill, Mr. Larkin became aware of a number of misrepresentations that Mason Hill, through its employees and marketing materials, was making to investors, including (1) the promise of a 12 to 14 percent return; (2) that Mason Hill owned the properties offered; and, (3) that Mason Hill had credit lines with lenders.[50]

Mr. Larkin personally conducted an audit of all Mason Hill properties. As a result of the audit, he discovered that 30% of properties were unoccupied and another 20% were tenanted but with tenants not paying rent.[51]  Five to eight properties were in serious disrepair. Several properties listed on internal Mason Hill documents as belonging to a specific investor, in reality,

---

[47]Id. at 43.

[48]Id. at 46.

[49]Id.

[50]Larkin Testimony in June Tr. at 74; Larkin Decl. ¶ 22.

[51]June Tr. at 93.

did not.[52]  Properties purchased by Mason Hill were often obtained by simultaneous closings in which Mason Hill purchased the property on the same day that it sold the property to an investor.[53]

Initially, Mr. Larkin had a difficult time obtaining Mason Hill's records.[54]  After pressuring Mr. Brody and Ms. Roser for information and documentation, Mr. Larkin formed a better understanding of the extent of the fraud.[55]  Mr. Larkin's scrutiny of Mason Hill's records revealed that Mr. Brody and Ms. Roser's expenses were lumped under a marketing payment to a related company, VirtualMG.[56]  Mr. Larkin approached Ms. Roser to discuss the fraudulent operation of Mason Hill.  Following the conversation, in which Ms. Roser, indifferent, directed Mr. Larkin's concerns to Mr. Brody, Mr. Brody admonished Mr. Larkin for bringing the issues up with Ms. Roser.[57]  Mr. Brody claimed to be the "de facto C.E.O. . . . in charge of Mason Hill for 22 months" and that all conversations concerning Mason Hill's financial situation were to be had with him.[58]  During their conversation, Mr. Larkin spoke with Mr. Brody about the the fraudulent nature of Mason Hill's operation, exorbitant personal expenses of Mr. Brody and Ms. Roser, and cited several misuses of escrowed investor funds by Mr. Brody and Ms. Roser,

---

[52]Id. at 97.

[53]Id. at 98.

[54]Id. at 75.

[55]Id.

[56]Id.

[57]Id. at 105.

[58]Id.

including a hot tub, personal assistants' salaries, an extravagant trip to New York and restoring cars.[59]

Gregory Wood, a former president of Mason Hill, testified that many of the representations made in Mason Hill's website and elsewhere were false or misleading. Mason Hill never purchased properties in bulk at discounts. In fact, Mason Hill purchased properties individually at the same price at which an individual investor could obtain the properties. Consequently, investors did not receive steep discounts on the properties as Mason Hill and its employees and/or agents represented. Mr. Wood admitted that Mason Hill often did not own properties advertised on its website as available.

Mr. Wood testified that not all properties were "turnkey" ready, because the properties were not refurbished to "near-new" condition, as represented. He also testified that Mason Hill had outsourced property management to other companies, even though the website stated it had in-house, on-site property management. Mr. Wood admitted that Mason Hill was not able to "line up" financing or provide seller financing, as was represented on the website and elsewhere. Mr. Wood further stated he had previously discussed the website and the misleading statements with Ms. Roser. Ms. Roser wrote and was responsible for all the marketing materials and programs for Mason Hill, including the website, brochures, and webinars. In spite of this, Ms. Roser refused or failed to make changes to the website and other marketing materials so that the representations were not misleading.

---

[59]Id. at 107.

**Commingling and Improper Use of Investor Funds**

Investor funds were commingled and later used for the personal expenses of Mr. Brody. Mason Hill told investors that once they reserved a property and paid a reservation deposit, the funds would be placed in escrow and applied to the purchase price of the property at closing. Rather than placing funds in escrow, Mason Hill commingled reservation deposits with Mason Hill's operating accounts. Investor funds were used to pay Mason Hill's operating expenses, sales commissions, and the lavish personal expenses of Mr. Brody. These personal expenses included trips to New York, Florida, Las Vegas and San Diego, cruises, rare book purchases, Mr. Brody's house and car payments, a hot tub, and the payments on a Cadillac CTS used exclusively by Mr. Brody's criminal defense lawyer.

**Ponzi Scheme**

Mason Hill operated as a Ponzi scheme.[60] Returns to investors were funded from the principal sums of newly-attracted investors. Later investor funds were used to purchase properties for earlier investors and to make putative profit payments to earlier investors, even when properties had not been purchased or rented as promised. In fact, Mason Hill did not complete transactions as promised for a number of investors. Mr. Brody maintained that Mason Hill was entitled to do whatever it wanted with investor deposits because the deposits were non-refundable.[61]

Thomas Larkin testified that while he worked at Mason Hill, he became convinced that

---

[60]See, e.g., Wood Dep. at 10, 30-32, 39, 50-51, 77-79, 172; Larkin Decl. ¶¶ 21-23; Larkin Testimony in June Tr. at 75-77 (discussing profit and loss statement), 93; Keith Decl. ¶¶ 2, 5, 7, 10-11; Young Decl. ¶ 16; Young Testimony in June Tr. at 68.

[61]See, e.g., Wood. Dep. at 55; Larkin Testimony in June Tr. at 92; Keith Decl. ¶ 4.

Mason Hill was operating as a Ponzi scheme. Mr. Larkin determined that Mason Hill was operating as a Ponzi scheme when Patrick Brody directed him to use funds from new investors to purchase properties for earlier investors. Based on this knowledge, Mr. Larkin concluded Mason Hill could not continue as a profitable operation, and he resigned from Mason Hill.[62]

In April 2011, the SEC shut down Mason Hill, and the court transferred control of Mason Hill to a court-appointed receiver.

## CONCLUSIONS OF LAW

The court finds that the SEC has proven by clear and convincing evidence that Patrick Brody is in contempt of court (1) for failure to make any effort to pay the judgment,[63] and (2) for acting as an unregistered broker and committing fraud in connection with the offer, sale or purchase of securities, a direct violation the portion of the judgment enjoining him from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

---

[62]His tenure with Mason Hill, from approximately August to October 2010, was brief. He left Mason Hill based on his concerns of personal liability stemming from his liability to "effect a business model that was not bordering on fraudulent." (June 29, 2011 Tr. at 72.)

[63]This contempt order does not apply to the $110,000 third-tier penalty imposed by the court against Mr. Brody. As SEC notes in its supporting memorandum, the SEC "is not seeking to hold Brody in contempt for non-payment of the civil penalty because a civil penalty is considered a debt as defined in the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001, et seq., and therefore is enforceable exclusively under that statute." (Mem. Supp. (Docket No. 1389) at p. 2 n.1.)

**Contempt Standard**

Under federal law, the court has inherent power to coerce compliance with its orders,

sanction behavior constituting fraud on the court, and vindicate its authority in the face of

contumacious behavior.

> [I]t is firmly established that the power to punish for contempts is inherent in all
> courts.  This power reaches both conduct before the court and that beyond the
> court's confines, for the underlying concern that gave rise to the contempt power
> was not merely the disruption of court proceedings.  Rather, it was disobedience
> to the orders of the Judiciary, regardless of whether such disobedience interfered
> with the conduct of trial.

Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) (internal citations, omissions, and quotation

marks omitted).  Congress codified the court's authority in the United States Code:

> A court of the United States shall have power to punish by fine or imprisonment,
> or both, at its discretion, such contempt of its authority, and none other, as—
> . . .
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or
> command.

18 U.S.C. § 401.  See also Fed. R. Civ. P. 70 (in proper cases, court may adjudge a party in civil

contempt for failure to perform specific acts required by a judgment).

Civil contempt is remedial and is intended to coerce compliance with an order of the

court.  McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949); United States v. Lippitt,

180 F.3d 873, 876-77 (7th Cir. 1999) (citing Hicks v. Feiock, 485 U.S. 624, 631-32 (1988))

("[C]ontempt is considered civil if the sanction imposed is designed primarily to coerce the

contemnor into complying with the court's demands and criminal if its purpose is to punish the

contemnor, vindicate the court's authority, or deter future misconduct."); cf. Int'l Union, United

Mine Workers of Amer. v. Bagwell, 512 U.S. 821, 829 (1994) (expanding remedial purposes to

17

include losses sustained, not merely future compliance).  In a civil contempt matter, the

defendant can purge himself or herself of the contempt at any time.  Shillantani v. U.S., 384 U.S.

364, 370-71 (1966).

In the Tenth Circuit, "[t]o prevail in a civil contempt proceeding, the plaintiff has the

burden of proving, by clear and convincing evidence, that a valid court order existed, that the

defendant had knowledge of the order, and that the defendant disobeyed the order." Reliance Ins.

Co. v. Mast Constr. Co., 159 F.3d 1311, 1315 (10th Cir. 1988) (citations omitted). "Civil

contempt may be used 'to compensate the contemnor's adversary for injuries resulting from the

contemnor's noncompliance' with a court order."  Reliance, 159 F.3d at 1318 (quoting O'Connor

v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1211 (10th Cir. 1992)). Moreover, civil

contempt does not depend on the state of mind or on the presence of good faith on the

defendant's part, i.e., "intent" is not an element.  In re Crystal Palace Gambling Hall, Inc., 817

F.2d 1361, 1365 (9th Cir. 1987); see also Donovan v. Mazzola, 716 F.2d 1226, 1240 (9th Cir.

1983) (holding that "good faith" is no defense).  Finally, "[i]n a civil contempt proceeding, once

a plaintiff has established the elements of contempt by clear and convincing evidence, it need

only prove damages by a preponderance of the evidence."  Reliance, 159 F.3d at 1318.

Once the SEC has met its initial burden, the burden shifts to the defendant to come

forward with evidence showing "categorically and in detail" why he is unable to comply with the

court's order.  U.S. v. Rylander, 460 U.S. 752, 755 (1983).  And he must establish that he has

made, in good faith, all reasonable efforts to meet the terms of the court order.  CFTC v.

Wellington Precious Metals, Inc., 950 F.2d 1525, 1529-30 (11th Cir. 1992).  The burden shifts

back to the SEC only upon "clearly established" evidence presented by the alleged contemnor

18

that he is unable to comply.  Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).

**The SEC Has Satisfied Its Burden.**

       **A Valid and Sufficiently Detailed Order Existed.**

On May 21, 2007, the court granted summary judgment on the SEC's claims against Mr.

Brody.[64]  On February 8, 2011, the court entered a Final Judgment against Mr. Brody.[65]  Mr.

Brody has not appealed the summary judgment order or the Final Judgment, and no stay has been

issued that would allow Mr. Brody to ignore the mandate of the court.

The content of the Final Judgment and the preceding summary judgment order is detailed

above.  There can be no genuine doubt about what conduct was required, what conduct was

prohibited, and which securities laws were at issue.

Because the Final Judgment is valid and sufficiently detailed in defining what conduct is

prohibited, the first element of contempt has been established.

       **Mr. Brody Had Ample Notice of the Final Judgment.**

As the court record indicates, both the order granting summary judgment and the Final

Judgment were properly served on Mr. Brody.  There can be no genuine doubt that Mr. Brody

had sufficient notice of the summary judgment order and the Final Judgment.

       **The SEC Has Established Mr. Brody's Contumacious Behavior and Disobedience by Clear and Convincing Evidence.**

          Failure to Make Any Effort to Pay Judgment

Mr. Brody has failed to make any attempt to pay the required disgorgement and

---

[64]See Docket No. 977.

[65]See Docket No. 1349.

19

prejudgment interest, as well as post judgment interest due thereon.  The lack of any payment

made pursuant to the Final Judgment, despite his ability to pay at least a portion of the sums due,

is clear and convincing evidence that Brody has not been diligent in complying with the court's

order.

<u>Violations of the Securities Laws and the Final Judgment</u>

Mr. Brody is also in contempt of the portion of the judgment enjoining him from

violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)]

and Sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act")

[15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rule 10b-5 promulgated thereunder [17 C.F.R.

§ 240.10b-5].  These provisions prohibit acting as an unregistered broker or committing fraud in

connection with the offer, sale or purchase of securities.  Mr. Brody's actions demonstrate, by

clear and convincing evidence, that he was fraudulently soliciting securities from investors in

violation of the Final Judgment.

*Mr. Brody Sold Investment Contracts as Defined By <u>Howey</u>.*

Mason Hill, through its employees and control persons, offered investment contracts in

the form of reservation and purchase agreements. An investment contract is a security if it

involves (1) investment of money; (2) in a common enterprise; (3) with profits derived solely

from others' efforts.  <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 301 (1946).  The elements of

<u>Howey</u> are satisfied here.

First, investors unquestionably invested money with Mason Hill. The Reservation

Agreements required investors to transfer at least $20,000 to Mason Hill in order to secure the

opportunity to purchase a property. Investors advanced money to Mason Hill to buy properties

Mason Hill had found. In fact, Mason Hill marketing materials and employees actively portrayed

Mason Hill as a portfolio-quality investment. Mason Hill investors ultimately committed their

money, a sum of at least $20,000 per property, in order to gain the promised 10% to 30% return

on their investments.

Second, a common enterprise existed.  The Tenth Circuit has held that the determination

of whether a common enterprise exists is not based solely on the presence of either horizontal or

vertical commonality.  The Tenth Circuit has rejected such "rigid" requirements and instead, the

"economic reality" is examined so that when a transaction, in substance, involves an investment,

the common enterprise will be present.  McGill v. Am. Land & Exploration Co., 776 F.2d 923,

925 (10th Cir. 1985) (citing Tcherepnin v. Knight, 389 U.S. 332, 336 (1967)).  The "determining

factor of a common enterprise and the economic reality of the transaction is whether or not the

investment was for profit." Campbell v. Castle Stone Homes, Inc., Case. No. 2:09-CV-250-TS,

2011 WL 902637 *4 (D. Utah Mar. 15, 2011).

Here, the economic realities demonstrate that the common enterprise element is met.

Mason Hill coupled the sale of real estate with Mason Hill's management to generate promised

returns.  Mason Hill offered a free year of management services as added value for investors.

Mason Hill, in brief, touted itself as a hassle-free investment.  Its website claimed that it

presented a "turnkey cash flow real estate investment." Mason Hill told investors they would

receive annual returns of between 10% and 30% and represented that investors would see

immediate cash flow of at least $650 per month. Mason Hill represented to investors that it

would generate profits through Mason Hill's simple, five-step approach to real estate investing.

Mason Hill's literature was replete with diagrams, charts and step-by-step illustrations presenting

Mason Hill as a passive investment.  Furthermore, Mason Hill commingled investor funds –
including reservation deposits – in common accounts. Consequently, the common enterprise
element of the Howey test is satisfied.

Finally, Howey's third element is established because the profits from the investment
were to be derived solely from the efforts of Mason Hill.  Investors had no role in the selection of
the properties and provided nothing beyond their principal investment.  Mason Hill found the
properties, selected the tenants, provided all property management services and sent out the
monthly checks.  Investors had no role in the investment decisions and provided nothing beyond
funding.  The investors expected to make a profit on the investment with Mason Hill.

*Mr. Brody made false statements and omissions of material facts in
connection with the sale of securities.*

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] prohibits persons, in the offer or
sale of a security, from employing any device, scheme or artifice to defraud; obtaining money or
property through materially false or misleading statements or omission of material facts; or
engaging in any transaction, practice, or course of business which operates as a fraud or deceit.
United States v. Naftalin, 441 U.S. 768, 772-73 (1979).  Section 10(b) of the Exchange Act and
Rule 10b-5 prohibit similar conduct in connection with the purchase or sale of a security.
Section 10(b) was designed to prevent all manner of fraudulent practices. Chiarella v. United
States, 445 U.S. 222, 226 (1980); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201 (1976);
Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); SEC v. Capital Gains
Research Bureau, Inc., 375 U.S. 180, 186 (1963).

Mr. Brody's misrepresentations and omissions of fact are numerous and significant. His

failure to inform investors that investor money would subsidize the his profligate lifestyle is a material omission of fact.  Indeed, as a part of the Mason Hill scheme, Mr. Brody solicited IRA and 401(k) retirement funds from investors – funds which were dissipated on his personal bills and extravagant expenditures.

Mason Hill's claims that investor reservation deposits were held safely in escrow was a material misrepresentation of fact.  Mason Hill transferred investor funds from the escrow accounts, commingling the money with Mason Hill's general operating accounts. Unbeknownst to investors, these funds were used to pay Mason Hill's operating expenses, sales commissions and Mr. Brody's and his wife's personal expenses.  Mason Hill also used new investor funds to purchase properties for some earlier investors and to make the promised profit payments to earlier investors – a classic Ponzi scheme.

Mason Hill's marketing strategy was misleading.  Misrepresentations were made to investors regarding high monthly returns through a "turnkey" approach to real estate investing. Mason Hill promised investors "turnkey" ready properties, refurbished to "near-new" condition. That was false.  Many of the properties purchased by Mason Hill were not rehabilitated, but were in various states of disrepair and often unsuitable for tenancy.  Nevertheless, Mr. Brody, his wife, and their employees and/or strategic partners promised investors returns, varying from 10% to 30%, with monthly net rental profits of at least $650 to $1000.

The property selection process, the pretext that Mason Hill maintained on-site property management and even claims of an inventory of property purchased in bulk to provide investors discounts were all further misrepresentations Mason Hill made during solicitation of funds. Mason Hill provided information sheets and photographs of specific properties purportedly

owned by Mason Hill and available for purchase.  Often, Mason Hill had either not purchased the real estate at all or had purchased a different property using investor funds.  Mason Hill also claimed to maintain an in-house property management team.  The management team was to screen and place tenants and ensure the timely occupancy of properties to obtain an immediate income stream for investors.  In reality, it did not maintain an on-site management team.

Finally, Mason Hill misrepresented to investors that Mason Hill held an inventory of available properties. Mason Hill claimed it had acquired the alleged properties in bulk from banks and/or REOs at prices not available to individual purchasers.  Not only was there was no inventory of properties, Mason Hill had never purchased properties in bulk.  In fact, Mason Hill provided no discounts for investors, because it actually purchased properties individually – and at the same price at which the properties could be obtained by an individual investor. Often, Mason Hill participated in simultaneous closings in which it would acquire a property and immediately sell it to an investor. Mason Hill did not disclose this practice to its investors.

*Mr. Brody's Misrepresentations and Omissions were Material.*

Information is material if a substantial likelihood exists that the facts would have assumed actual significance in the investment deliberations of a reasonable investor.  Basic Inc. v. Levinson, 485 U.S. 224, 234-36, 240 (1988).  Misrepresentations regarding the use of investors' funds are material.  See SEC v. Cochran, 214 F.3d 1261, 1268 (10th Cir. 2000) (information implicating the fair market value would be material to a reasonable investor); Everest Sec., Inc. v. SEC, 116 F.3d 1235, 1239 (8th Cir. 1997) (holding that it would be material to an investor to know that the offering company's existing project had been abandoned, that none of its asset value was to be recouped.)  Similarly, investors would consider it important to

24

know their funds were being misappropriated and used for purposes other than those stated when solicited. <u>SEC v. TLC Invs. & Trade Co.</u>, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001).

Here, as described above, Mr. Brody made misrepresentations and omissions regarding the use of the investors' funds and failed to disclose that such funds were being misappropriated and used for purposes other than those stated when solicited. Mason Hill misrepresented to investors that their funds would be placed in escrow, when in reality the funds were misappropriated by Mr. Brody and his wife or directed towards Mason Hill's day-to-day operations. There is a substantial likelihood that such information would have assumed actual significance in the investment deliberations of the Mason Hill's investors. The misrepresentations and omissions, therefore, are material.

*Mr. Brody Acted With Scienter.*

Scienter is an element of violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5, but is not a required element of a violation of Sections 17(a)(2) or 17(a)(3) of the Securities Act. <u>Aaron v. SEC</u>, 446 U.S. 680, 696-97 (1980). The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." <u>Ernst & Ernst</u>, 425 U.S. at 193 n.12. Reckless conduct has been held to satisfy the scienter requirement. <u>Edward J. Mawod & Co. v. SEC</u>, 591 F.2d 588, 595-97 (10th Cir. 1979).

Mr. Brody acted with the requisite scienter. Mr. Brody was involved in the operations of the business, with significant decision-making power. Mr. Brody, among other things, misrepresented to investors the nature of their investment, namely that Mason Hill invested in real estate in well-desired areas, offered steep discounts, high returns and provided the safety of

investor funds.  Mason Hill touted itself as a hassle-free approach real estate investing.  Mr.

Brody knowingly misappropriated investors' monies, including funds from IRA and 401(k)

accounts.  He caused and/or instructed the transfer of investors' funds to VirtualMG, a front

company Ms. Roser owned and controlled, in order to pay for his and his wife's personal

expenses. Company managers confronted both Mr. Brody and Ms. Roser with evidence of

wrongdoing; however Mr. Brody and Ms. Roser chose to ignore the evidence. Ultimately, Mr.

Brody knowingly operated a classic Ponzi scheme for his personal benefit.

The court notes that it draws an adverse inference from Mr. Brody's invocation of his

Fifth Amendment Privilege.  He refused to answer any substantive questions during his

deposition in Art Intellect.  The United States Supreme Court has held that, "the Fifth

Amendment does not forbid adverse inferences against parties to civil actions when they refuse

to testify in response to probative evidence offered against them[.]"  Baxter v. Palmigiano, 425

U.S. 308, 318 (1976).  "'Failure to contest an assertion . . . is considered evidence of

acquiescence . . . if it would have been natural under the circumstances to object to the assertion

in question.'" Id. at 319 (quoting United States v. Hale, 422 U.S. 171, 176 (1975)).

Mr. Brody's silence and failure to contest the SEC's assertions is evidence of his

acquiescence to the fact that he was conscious of Mason Hill's fraudulent activities and his active

involvement in the scheme to defraud Mason Hill investors and that he knowingly and purposely

defrauded investors.

*Mr. Brody Used the Means and Instrumentalities of Interstate Commerce*

Mr. Brody used the requisite jurisdictional means to effectuate the fraud.  In Pereira v.

United States, 347 U.S. 1, 8-9 (1954), the United States Supreme Court noted that the

26

"jurisdictional means" element is satisfied if a defendant knows that the use of mail or of wire

services was a reasonably foreseeable consequence of a scheme. "All that is required to establish

a violation of [Section 17(a), Section 10(b) or Rule 10b-5] is a showing that a means,

instrumentality or facility of a kind described in the introductory language of th[e] section was

used, and that in connection with that use an act of a kind described [in the relevant section]

occurred." Matheson v. Armbrust, 284 F.2d 670, 673 (9th Cir. 1960); accord United States v.

Tallant, 547 F.2d 1291, 1297 (5th Cir. 1977). Here, Mr. Brody made use of the mails, the

Internet and the telephone to solicit investments. Funds were wired to Mason Hill bank accounts

and subsequently used to make rental payments to investors. That is all that is required.

**Conclusion**

Mr. Brody has two overall obligations under the Final Judgment. He must pay back his

ill-gotten gains. Second, he must refrain from engaging in conduct that would violate the federal

laws protecting citizens from securities fraud. The information produced by the SEC shows that

he has done just the opposite. The Preliminary Injunction Order in Art Intellect directly ties Mr.

Brody to the Mason Hill scheme. That scheme began as early as 2009, a significant time after

the court had issued its order finding that Mr. Brody violated federal securities laws and

enjoining him from engaging in such activity. The Final Judgment solidified what has been clear

for years. Yet Mr. Brody blatantly and cavalierly ignored the admonition.[66]

The SEC requests that the court find contempt and order immediate compliance with the

securities law provisions listed in the Final Judgment. It also seeks an order requiring Mr. Brody

---

[66]Indeed, this court recently found Mr. Brody in contempt in the Art Intellect case as well.
See Nov. 15, 2011 Civil Contempt Order & Mem. Decision (Docket No. 152 of Art Intellect).

to disgorge all monies he has received as a result of his violations of the Final Judgment.

The SEC's proposed remedy is complicated by a number of factors.  First, Mr. Brody, is currently serving a ten-month federal sentence (he self-surrendered on July 1, 2011), which sentence was imposed after a jury convicted him of failure to file a tax return.  (See Indictment pp. 9-10 in United States v. Brody, Case No. 2:08-CR-410 (D. Utah) (hereinafter "U.S. v. Brody"); Jury Verdict (Docket No. 223) in U.S. v. Brody.)  He faces approximately six more months in prison.  (See May 6, 2011 Minute Entry (Docket No. 302) in U.S. v. Brody.)  Second, the SEC has shut down Mason Hill through its civil enforcement action in Art Intellect, in which the court issued an order freezing Mr. Brody's personal assets and appointing a receiver to marshal Mason Hill assets for investors defrauded in that matter.

At this date (the SEC originally moved for a finding of contempt before Mr. Brody began serving his sentence), it is not clear what, if any, securities-related activity Mr. Brody is currently pursuing, given that he is incarcerated.  He has already been enjoined and ordered to refrain from violating the securities laws.  His assets are frozen through a court order in Art Intellect, and those assets from which he may be able to disgorge monies are subject to the Receivership in Art Intellect.  Accordingly, the court directs the SEC to submit a brief to the court with suggestions on the most appropriate remedy at this time.

**SEC's Request for Fees and Costs**

The SEC contends that, upon a finding of contempt, it is entitled to an award of the costs and fees incurred by it in prosecuting this contempt action.  The SEC's memorandum does not engage in analysis about why the SEC, a government agency, is entitled to attorneys' fees and costs.  Accordingly, that portion of the motion is denied without prejudice.  If the SEC wishes to

28

present a more substantial analysis of why the SEC is entitled to fees and costs, the court will consider the motion.

## ORDER

For the reasons set forth above, **the court finds PATRICK M. BRODY in CONTEMPT OF COURT** for violation of the Final Judgment, and the court **ORDERS** as follows:

1.      The SEC's motion seeking an order holding Patrick Brody in civil contempt (Docket No. 1388) is GRANTED (with the exception of the request for fees, which is denied without prejudice) as stated in detail above.

2.      The SEC is hereby directed to file a brief with the court, within 30 days from the date of this order, in which the SEC shall provide guidance to the court on appropriate remedies under the circumstances.  Mr. Brody may file a response to the SEC's brief within 30 days of the SEC's filing of that brief.  The SEC may then reply within 14 days of the filing of Mr. Brody's opposition, if any.

SO ORDERED this 21st day of November, 2011.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

29